# Ballard Spahr
### LLP

– – – – – – – – – – – – – – – – – – – –
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
TEL 215.665.8500
FAX 215.864.8999
www.ballardspahr.com

Michael Berry
Tel: 215.988.9773
berrym@ballardspahr.com

August 20, 2025

*Via ECF*

Patricia S. Dodszuweit
Clerk of Court
U.S. Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106

Re:    *Atlas Data Privacy Corp. v. We Inform, LLC, et al.*, No. 25-1555 through
       25-1578; 25-1580 through 25-1593; 25-1676; and 25-1677
       Notice of Supplemental Authority Pursuant to Fed. R. App. P. 28(j)

Dear Ms. Dodszuweit:

We write to notify the Court of yesterday's decision in *Jackson v. Whitepages, Inc.*, No. 1:24-cv-80 (N.D. W. Va.) (attached as Exhibit A), striking down a provision of West Virginia's Daniel's Law, W. Va. Code § 5A-8-24(e), as facially unconstitutional under the First Amendment. That provision created a cause of action for covered persons whose addresses and phone numbers are disclosed without their written permission where "a reasonable person would believe that providing such information would expose another to harassment or risk of harm to life or property." Four aspects of *Jackson* bear emphasis.

First, the court held the prohibition on the disclosure of addresses and phone numbers was "undoubtedly a content-based restriction" on noncommercial speech subject to strict scrutiny. Ex. A at 17, 20-22, 31.

Second, in holding strict scrutiny was "the proper framework," *id.* at 31, the court rejected each argument Appellees raise in this appeal, *id.* at 18-31 (rejecting, for example, arguments for reduced scrutiny based on history and *Vidal*, some "special consideration as a law protecting privacy," and the *Florida Star* line of cases).

Third, the court held West Virginia's law was "not the least restrictive means" because similar laws are "more narrowly tailored and burden far less

Patricia S. Dodszuweit
August 20, 2025
Page 2

speech." *Id.* at 33-35.  In particular, West Virginia's is the only law that allowed for money damages without first requiring a covered person to seek injunctive relief or submit a nondisclosure notice.  *Id.* at 37.  Although the court contrasted that law's lack of a notice requirement with the notice requirement in New Jersey's law, New Jersey's law differs from West Virginia's in material ways that *Jackson* had no need to address, including its sweeping prohibition on disclosure in all circumstances, mandatory damages award, and unique assignment provision.

Finally, the court emphasized that, "even beyond its lack of a notice requirement," West Virginia's law "lacks a knowledge requirement," an important "speech-protective limit" New Jersey's law likewise lacks.  *Id.* at 40-42.  Without this limit, New Jersey's law impermissibly chills speech, *id.* at 40, an effect compounded by the law's imposition of strict liability.

Respectfully submitted,

*On behalf of All Defendants-Appellants*

*/s/ Michael Berry*
Michael Berry
Marcel S. Pratt
Anna Kaul

*Attorneys for Defendants-Appellants*
*Thomson Reuters Enterprise Centre GmbH*
*and West Publishing Corporation (No. 25-1570)*

Word Count:  343

cc:  All Counsel of Record (via ECF)

Exhibit A

# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF WEST VIRGINIA
# AT CLARKSBURG

MICHAEL JACKSON,
   on behalf of himself and
   all others similarly situated,
      Plaintiff,

v.

WHITEPAGES, INC.,

     Defendant.

Civil Action No. 1:24-cv-80

---

MICHAEL JACKSON,
   on behalf of himself and
   all others similarly situated,
      Plaintiff,

v.

LEXISNEXIS RISK
SOLUTIONS, INC.,

     Defendant.

Civil Action No. 1:24-cv-81

---

MICHAEL JACKSON,
   on behalf of himself and
   all others similarly situated,
      Plaintiff,

v.

THOMSON REUTERS
AMERICA CORP.,

     Defendant.

Civil Action No. 1:24-cv-88

---

1

**MICHAEL JACKSON,**
  on behalf of himself and
  all others similarly situated,
          Plaintiff,

v.                                                    Civil Action No. 1:24-cv-96

**THRYV, Inc.**

          Defendant.

---

**MICHAEL JACKSON,**
  on behalf of himself and
  all others similarly situated,
          Plaintiff,

v.                                                    Civil Action No. 1:24-cv-102

**PEOPLECONNECT, INC., et al.**

          Defendants.

---

## <u>MEMORANDUM OPINION</u>

This matter is before the court on a consolidated motion to dismiss filed by each of the defendants in the above-captioned cases. Plaintiff Michael Jackson filed class action complaints against these defendants in West Virginia state court alleging violations of a West Virginia statute known as Daniel's Law. Section E of West Virginia's Daniel's Law provides a cause of action for damages and prohibits "disclos[ing], redisclos[ing] or otherwise mak[ing] available the home address or unpublished home or personal telephone number of any active, formerly active, or retired judicial officer, prosecutor, federal or state public defender, federal or state assistant public defender, or law-enforcement officer under circumstances in which a

reasonable person would believe that providing such information would expose another to harassment or risk of harm to life or property." W. Va. Code § 5A-8-24(e). Jackson, a retired law enforcement officer, is suing on behalf of himself and thousands of other judicial and law enforcement officers whose information is displayed on defendants' "people search" websites.

Defendants successfully removed these cases to federal court on the basis of diversity jurisdiction and the Class Action Fairness Act. Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Defendants argue that Section E of West Virginia's Daniel's Law is facially unconstitutional under the First Amendment, as incorporated through the Fourteenth Amendment, because it is a content-based regulation of speech that cannot survive strict scrutiny. Defendants also argue that Section E of West Virginia's Daniel's Law is facially unconstitutional under the Due Process Clause of the Fourteenth Amendment because it is so vague as to deprive potential violators of notice as to what conduct is proscribed.

The court agrees that Section E regulates speech based on its content. The court further concludes that Section E cannot survive strict scrutiny because it is not narrowly tailored. Indeed, comparing West Virginia's Daniel's Law to the many other state and federal statutes aimed at the same legislative objective provides a helpful illustration of the ways in which West Virginia's statute is far from the least restrictive means of achieving West Virginia's undeniably compelling interest in protecting its public servants from harassment and violence. Thus, because the statutory provision on which Jackson relies is unconstitutional, defendants' motion to dismiss must be **GRANTED**.

3

## BACKGROUND

### I.      West Virginia's Daniel's Law

West Virginia's Daniel's Law is one of several laws passed by state legislatures across the country in the wake of the 2020 murder of United States District Judge Esther Salas's son, Daniel Anderl. Am. Compl., ECF No. 19, ¶ 3.[1] A lawyer who had litigated before Judge Salas found Judge Salas's address online and went to her home aiming to assassinate Judge Salas, instead shooting and severely wounding her husband and tragically killing Daniel. See Atlas Data Priv. Corp. v. We Inform, LLC, 758 F. Supp. 3d 322, 330 (D.N.J. 2024) (summarizing the tragedy and New Jersey's legislative response). Aiming to prevent similar tragedies, the West Virginia Legislature enacted its Daniel's Law in 2021. Am. Compl., ECF No. 19, ¶ 1. The West Virginia Legislature explained that its purpose was to "enhance the safety and security of certain public officials in the justice system" and "to foster the ability of these public servants . . . to carry out their official duties without fear of personal reprisal from affected individuals related to the performance of their public functions." W. Va. Code § 5A-8-24(b).

The provision of West Virginia's Daniel's Law at issue in this case, Section E, provides:

> Unless written permission is first obtained from the individual, a person, business, or association shall not disclose, redisclose or otherwise make available the home address or unpublished home or personal telephone number of any active, formerly active, or

---

[1] Unless otherwise indicated, all citations to the record are based on the docket in Jackson v. Whitepages, Inc., No. 1:24-cv-080. The amended complaints in the above-captioned cases are largely identical, particularly in all respects relevant to the facial constitutional issues addressed in this memorandum opinion. The same Rule 12(b)(6) motions and briefing were filed in each of the above-captioned cases.

>       retired judicial officer,[2] prosecutor,[3] federal or state public
>       defender, federal or state assistant public defender, or law-
>       enforcement officer[4] under circumstances in which a reasonable
>       person would believe that providing such information would
>       expose another to harassment or risk of harm to life or property.

W. Va. Code § 5A-8-24(e). The statute defines the prohibited conduct, disclosure, broadly; "to

disclose" includes "to publish, publicly display, distribute, deliver, circulate, post, lend,

provide, advertise, or disseminate by any means including, but not limited to, electronic

transmission and on any medium including, but not limited to, the Internet." W. Va. Code §

5A-8-24(c)(1). To enforce this provision, Section E provides protected judicial and law

enforcement officers and "any other person residing at the home address" of such a protected

---

[2] West Virginia's Daniel's Law defines "judicial officer" as "the chief justice or an associate justice of the United States Supreme Court, a judge of the United States Court of Appeals, a judge of a federal district court, a magistrate judge of a federal district court, any other judge for a court established by federal law, the chief justice or a justice of the Supreme Court of Appeals of West Virginia, a circuit judge, a family law judge, a magistrate, an administrative law judge, a municipal court judge, or any other judge established by state law." W. Va. Code § 5A-8-24(c)(3).

[3] West Virginia's Daniel's Law defines "prosecutor" as the "United States Attorney or his or her assistant United States attorneys, any other prosecutor established by federal law, the Attorney General of the State of West Virginia or his or her assistant attorneys general, a county prosecuting attorney or his or her assistant prosecuting attorneys, or any other prosecutor established by state law." W. Va. Code § 5A-8-24(c)(5).

[4] West Virginia's Daniel's Law defines "law-enforcement officer" by reference to a second statute, W. Va. Code § 29B-1-2(2). W. Va. Code § 5A-8-24(c)(4). The second statute defines "law-enforcement officer" to include all those who fit the definitions of "law-enforcement officer" or "chief executive" found in a third statute, W. Va. Code §30-29-1. W. Va. Code § 29B-1-2(2). That third statute defines "law-enforcement officer" as "any duly authorized member of a law-enforcement agency who is authorized to maintain public peace and order, prevent and detect crime, make arrests, and enforce the laws of the state or any county or municipality thereof, other than parking ordinances, and includes those persons employed as campus police officers at state institutions of higher education in accordance with the provisions of §18B-4-5 of this code, persons employed as hospital police officers in accordance with the provisions of §16-5B-19 of this code, and persons employed by the Public Service Commission as motor carrier inspectors and weight-enforcement officers charged with enforcing commercial motor vehicle safety and weight restriction laws, although those institutions and agencies may not be considered law-enforcement agencies. The term also includes those persons employed as county litter control officers charged with enforcing litter laws who have been trained and certified as law-enforcement officers and whose certification is currently active. The term also includes those persons employed as rangers by resort area districts in accordance with the provisions of §7-25-23 of this code." W. Va. Code §30-29-1(6). The third statute defines "chief executive" as "the Superintendent of the State Police; the chief Natural Resources police officer of the Division of Natural Resources; the sheriff of any West Virginia County; any administrative deputy appointed by the chief Natural Resources police officer of the Division of Natural Resources; or the chief of any West Virginia municipal law-enforcement agency." W. Va. Code §30-29-1(2).

person with a private right of action.[5] W. Va. Code § 5A-8-24(e)(1). A prevailing plaintiff may

recover:

> (A) Actual damages, but not less than $1,000, for each violation of this act;
>
> (B) Punitive damages, if applicable, in accordance with §55-7-29 of this code;
>
> (C) Reasonable attorney's fees and other litigation costs reasonably incurred; and
>
> (D) Any other preliminary or equitable relief as the court deems appropriate.

W. Va. Code § 5A-8-24(e)(2). Section E is the only provision in West Virginia's Daniel's Law

that creates a cause of action for damages.

A separate provision of West Virginia's Daniel's Law, Section D, applies to government

disclosures. Section D provides:

> Unless written permission is first obtained from the individual, a state or local government agency shall not <u>knowingly</u> disclose, redisclose, or otherwise make available the home address or unpublished home or personal telephone number of any active, formerly active, or retired judicial officer, prosecutor, federal or state public defender, federal or state assistant public defender, or law-enforcement officer.

W. Va. Code § 5A-8-24(d) (emphasis added). Thus, while only knowing disclosures by the

government violate the law, no similar knowledge requirement applicable to private entities is

evident on the face of the statute. Instead, disclosure by a private entity violates the law

whenever disclosure occurs without permission "under circumstances in which a reasonable

---

[5] This opinion uses phrases like "judicial and law enforcement officers" and "protected persons" as shorthand for all those protected by West Virginia's Daniel's Law.

person would believe that providing such information would expose another to harassment or risk of harm to life or property." W. Va. Code § 5A-8-24(e).

Neither Section E nor Section D requires that disclosing entities first be given notice that they are disclosing a protected person's information before they are in violation of West Virginia's Daniel's Law. However, yet another distinct provision of West Virginia's Daniel's Law, Section H, sets out a notice procedure by which protected judicial and law enforcement officers, W. Va. Code § 5A-8-24(f), or their immediate family members,[6] W. Va. Code § 5A-8-24(g), may request in writing that a person, business, or association that has disclosed their protected information cease displaying their protected information, W. Va. Code § 5A-8-24(h). If the disclosing person, business, or association fails to "immediately remove the information from any location where the information has been disclosed which is within [their] control," W. Va. Code § 5A-8-24(h)(1), then "[a] civil action may be maintained by the individual whose information is disclosed . . . for failure to comply with a request to refrain and remove the information . . . , and the court may award injunctive or declaratory relief" and "reasonable attorney's fees and other litigation costs." W. Va. Code § 5A-8-24(h)(2). Additionally, "A person who willfully refuses to remove information within 24 hours of receipt of the written request . . . is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $1,000, or confined for up to six months, or both fined and confined." W. Va. Code § 5A-8-24(h)(3). However, in contrast to Section E, Section H does not include a damages provision for enforcing its notice and removal procedure. This explains why Jackson is

---

[6] West Virginia's Daniel's Law defines "[i]mmediate family member" as the "spouse, child, parent, or any other family member related by blood or by law to the judicial officer, prosecutor, or law-enforcement officer, and who resides in the same residence as the judicial officer, prosecutor, federal or state public defender, federal or state assistant public defender, or law-enforcement officer." W. Va. Code § 5A-8-24(c)(2).

proceeding in this suit for damages under Section E. As evidenced by these entirely distinct enforcement schemes, the notice provisions of Section H are not silently subsumed into Jackson's cause of action under Section E.

Because Jackson is proceeding under Section E, only Section E's constitutionality is at issue.

## II.     Factual Background

Michael Jackson is a retired law enforcement officer who served with the Braxton County Sheriff's Department and the Sutton and Clendenin Police Departments. Am. Compl., ECF No. 19, ¶ 10. Jackson alleges that defendants have disclosed his home address and unpublished phone number, as well as those of thousands of West Virginia's other active, formerly active, or retired judicial officers, prosecutors, federal or state public defenders, and law enforcement officers. Id. ¶ 7. Jackson further alleges that defendants have done so without obtaining permission. Id. ¶ 84. Jackson alleges, "Defendant[s]'[] conduct exposed Plaintiff and his peers to harassment and/or risk of harm to life or property because disclosing, redisclosing, or otherwise making available their personal information means that those personal details can be leveraged for nefarious purposes, including by individuals (i.e., criminals, disputants, offenders, etc.) with whom the public servants dealt in the line of their duties." Id. ¶ 85.

Jackson describes defendants as "data broker[s]," meaning that they "'collect[] consumers' personal information and resell[] or share[] that information with others.'" Id. ¶ 15. Jackson alleges that defendants collect personal information from various sources, such as public records, social media, and other data brokers, and provide online "people search" or "people finder" functions using that data. Id. ¶ 16. For example, as to defendant Whitepages,

Inc., Jackson alleges that, entirely for free, any user can search whitepages.com for any individual, including those protected by West Virginia's Daniel's Law, by name, city, state, phone number, or address and gain access to a limited preview of that individual's "background report," which includes the individual's name, age range, cell phone number, landline phone number, address, and other information. Id. ¶¶ 20-24. For a fee, more "complete" background reports are also available. Id. ¶¶ 24-30.

Jackson alleges that because defendants' "people search" websites are "highly comprehensive" and "highly searchable," they make it easy for anyone with an internet connection to access the information West Virginia's Daniel's Law seeks to shield. By contrast, government records repositories do not consolidate information in a single place and are more cumbersome to search. Id. ¶ 41 (citing the example of a tax office website, which provides only a person's address, not their phone number, email addresses, Social Security Number, date of birth, etc.). For example, Jackson alleges government tax records are disaggregated by county, making it difficult for a searcher to find a person of interest using government tax records, unless the searcher already knows their person of interest's county of residence. Id. ¶ 40.

Each of Jackson's amended complaints contains a single count for violation of Section E of West Virginia's Daniel's Law. Id. ¶¶ 110-20. The amended complaints demand a jury trial and seek class certification. Id. at Prayer for Relief. Jackson is seeking declaratory relief, injunctive relief, statutory damages of $1,000 for each violation of West Virginia's Daniel's Law, attorneys' fees, and other litigation costs. Id. at Prayer for Relief.

### III.    Procedural History

Jackson first sued in state court and defendants successfully removed to federal court based on diversity jurisdiction and the Class Action Fairness Act. Notice of Removal, ECF No. 1, ¶¶ 5-10 (citing diversity jurisdiction); see also Jackson v. PeopleConnect, Inc. et al., No. 1:24-cv-102, Notice of Removal, ECF No. 1, ¶¶ 4-5 (citing both diversity jurisdiction and the special jurisdictional provisions of the Class Action Fairness Act). Because West Virginia's Daniel's Law protects judicial and law enforcement officers in West Virginia, the Chief Judge of the Fourth Circuit reassigned the cases to a judge not based in West Virginia to avoid the appearance of a conflict of interest. ECF No. 15 (citing 28 U.S.C. § 292(b)).

Once these cases were before this court, a status conference with Jackson and all defendants was held on November 14, 2024. The parties advised the court that defendants intended to file a consolidated motion to dismiss based on facial unconstitutionality arguments. ECF No. 24. Accordingly, by subsequent order, the court set a briefing schedule and directed, "The initial motion to dismiss is limited to two issues: (1) the facial constitutionality of West Virginia's Daniel's Law under the First and Fourteenth Amendments to the United States Constitution and the Free Speech Clause of the West Virginia Constitution, and (2) Article III standing. No other grounds for dismissal or responsive pleadings by Defendants shall be due until after the court has ruled on the motion to dismiss." ECF No. 25 at 3-4. The order noted that defendants would not be deemed to have waived any other grounds for dismissal. Id. at 4. The court further gave each defendant the option of filing an individual brief but required any defendant choosing this option to alert Jackson on or before January 27, 2025. Id. at 4. Finally, the court otherwise stayed the cases pending

10

resolution of the consolidated motion to dismiss. Id. at 5.

On January 24, 2025, all defendants filed a consolidated motion to dismiss. ECF No. 28. No defendant exercised the option to submit an individual brief, and no defendant briefed Article III standing. Id. Defendants contended (1) that Section E of West Virginia's Daniel's Law is unconstitutional under the First and Fourteenth Amendments, either as a content-based regulation of speech subject to strict scrutiny or under any level of scrutiny, and (2) that Section E of West Virginia's Daniel's Law is unconstitutional under the Due Process Clause of the Fourteenth Amendment due to vagueness.

Because the consolidated motion to dismiss challenged the constitutionality of a West Virginia statute in a case in which West Virginia is not a party, both the defendants, ECF No. 29, and the court, ECF No. 32, provided notice to the West Virginia Attorney General, in accordance with 28 U.S.C. § 2403 and Federal Rule of Civil Procedure 5.1. Notably, the West Virginia Attorney General did not intervene to defend the constitutionality of West Virginia's Daniel's Law, and the period for doing so under Federal Rule of Civil Procedure 5.1 has now elapsed.[7]

Jackson responded in opposition on March 3, 2025, ECF No. 30, and defendants replied on March 31, 2025, ECF No. 31.[8] An oral argument was held on May 9, 2025, in

---

[7] The absence of intervention by the West Virginia Attorney General lies in contrast to the intervention of the New Jersey Attorney General in Atlas Data Privacy Corp. v. We Inform, LLC, 758 F. Supp. 3d 322 (2024), and Kratovil v. City of New Brunswick, 261 N.J. 1, 336 A.3d 201 (2025), which concerned facial and as-applied challenges to New Jersey's Daniel's Law. Also unlike Atlas and Kratovil, no amicus curiae briefs were filed in this case.

[8] Jackson's brief reveals some confusion as to whether the court's order permitted the parties to argue vagueness at this stage. ECF No. 30 at 48. However, because the court's order stated that facial First and Fourteenth Amendment challenges were to be included, the issue of vagueness, which arises under the Due Process Clause of the Fourteenth Amendment, was properly presented. ECF No. 25.

Clarksburg, West Virginia.

## STANDARD OF REVIEW

Rule 12(b)(6) permits defendants to seek dismissal based on a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017). When a district court decides to grant a motion to dismiss, the court has discretion over whether dismissal should be with or without prejudice. See Carter v. Norfolk Cmty. Hosp. Ass'n, 761 F.2d 970, 974 (4th Cir. 1985). If amendment to the pleadings would be futile, dismissal with prejudice is warranted. See Cozzarelli v. Inspire Pharms., Inc., 549 F.3d 618, 630 (4th Cir. 2008) (finding district court did not abuse its discretion in dismissing complaint with prejudice where "amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability").

This particular Rule 12(b)(6) motion is based on arguments that Section E of West Virginia's Daniel's Law is unconstitutional. "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law," such as unconstitutionality. Neitzke v. Williams, 490 U.S. 319, 326 (1989). If a plaintiff is seeking to recover under an unconstitutional statute, then the plaintiff has failed to state a claim upon which relief can be granted because "no relief could be granted under any set of facts that could be proved consistent with the allegations."

Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

Defendants here frame their arguments as arguments that Section E of West Virginia's Daniel's Law is unconstitutional on its face. Ordinarily, to be found facially unconstitutional, a law must lack any plainly legitimate sweep. United States v. Salerno, 481 U.S. 739, 745 (1987). However, as the Supreme Court recently explained, the standard for evaluating facial unconstitutionality in the First Amendment context is "less demanding though still rigorous," in light of the need to provide "'breathing room for free expression.'" Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024) (quoting United States v. Hansen, 599 U.S. 762, 769 (2023)). "[T]he question in such a case is whether a law's unconstitutional applications are substantial compared to its constitutional ones. To make that judgment, a court must determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." Id. at 718.

Determining whether Section E of West Virginia's Daniel's Law is facially unconstitutional requires some interpretation of the provision. Federal courts exercise deference when interpreting state statutes to evaluate their constitutionality by attempting to read state statutes as would the courts of the relevant state to the extent possible. Shook v. City of Lincolnton, No. 518-cv-193, 2019 WL 4145709, at *7 (W.D.N.C. Aug. 29, 2019) (citing Grayned v. City of Rockford, 408 U.S. 104, 109-11 (1972), and Terminiello v. City of Chicago, 337 U.S. 1, 6 (1949)). Additionally, the Supreme Court has cautioned that "courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional." United States v. Davis, 588 U.S. 445, 463 n.6 (2019). West Virginia courts also hold that "[w]herever an act of the Legislature can be so construed and applied as to avoid a conflict with the

Constitution, and give it the force of law, such construction will be adopted by the courts." Cottrill v. Ranson, 200 W. Va. 691, 698, 490 S.E.2d 778, 785 (1997) (quotation omitted). However, courts may only impose a limiting construction on a statute if the statute is "readily susceptible" to such construction. United States v. Stevens, 559 U.S. 460, 130 (2010) (citing Reno v. American Civil Liberties Union, 521 U.S. 844, 884 (1997)); see also Brayshaw v. City of Tallahassee, 709 F. Supp. 2d 1244, 1250 (N.D. Fla. 2010) (applying Stevens and Reno to a state statute found to be a content-based regulation of speech and deciding no limiting construction was available).

## DISCUSSION

### I.   Section E of West Virginia's Daniel's Law regulates speech.

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to state laws by virtue of the Fourteenth Amendment. Stromberg v. California, 283 U.S. 359, 368 (1931). The West Virginia Constitution likewise forbids any "law abridging the freedom of speech." W. Va. Const. art. III § 7. Because the West Virginia Constitution's speech protections are "virtually identical" to those of the federal Constitution, West Virginia courts have held that the federal and state constitutional free speech provisions may be relied upon "interchangeably." State By & Through McGraw v. Imperial Mktg., 196 W. Va. 346, 359 n.43, 472 S.E.2d 792, 805 n.43 (1996); see also Yurish v. Sinclair Broad. Grp., Inc., 246 W. Va. 91, 98, 866 S.E.2d 156, 163 (2021) ("Thus, the United States Supreme Court decisions in First Amendment cases are binding precedent on" the Supreme Court of Appeals of West Virginia.).

Section E of West Virginia's Daniel's Law regulates speech. Factual disclosures,

14

including "disclos[ing], redisclose[ing] or otherwise mak[ing] available . . . home address[es] or unpublished home or personal telephone number[s]," W. Va. Code § 5A-8-24(e), constitute speech under well-settled Supreme Court precedent. As the Court explained in <u>Sorrell v. IMS Health Inc.</u>, "the creation and dissemination of information are speech within the meaning of the First Amendment." 564 U.S. 552, 570 (2011). The Court reasoned, "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." <u>Id.</u> In <u>Sorrell</u> itself, the Court concluded that a Vermont law that banned the sale, transmission, or use of prescriber-identifiable data for marketing or promoting a prescription drug without the consent of the prescriber was an unconstitutional regulation of speech. <u>Id.</u> at 570-71, 580. Other factual disclosures that the Supreme Court has deemed speech protected by the First Amendment include the "information on beer labels," <u>Rubin v. Coors Brewing Co.</u>, 514 U.S. 476, 481 (1995), credit reports, <u>Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749, 759 (1985) (plurality opinion), and statements by a charitable organization disclosing the percentage of charitable contributions collected during the previous year which were actually given to charity, <u>Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.</u>, 487 U.S. 781, 795 (1988).

Following these precedents, lower courts consistently hold that factual disclosures of individuals' personal data, including Social Security Numbers, ages, and dates of birth, constitute speech. <u>See</u>, <u>e.g.</u>, <u>Ostergren v. Cuccinelli</u>, 615 F.3d 263, 271 (4th Cir. 2010) (concluding that posting unredacted Virginia land records containing Social Security Numbers on a website was speech); <u>IMDb.com Inc. v. Becerra</u>, 962 F.3d 1111, 1120 (9th Cir. 2020) (treating publication of the ages and dates of birth of entertainment industry professionals as

15

speech). Indeed, lower courts have specifically found that disclosures of public officials' and law enforcement officers' home addresses and phone numbers are speech. See, e.g., Publius v. Boyer-Vine, 237 F. Supp. 3d 997, 1012-13 (E.D. Cal. 2017) (finding that a law barring disclosure of "home address or telephone number of any elected or appointed official" regulated "speech"); Brayshaw v. City of Tallahassee, 709 F. Supp. 2d 1244, 1249 (N.D. Fla. 2010) (deciding that posting information on the internet concerning a police officer's name, age, family members, address, phone number, and email address was protected speech); Sheehan v. Gregoire, 272 F. Supp. 2d 1135, 1141 (W.D. Wash. 2003) (identifying as a regulation of speech a state statute prohibiting selling or publishing the addresses, phone numbers, birthdates, or Social Security Numbers of law enforcement officers). And of most significance here, in Atlas Data Privacy Corp. v. We Inform, LLC (hereinafter, "Atlas"), which concerned New Jersey's Daniel's Law, a district court recently concluded that the disclosures of law enforcement officers' home addresses and phone numbers prohibited by the New Jersey statute were speech. 758 F. Supp. 3d at 334. Accordingly, there is no doubt that West Virginia's Daniel's Law regulates speech.

## II.    Section E of West Virginia's Daniel's Law regulates speech based on its content.

More specifically, West Virginia's Daniel's Law regulates speech based on its content. In Reed v. Town of Gilbert, the Supreme Court explained that "government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." 576 U.S. 155, 163 (2015). Put differently, a law is content-based if it "target[s] speech based on its communicative content." Id. Here, West Virginia's

Daniel's Law prohibits public discussion of an entire topic—the home addresses and phone numbers of protected individuals. Because Section E of West Virginia's Daniel's Law targets this topic with steep civil penalties, Section E of West Virginia's Daniel's Law is a content-based restriction of speech.

In <u>Reed</u> itself, the Supreme Court found a town ordinance regulating the number, size, duration, and location of certain types of signs to be content-based where that ordinance distinguished between "Ideological Sign[s]," to which the ordinance extended the most permissive regulation, "Political Sign[s]," which the ordinance treated less favorably, and, finally, "Temporary Directional Signs Relating to a Qualifying Event," which the ordinance regulated most strictly. <u>Id.</u> at 159-61. Just as the sign ordinance in <u>Reed</u> treated Ideological Signs differently from Temporary Directional Signs, West Virginia's Daniel's Law treats disclosures of the home addresses and phone numbers of judges and prosecutors differently from disclosures of the home addresses and phone numbers of, say, teachers and electricians. Thus, under <u>Reed</u>, West Virginia's Daniel's Law is undoubtedly a content-based restriction of speech because its prohibition targets one topic but not others.

The Supreme Court retreated somewhat from lower courts' excessively broad interpretations of <u>Reed</u> in <u>City of Austin v. Reagan National Advertising of Austin, LLC</u>, but the Court ultimately left intact <u>Reed</u>'s definition of content-based laws as those that target speech based on the "topic discussed." <u>Id.</u> at 163. In <u>City of Austin</u>, the Supreme Court rejected a rule that had been adopted by several lower appellate courts following <u>Reed</u> "that a regulation cannot be content neutral if it requires reading the [speech (specifically in <u>Reed</u> and <u>City of Austin</u>, signage)] at issue" as "too extreme an interpretation of this Court's precedent."

596 U.S. 61, 69 (2022). The Court then held that a city's regulation of signs based on whether they were on- or off-premises was content neutral. <u>Id.</u> at 71. The Court noted that "enforcing the City's challenged sign code provisions requires reading a billboard to determine whether it directs readers to the property on which it stands or to some other, offsite location." <u>Id.</u> However, "[u]nlike the sign code at issue in <u>Reed</u>, . . . [an on-premises/off-premises distinction] do[es] not single out any topic or subject matter for differential treatment." <u>Id.</u> Jackson asks this court to apply <u>City of Austin</u> to find that West Virginia's Daniel's Law is not content-based. Opp'n, ECF No. 30 at 18. However, the "commonsense" insight of <u>City of Austin</u> does not alter the analysis here. 596 U.S. at 76 (quotation omitted). West Virginia's Daniel's Law <u>does</u> "single out . . . for differential treatment" the topic of judicial and law enforcement officers' home addresses and phone numbers. <u>Id.</u> at 71. Application of West Virginia's Daniel's Law turns on <u>what</u>, for example, a whitepages.com entry says—whether its "communicative content" or "topic" or "subject matter" is the address of a protected person—and not, as with the on-premises/off-premises distinction in <u>City of Austin</u>, simply what is said vis-à-vis <u>where</u> it is said. West Virginia's Daniel's Law thus falls comfortably within the definition of content-based regulation of speech articulated in <u>Reed</u> and <u>City of Austin</u>.

### III.   Strict scrutiny applies to Section E of West Virginia's Daniel's Law.

Having concluded that West Virginia's Daniel's Law regulates speech based on its content, the next question is what level of scrutiny to apply. In <u>Reed</u>, the Court held that "[c]ontent-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." 576 U.S. at 163; <u>see also</u> <u>City of Austin</u>, 596 U.S. at 69. Here, however, Jackson makes several bids

18

for a lower level of scrutiny that must be addressed. None is persuasive.

First, Jackson argues that West Virginia's Daniel's Law "has no nexus with viewpoint discrimination" and therefore merits lesser scrutiny. Opp'n, ECF No. 30 at 26-29. This argument is foreclosed by <u>Reed</u>. There, the Court found that the sign ordinance was content-based and triggered strict scrutiny, even though the ordinance did not distinguish between signs based on the viewpoint the sign expressed; for example, the law treated all Political Signs the same, favoring neither signs for Republicans nor signs for Democrats. <u>Reed</u>, 576 U.S. at 168-69. The Court reasoned, "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" <u>Id.</u> at 168 (quoting <u>Rosenberger v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 829 (1995)). "But it is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" <u>Id.</u> at 169 (quoting <u>Consolidated Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.</u>, 447 U.S. 530, 537 (1980)). <u>City of Austin</u> reaffirmed this aspect of <u>Reed</u>. 596 U.S. at 70.[9] And here, West Virginia's Daniel's Law indeed prohibits public discussion of an entire

---

[9] Jackson relies on the Supreme Court's recent decision, and specifically on Justice Barrett's concurrence, in <u>Vidal v. Elster</u>, which concerned content-based trademark regulations, to argue that content-based laws can sometimes be subject to lesser scrutiny where viewpoint discrimination is not afoot. <u>See</u> Opp'n, ECF No. 30 at 26; <u>Vidal</u>, 602 U.S. 286, 316 (2024) (Barrett, J., concurring) (arguing that content-based trademark rules are permissible in certain circumstances because, in the trademark context, "[c]ourts have applied content-based rules not to suppress ideas, but simply to serve trademark law's purposes") (quotation omitted). However, both the majority and concurring opinions in <u>Vidal</u> narrowly focused on the unique history and purpose of trademark law. <u>See</u> <u>Id.</u> at 295 (Thomas, J.) ("Several features of trademark counsel against a <u>per se</u> rule of applying heightened scrutiny to viewpoint-neutral, but content-based trademark regulations . . . . Most importantly, trademark rights have always coexisted with the First Amendment, despite the fact that trademark protection necessarily requires content-based distinctions."); <u>id.</u> at 316 (Barrett, J., concurring) ("[C]ontent-based trademark rules have long coexisted with the Free Speech Clause, and their function is generally compatible with it."). Indeed, the Court reaffirmed that "[a]s a general matter, a content-based regulation is presumptively

topic—the home addresses and phone numbers of protected individuals.

In a similar vein, Jackson argues that West Virginia's Daniel's Law is not subject to strict scrutiny as a content-based regulation of speech because "nothing in [West Virginia's] Daniel's Law suggests the Legislature intended to suppress substantive communications discussing any idea." Opp'n, ECF No. 30 at 18. <u>Reed</u> dispenses with this argument as well. In <u>Reed</u>, even though the town did not set out with a content-based purpose or justification for its sign ordinance, aiming instead simply to curb excessive signage, the Court found the sign ordinance was content-based. <u>Id.</u> at 165. The Court reasoned, "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." <u>Id.</u> (quoting <u>Cincinnati v. Discovery Network, Inc.</u>, 507 U.S. 410, 429 (1993)). Thus, the West Virginia Legislature's intent is immaterial to the conclusion that West Virginia's Daniel's Law is subject to strict scrutiny as a facially content-based restriction of speech.

Next, Jackson argues that West Virginia's Daniel's Law pertains to merely commercial speech. Opp'n, ECF No. 30 at 29-30. Jackson cites the fact that defendants "are driven by an economic motivation." <u>Id.</u> at 30. He also compares disclosures of addresses and phone numbers on "people search" websites to advertisements because "[c]ompanies (including some Defendants) will post the home addresses and phone numbers of persons to draw customers to their sites, who in turn will then see advertisements for other goods and services." <u>Id.</u> Both of these arguments would apply just as well to The New York Times.

---

unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." <u>Id.</u> at 293 (Thomas, J.) (quotations omitted). The general rule for content-based regulation of speech set forth in <u>Reed</u>, not the distinct rule for content-based trademark regulation set forth in <u>Vidal</u>, governs this case.

Because even clearly protected speech often serves economic purposes, the Supreme Court has made clear that economic motivation is not the touchstone of commercial speech analysis. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 67 (1983) (concluding that an "economic motivation . . . would clearly be insufficient by itself to turn the materials into commercial speech"). Instead, Supreme Court precedents define commercial speech narrowly as "expression related solely to the economic interests of the speaker and its audience," Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 562-63 (1980), or "speech that does no more than propose a commercial transaction," United States v. United Foods, Inc., 533 U.S. 405, 409 (2001). Here, as the district court in Atlas recognized regarding New Jersey's Daniel's Law, "Daniel's Law . . . does not concern commercial speech" because "[t]he expression in issue here is not about the economic interests of the plaintiffs, the defendants, or the public, let alone solely about their economic interests," and "certainly does not propose a commercial transaction." 758 F. Supp. 3d at 334. Rather, disclosing an address or phone number states a fact that could be used for any number of noneconomic purposes, such as promoting transparency or allowing a user of a database to locate an old friend who has moved.

Moreover, Jackson's focus on the law's applicability to defendants' business models is misplaced, given West Virginia's Daniel's Law's broader sweep and the fact that defendants' motion to dismiss is based on facial unconstitutionality. In City of Austin, the Supreme Court concluded that a commercial speech analysis was inappropriate because the on-premises/off-premises sign regulation at issue contained "no exception for noncommercial speech." 596 U.S. at 68 n. 3. Similarly, in Atlas, the district court found that New Jersey's Daniel's Law could

21

not be analyzed as a regulation of commercial speech because the law's prohibitions "encompass[ed] to 'give, . . . post, . . . disseminate, [and] exhibit'" covered information, in addition to prohibiting "'sell[ing]'" or "'advertis[ing]'" such information. 758 F. Supp. 3d at 334. Here too, West Virginia's Daniel's Law applies to disclosures by a "person" or "association," as well as by a "business," and does not otherwise distinguish commercial from noncommercial disclosures. W. Va. Code § 5A-8-24(e). Jackson's commercial speech argument fails.

Finally, Jackson argues that West Virginia's Daniel's Law should receive special consideration as a law protecting privacy. Opp'n, ECF No. 30 at 20. This argument builds on the analysis of New Jersey's Daniel's Law conducted by the district court in Atlas. There, the court determined that New Jersey's Daniel's Law was a "privacy statute" because it concerns judges' and other protected persons' "right to be let alone insofar as their home addresses and unpublished phone numbers are concerned." Atlas, 758 F. Supp. 3d at 336. On this basis, the Atlas court declined to apply Reed and strict scrutiny, despite having concluded that New Jersey's Daniel's Law was indeed a content-based regulation of speech. Id. at 335-36. Instead, the Atlas court applied a specialized privacy analysis drawn from Supreme Court precedents "recogniz[ing] the tension that exists between privacy law and the right of freedom of speech and the press." Id. at 336. Specifically, the court cited the Supreme Court's cases analyzing statutes prohibiting the dissemination of truthful information about the identities of rape victims and juvenile offenders, such as Smith v. Daily Mail Publishing Co., 443 U.S. 97 (1979), and The Florida Star v. B.J.F. (hereinafter, "Florida Star"), 491 U.S. 524 (1989). Id. at 336. The Atlas court reasoned that because these privacy-related cases did not use the words "strict

scrutiny," the tests they applied must have been more permissive. Id.[10] From these precedents, the district court derived a three-factor test for balancing privacy interests against the First Amendment: (1) whether the information is lawfully obtained and is of public significance, (2) whether the law serves a state interest of the highest order, and (3) whether the statute actually serves those interests and is not underinclusive. Id. at 336-37. The Atlas court ultimately found that New Jersey's Daniel's Law was constitutional because the court concluded that the privacy interests served by New Jersey's Daniel's Law outweighed the First Amendment interests jeopardized by New Jersey's Daniel's Law. Id. at 339.

The Atlas court's analysis does not sway this court's conclusion that strict scrutiny applies to West Virginia's Daniel's Law. Fourth Circuit precedent requires this court to apply strict scrutiny, regardless of whether precedents like Daily Mail and Florida Star apply.

As an initial matter, it is by no means clear that the Florida Star line of Supreme Court precedents is a natural factual fit with West Virginia's Daniel's Law. Florida Star concerned a newspaper publishing the name of a rape victim that had been, against state policy, inadvertently disclosed in a police report, and Daily Mail concerned newspapers publishing the name of a juvenile offender that had been discovered by reporters communicating with witnesses and law enforcement. Florida Star, 491 U.S. at 531. To these nearly identical and rather particular facts, the Court applied the following rule intended as a "limited" principle "sweep[ing] no more broadly than the appropriate context of the instant case:" "'[I]f a

---

[10] Although the Atlas opinion never compares its Florida Star analysis to a particular tier of scrutiny, at times, the Atlas opinion sounds in a rational basis review register. Atlas, 758 F. Supp. 3d at 339 ("The Legislature made a rational decision in allowing covered persons to assign their claims. . . . Defendants are simply disagreeing with the Legislature's policy choices. Reasonable people of course may have different views about those choices.").

newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.'" Id. at 532-33 (quoting Daily Mail, 443 U.S. at 103). The Court held that the First Amendment had been violated in both cases. Id. at 530-31. Several factual distinctions make Florida Star a less than obvious frame for this case: West Virginia's Daniel's Law does not focus on newspapers; home addresses and phone numbers are not the intimate details of ongoing criminal proceedings; and judges and law enforcement officials are not analogous to juvenile offenders or rape victims. And indeed, other courts have declined to extend Florida Star in similar cases. For example, the Ninth Circuit refused to apply Florida Star, and instead applied Reed and strict scrutiny, in a case concerning publication of entertainment professionals' ages and dates of birth, explaining, "[W]e will not cordon off new categories of speech for reduced protection unless it is part of a long (if heretofore unrecognized) tradition of proscription." IMDb.com Inc., 962 F.3d at 1124 (quotations omitted). This court would be in good company if it were to ignore Florida Star entirely. See also Am. Ass'n of Pol. Consultants v. FCC, 923 F.3d 159 (4th Cir. 2019) (applying Reed and strict scrutiny to a content-based exemption to "privacy protections" for consumers under automated call ban and not citing Florida Star cases).

Regardless, to the extent Florida Star is applicable to West Virginia's Daniel's Law, Florida Star only reinforces the conclusion that strict scrutiny applies. While the language of Florida Star differs from the standard strict scrutiny formulation in that it specifically mentions "lawfully obtain[ed] truthful information about a matter of public significance," Florida Star remains highly speech protective, requiring a "state interest of the highest order." Compare

id. with Reed, 576 U.S. at 163 ("Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). Accordingly, the Supreme Court has found First Amendment violations in each of its Florida Star cases, and the Supreme Court has never used this formulation to justify restricting the freedom to publish truthful information. See Florida Star, 491 U.S. at 530-31 (finding unconstitutional imposition of liability on a newspaper for publishing the name of a rape victim and noting that the Court similarly found the restrictions of speech unconstitutional in Daily Mail, 443 U.S. 97; Oklahoma Publ'g Co. v. Oklahoma Cnty Dist. Ct., 430 U.S. 308 (1977); and Cox Broad. Corp. v. Cohn, 420 U.S. 469 (1975)); see also Atlas, 758 F. Supp. 3d at 336 ("In all of these cases the Supreme Court ruled that the First Amendment carried the day over the right to privacy.").

Indeed, more recent Supreme Court decisions confirm that, far from supplanting strict scrutiny of content-based restrictions of speech, Florida Star heightens the First Amendment scrutiny applied to content-neutral laws. In Bartnicki v. Vopper, the Court considered whether the government could punish the publication of truthful information where the publisher of the information obtained the information lawfully but from a source who obtained the information unlawfully. 532 U.S. 514, 528 (2001) (quotation omitted). The Court cited Daily Mail in support of the strong presumption of First Amendment protection given to the publication of truthful information, ultimately concluding that even illegality in the acquisition of truthful information could not justify departing from that presumption. Id. at 527 (quoting Daily Mail, 443 U.S. at 102, for the proposition that "state action to punish the publication of truthful information seldom can satisfy constitutional standards"). However, even before

25

considering <u>Daily Mail</u>, the Court first reached the question of whether the statute at issue was content-based or content neutral, ultimately concluding that the statute, which prohibited wiretapping and the disclosure of information illegally gleaned from wiretapping, was a content-neutral regulation of speech that would have been subject to lesser scrutiny were it not for the heightened protection accorded to the publication of truthful information under <u>Daily Mail</u>. <u>Id.</u> at 526-27. Although the majority did not use the phrase "strict scrutiny," the dissent criticized the majority for applying "strict scrutiny" to a content-neutral law. <u>Id.</u> at 545 (Rehnquist, C.J., dissenting). Thus, <u>Bartnicki</u> further confirms that the <u>Florida Star</u> cases boost protection against content-neutral regulation of speech, rather than detracting from protection against content-based restriction of speech.

The Fourth Circuit has also applied <u>Florida Star</u> to bolster First Amendment scrutiny, not to reduce it. The Fourth Circuit applied <u>Florida Star</u> in <u>Ostergren v. Cuccinelli</u>, which held that it would be unconstitutional to apply a Virginia statute prohibiting communication of other individuals' Social Security Numbers to a plaintiff who disclosed public records containing Social Security Numbers with the aim of alerting the public to the fact that the state was making such sensitive information publicly discoverable. 615 F.3d at 263. The court rebutted the state's argument that the publication of Social Security Numbers should be viewed, like obscenity and fighting words, as beyond the scope of the First Amendment by pointing to <u>Florida Star</u> and its lineage. <u>Id.</u> Far from lessening First Amendment protection, the <u>Florida Star</u> cases were once again relevant to show that First Amendment protections applied with full force because "'[p]ublic records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the

reporting of the true contents of the records by the media.'" <u>Id.</u> at 272 (quoting <u>Cox Broad.</u> <u>Corp.</u>, 420 U.S. at 495). Without using the phrase "strict scrutiny," the Fourth Circuit then applied what was effectively strict scrutiny. <u>Id.</u> at 276 ("[T]he only remaining issues are (1) whether Virginia has asserted a state interest of the highest order and (2) whether enforcing [the law] against Ostergren would be narrowly tailored to that interest.").

In <u>Soderberg v. Carrion</u>, the Fourth Circuit provided further clarity by explicitly characterizing the <u>Florida Star</u> standard as strict scrutiny and relying on the standard to heighten the scrutiny applied to a content-neutral law, much as the Supreme Court had done in <u>Bartnicki</u>. The court observed, "[A]lthough the <u>Daily Mail</u> Court did not refer to its standard as 'strict scrutiny,' that term has since been used to describe the standard." 999 F.3d 962, 969 (4th Cir. 2021) (citing <u>Bartnicki</u>, 532 U.S. at 545 (Rehnquist, C.J., dissenting) and <u>Peavy v.</u> <u>WFAA-TV, Inc.</u>, 221 F.3d 158, 189 (5th Cir. 2000)). The Fourth Circuit then relied on <u>Daily</u> <u>Mail</u> to reverse the district court's decision to apply intermediate scrutiny to a content-neutral statute that criminalized broadcasting official court recordings of state criminal proceedings, remanding so that strict scrutiny could instead be applied. <u>Id.</u> at 967-70.

Thus, applying <u>Florida Star</u> is not necessary in this case both because West Virginia's Daniel's Law may well be distinguishable from the laws at issue in the <u>Florida Star</u> cases and because West Virginia's Daniel's Law is already subject to strict scrutiny as a content-based restriction of speech. Nevertheless, <u>Florida Star</u> provides an additional ground on which to apply strict scrutiny because West Virginia's Daniel's Law implicates the publication of truthful information. <u>See</u>, <u>e.g.</u>, <u>Publius</u>, 237 F. Supp. 3d at 1013-14 (applying <u>Reed</u> and strict scrutiny to a law shielding the home addresses and phone numbers of California legislators then

supplementing this analysis with Florida Star to further support unconstitutionality); Sheehan, 272 F. Supp. 2d at 1141 (relying on content-based nature of regulation and Florida Star as independent grounds for declaring unconstitutional a state statute prohibiting the release of law enforcement officers' residential addresses and telephone numbers); Brayshaw, 709 F. Supp. 2d at 1249 (declining a defendant's invitation to apply Florida Star and Daily Mail to reduce the constitutional protection applied to truthful disclosure of police officers' personal information and instead applying strict scrutiny, both because of Florida Star and because the law regulated speech based on its content). Even if this court found the Atlas court's reasoning persuasive as out-of-circuit precedent,[11] Fourth Circuit precedent, particularly Soderberg,

---

[11] On June 7, 2025, Jackson filed a notice of supplemental authority alerting the court to the Supreme Court of New Jersey's decision in Kratovil v. City of New Brunswick, which was issued on June 17, 2025. ECF No. 38. In Kratovil, the Supreme Court of New Jersey rejected a journalist's as-applied challenge to New Jersey's Daniel's Law by applying Daily Mail and Florida Star. 261 N.J. at 6, 336 A.3d at 205. However, Kratovil does not dissuade this court from applying ordinary strict scrutiny.

The facts of Kratovil were far more analogous to those of Daily Mail and Florida Star than are those at issue here. The Kratovil plaintiff was a journalist who learned through a lawful records request that the voting address of the New Brunswick, New Jersey Police Director was in the Borough of Cape May—a two-hour drive from New Brunswick. 261 N.J. at 7, 336 A.3d at 205. The journalist filed a complaint seeking declaratory and injunctive relief from application of New Jersey's Daniel's Law, hoping to eventually publish a story on the issue of whether the Police Director was adequately performing his duties—a topic of public concern. 261 N.J. at 8, 336 A.3d at 206. Because Daily Mail and Florida Star specifically concerned newspaper publication of truthful, lawfully obtained information of public concern, the test they articulated fits the journalistic interests at issue in Kratovil. 261 N.J. at 5-6, 336 A.3d at 204 (emphasizing the freedom of the press component of the Supreme Court's reasoning in Daily Mail and Florida Star). By contrast, West Virginia's Daniel's Law has no particular focus on journalism.

Furthermore, Kratovil declined to consider whether Daily Mail and Florida Star were equivalent to the strict scrutiny called for by Reed. 261 N.J. at 22 n.5, 336 A.3d at 214 n.5. The Supreme Court of New Jersey applied Daily Mail and Florida Star "alone," as the complaint and briefs were premised on the standard set in the Daily Mail line of cases. Id.

Finally, the Kratovil court's application of Daily Mail and Florida Star was not equivalent to the privacy balancing test deployed in Atlas. The Kratovil court used the finding that the Police Director's home address was truthful, lawfully obtained information related to a story on a matter of public significance as a trigger for applying the "second inquiry in the test prescribed in Daily Mail and Florida Star" as to "whether the challenged law serves a need to further a state interest of the highest order." 261 N.J. at 24-25, 336 A.3d at 216. In practice, this "second inquiry" was strict scrutiny, as the Kratovil court considered both the magnitude of the state's interest and narrow tailoring. 261 N.J. at 24-29, 336 A.3d at 216-18. By contrast, the Atlas court used its finding

28

leaves this court no choice but to apply strict scrutiny to West Virginia's Daniel's Law.[12]

Jackson adds a second theory seeking to reduce the scrutiny applied to West Virginia's Daniel's Law as a privacy-related statute. Jackson contends that lesser scrutiny is justified in recognition of a history and tradition of permitting privacy torts to coexist with the First Amendment. Opp'n, ECF No. 30 at 22-26. Jackson draws support for this theory from the Supreme Court's historical analysis of trademark law in Vidal. However, Vidal does not purport to require a trans-substantive history and tradition test for the First Amendment. Not only was Vidal addressed solely to the unique trademark context, but the Court specifically deployed non-mandatory language: "in evaluating a solely content-based trademark restriction, we can consider its history and tradition." Vidal, 602 U.S. at 301 (Thomas, J.) (emphasis added); see also id. at 311-12 (Barrett, J., concurring in part) (noting that "the Court never explains why hunting for historical forebears on a restriction-by-restriction basis is the right way to analyze the constitutional question").

---

that the home addresses and unpublished home telephone numbers shielded by New Jersey's Daniel's Law generally "are not matters of public significance," not as a threshold guide as to which test to apply, but as a factor weighing against First Amendment protection. 758 F. Supp. 3d at 337. Kratovil is thus less like Atlas and more like the cases that use Florida Star and Daily Mail as a basis for applying strict scrutiny distinct from a law's content-based or content-neutral status.

Ultimately, the only meaningful divergence between Kratovil's analysis of New Jersey's Daniel's Law and this court's analysis of West Virginia's Daniel's Law is in the conclusion reached as to narrow tailoring. 261 N.J. at 29, 336 A.3d at 218. As explained elsewhere in this memorandum opinion, that divergence is simply a result of differences between the two statutes. New Jersey's Daniel's Law is indeed more narrowly tailored than Section E of West Virginia's Daniel's Law, principally because New Jersey's statute contains a notice requirement. In short, while New Jersey's Daniel's Law is narrowly tailored, West Virginia's Daniel's Law is not.

[12] Third Circuit precedent may have provided the Atlas court more flexibility in interpreting the Florida Star test. In Schrader v. District Attorney of York County, the Third Circuit characterized the Daily Mail and Florida Star line of cases and the Reed and City of Austin line of cases as two distinct lines of precedent pertaining to different factual scenarios. 74 F.4th at 126. The Third Circuit concluded, "We need not reconcile these two lines of precedent here because they point the same way"—toward a finding of unconstitutionality under the facts of Schrader itself. Id. By contrast, the Fourth Circuit has explicitly held that both lines of precedent call for strict scrutiny. Soderberg, 999 F.3d at 967-69.

Moreover, the Supreme Court has expressly cabined the relevance of history in interpreting the First Amendment. In Williams-Yulee v. Florida Bar, the majority upheld a Florida law banning judicial candidates from personally soliciting campaign funds, finding that the law survived strict scrutiny. 575 U.S. 433, 444, 455 (2015). The dissent appeared to put forward a historical analog test as an alternative to strict scrutiny, arguing that there was no "widespread and longstanding tradition" of regulating judicial candidates' speech that could "ratif[y]" such a regulation. Id. at 462 (Scalia, J., dissenting). The majority rejected this argument, explaining, "We do not dispute that [bans on judicial candidate solicitation lack a lengthy historical pedigree], but [that fact] has no relevance here." Id. at 446 (Roberts, C.J.). Although "a history and tradition of regulation are important factors in determining whether to recognize 'new categories of unprotected speech,'" history and tradition have no bearing in analyzing whether a particular regulation of speech to which the First Amendment applies survives constitutional scrutiny. Id. (quoting Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 791 (2011)). That is a task for the tiers of scrutiny. Id. at 442-44, 446; see also Free Speech Coal., Inc. v. Paxton, No. 23-1122, 2025 WL 1773625, at *5 (U.S. June 27, 2025) (affirming that the tiers of scrutiny are used to evaluate whether a regulation of speech to which the First Amendment applies passes muster and that history is pertinent only to the distinct inquiry into whether speech is among the "certain historic and traditional categories of speech—such as obscenity, defamation, fraud, [etc.]" that "have been understood to fall outside the scope of the First Amendment") (quotation omitted). Here, Jackson is asking the court to apply a lesser degree of scrutiny to privacy statutes, not to create a new category of unprotected speech that includes, perhaps, all potentially private information or, at least, home addresses and phone

numbers. Thus, strict scrutiny is the proper framework. The court need not wade into a quagmire of questions as to whether West Virginia's Daniel's Law is even relevantly similar to privacy torts.

Thus, there is no doubt that strict scrutiny applies. Section E of West Virginia's Daniel's Law is "presumptively unconstitutional." <u>Reed</u>, 576 U.S. at 163. It can survive only if it is "narrowly tailored to serve compelling state interests," <u>id.</u>, or, put differently, "'narrowly tailored to a state interest of the highest order,'" <u>Ostergren</u>, 615 F.3d at 276 (quoting <u>Florida Star</u>, 491 U.S. at 541).

## IV.   Section E of West Virginia's Daniel's Law fails strict scrutiny.

Section E of West Virginia's Daniel's Law fails strict scrutiny. Even though West Virginia's Daniel's Law serves a compelling state interest, Section E is not narrowly tailored. The West Virginia Legislature summarized its aim in enacting West Virginia's Daniel's Law in the following purpose clause:

> This act shall be liberally construed in order to accomplish its purpose and the public policy of this state, which is to enhance the safety and security of certain public officials in the justice system . . . and the immediate family members of these individuals, to foster the ability of these public servants who perform critical roles in the justice system, and to carry out their official duties without fear of personal reprisal from affected individuals related to the performance of their public functions.

W. Va. Code § 5A-8-24(b). Defendants concede that this is a "noble purpose." Mem. Supp. Mot. Dismiss, ECF No. 28 at 22; <u>see also</u> <u>Atlas</u>, 758 F. Supp. 3d at 337 (noting "that in recent years judges, prosecutors, police, correctional officers, and others in law enforcement have been the subject of an ever increasing number of threats and even assassinations," some of which "have been facilitated by malefactors obtaining the home address or unlisted phone

31

number of their targets"); Kratovil, 261 N.J. at 26, 336 A.3d at 216 ("New Jersey's interest in

protecting public officials from [] threats and thus ensuring that they may carry out their duties

without fear of harm to themselves or their families is clearly a state interest of the highest

order."). The court agrees.[13]

However, a compelling state interest by no means inoculates a statute against a finding

of unconstitutionality. See Brayshaw, 709 F. Supp. 2d at 1249 (finding that although "the state

interest of protecting police officers from harm or death may be compelling," a law prohibiting

publication of law enforcement officers' addresses and other identifying information "is not

narrowly tailored to serve this interest"). Under strict scrutiny, even the most compelling of

interests must be pursued by means that are narrowly tailored, thereby minimizing the burden

on the constitutional right at issue. See Sable Commc'ns of Cal., Inc. v. F.C.C., 492 U.S. 115,

126 (1989) (requiring that the government pursue its compelling interest "by narrowly drawn

regulations designed to serve those interests without unnecessarily interfering with First

Amendment freedoms") (quotation omitted). The narrow tailoring component of the strict

scrutiny standard "requires that a law be 'the least restrictive means of achieving a compelling

state interest.'" Free Speech Coal., Inc., 2025 WL 1773625, at *5 (quoting McCullen v. Coakley,

573 U.S. 464, 478 (2014)); see also United States v. Playboy Ent. Group, Inc., 529 U.S. 803,

813 (2000). "The party defending the constitutionality of a statute has the burden of proof

under the strict scrutiny test." Billings v. Aeropres Corp., 522 F. Supp. 2d 1121, 1126 (E.D.

Ark. 2007); see also Knights of Columbus Council 2616 v. Town of Fairfield, No. 3:22-cv-

---

[13] Moreover, the court is mindful of the fact that Jackson himself has initiated this litigation because he has personal concerns for his and others' safety, which are legitimate concerns falling within the scope of the compelling interest identified by the West Virginia Legislature.

1579, 2024 WL 3900102, at *12 (D. Conn. Aug. 22, 2024) ("The burden of demonstrating that a content-based restriction on expression satisfies strict scrutiny falls on the party . . . 'seeking to uphold [the] restriction.'") (quoting <u>Edenfield v. Fane</u>, 507 U.S. 761, 770 (1993)). Here, Jackson bears the burden of demonstrating that Section E of West Virginia's Daniel's Law is the least restrictive means of achieving West Virginia's interest in "enhance[ing] the safety and security" of judicial and law enforcement officers and their families. W. Va. Code § 5A-8-24(b).

Jackson cannot satisfy that burden because less restrictive alternatives exist. The least restrictive means analysis in this case is particularly straightforward because, rather than dealing in hypothetical alternatives, the court has the benefit of comparing West Virginia's Daniel's Law to a variety of analogous state and federal statutes that are more narrowly tailored and burden far less speech in pursuit of the same compelling legislative goal. Section E of West Virginia's Daniel's Law is unique among these laws in lacking speech-protective limitations on liability—most significantly, a notice requirement. In fact, Section E of West Virginia's statute might be the <u>most</u> restrictive of the available means for achieving its compelling interest.

States and the federal government have pursued a variety of measures to shield the home addresses and phone numbers of judicial and law enforcement officers from discovery by individuals wishing to do them harm. Some state statutes limit government disclosure of protected persons' home addresses and phone numbers in the first place, for example, by prohibiting public agencies from disclosing protected persons' home addresses and phone numbers through freedom of information act requests or public land records.[14] Unlike West

---

[14] <u>See</u>, <u>e.g.</u>, (**Connecticut**) Conn. Gen. Stat § 1-217 (2024) (prohibiting disclosure of addresses and other

Virginia's Daniel's Law, these measures do not target private speech, and many are even more limited in that they only restrict speech concerning covered information where a protected person has made a specific request that their information be shielded.[15] Other states impose heightened criminal penalties on those who publish sensitive information, such as an individual's home address, "with the intent to coerce, intimidate, or harass," while "knowing or having reason to know that person is a law-enforcement officer, . . . , or an active or retired federal or [state] justice, judge, or magistrate."[16] However, because these criminal statutes require both an intent to harass or otherwise harm and actual knowledge that the information pertains to a protected individual, even these criminal measures limit the risk that they will

---

personal information pertaining to judges, prosecutors, law enforcement officers, firefighters, social workers, and other public servants via freedom of information act requests; further providing that only "willful and knowing" violations will be penalized; and expressly stating that "[n]othing in this section shall be construed to allow a private right of action against a public agency, public official or employee of a public agency"); (**Florida**) Fla. Stat. § 119-071 (2024) (providing an exemption from public records requirements to judges and other court personnel); (**Nebraska**) Neb. Rev. Stat. § 23-3211 (2024) ("Unless requested in writing, the county assessor, register of deeds, and county treasurer shall withhold from the public the residential address of a law enforcement officer, a member of the Nebraska National Guard . . ., or a judge who applies to the county assessor in the county of his or her residence.").

[15] See supra note 14.

[16] (**Virginia**) Va. Code Ann. § 18.2-186.4 (making publication of covered information with criminal intent a class 6 felony where the information pertains to a judicial or law enforcement officer and making the same act a class 1 misdemeanor where the information pertains to any other person); see also (**Colorado**) Colo. Rev. Stat. § 18-9-313 (2024) (making it a class 1 misdemeanor "to knowingly make available on the internet personal information about a protected person"—defined to include judges, prosecutors, and other public servants— "or the protected person's immediate family if the dissemination of personal information poses an imminent and serious threat to the protected person's safety or the safety of the protected person's immediate family and the person making the information available on the internet knows or reasonably should know of the imminent and serious threat"); (**Maryland**) Md. Code Ann., Cts. & Jud. Proc. § 3-2304 (2024) (prohibiting knowing publication of judges' personal information, including home addresses and telephone numbers, if (1) "[t]he [publishing] individual knows or reasonably should know that publishing the personal information poses an imminent and serious threat to the protected individual; and" (2) the publication "results in . . . [a]ssault . . . ; [h]arassment; [t]respass; or [m]alicious destruction of property;" imposing criminal penalties of "imprisonment not exceeding 18 months or a fine not exceeding $5,000 or both"). Other states do not distinguish between public officials and other persons, instead broadly prohibiting intentionally "disseminating personally identifying information about another person . . . with the intent to intimidate, abuse, threaten, harass, or frighten a person," where "dissemination would cause a reasonable person to be in fear of physical injury to himself or herself, or to his or her immediate family member or household member." (**Kentucky**) Ky. Rev. Stat. Ann. § 525.085 (West 2024).

restrict more speech than necessary.

The state and federal statutes to which West Virginia's Daniel's Law bears the closest resemblance are those imposing civil liability on private entities for disclosing home addresses and phone numbers belonging to judicial and law enforcement officers. However, Section E of West Virginia's Daniel's Law stands out even amongst these laws due to Section E's lack of a notice requirement as a prerequisite to a suit for damages.[17] The federal Daniel Anderl Judicial Security and Privacy Act and the laws of at least nine states, including New Jersey's Daniel's Law, create a private right of action that is only available after a judge, law enforcement officer, or other potential plaintiff has provided notice (usually written notice) to the disclosing entity that they wish to have their information removed from where it is being displayed.[18] Two of these state statutes make damages available immediately upon the

---

[17] Section H of West Virginia's Daniel's Law contains a procedure by which judicial and law enforcement officers and their immediate family members can request that a disclosing entity remove their home address or phone number from where it is being displayed. W. Va. Code § 5A-8-24(h)(2). That portion of West Virginia's Daniel's Law is civilly enforceable through injunctive or declaratory relief and attendant attorney's fees and litigation costs, but not damages. Id. Accordingly, Jackson did not rely upon Section H in this suit, which is seeking damages, and Section H is not at issue in this case. Indeed, nothing in this opinion and accompanying order limits Jackson's ability to invoke the protection of Section H of West Virginia's Daniel's Law by requesting that defendants remove his address and phone number from their websites. But that issue is not before the court. In any event, because the two provisions set out distinct enforcement schemes, the constitutionality of one need not affect the constitutionality of the other. On the one hand, Section H might be constitutional, even if Section E is not, because it is more narrowly tailored both due to its notice requirement and its less extensive remedies. On the other hand, even if Section H were deemed constitutional, that would not save Section E, because Section E imposes civil liability without notice, and the notice provisions of Section H are not somehow transferrable to Section E. Nevertheless, one might rely on Section H as further evidence that Section E is not narrowly tailored because Section H demonstrates that even West Virginia's statute itself contains a less restrictive means of achieving the statute's overall compelling objective.

[18] See (**Federal**) Daniel Anderl Judicial Security and Privacy Act, James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263 § 5931, et. seq. (prohibiting private entities from displaying certain sensitive information, including home addresses, pertaining to federal judges and retired federal judges, upon receipt of a written request that the entity take down such information from where it is displayed; providing for fines and damages only upon the knowing violation of a court's order for declaratory or injunctive relief); (**California**) Cal. Gov't Code § 7928.215(e) (2024) ("A person, business, or association that receives the written demand of an elected or appointed official pursuant to this section shall remove the official's home address or telephone number from public display on the internet, including information provided to cellular telephone applications, within 48 hours of delivery of the written demand . . . ."); id. §

7928.225 (2024) (providing a cause of action for injunctive or declaratory relief from noncompliance with a written demand; providing for a fine not exceeding $1,000 only upon a violation of a court's order granting declaratory or injunctive relief); (**Delaware**) Del. Code Ann. tit. 10, § 1923(b) (2024) ("After a person has received a written request from a judicial officer to protect the personal information of the judicial officer or their family, that person must remove the personal information from public display within 72 hours . . . ."); id. § 1923(c) (providing a cause of action for a judicial officer or family member to seek declaratory or injunctive relief from noncompliance with a removal request; creating a cause of action for damages only upon a violation of a court's order granting declaratory or injunctive relief, in an amount not greater than three times the actual damages and not less than $10,000); (**Hawaii**) Haw. Rev. Stat. § 92I-2 (2024) ("After receiving a written request, the government agency, person, or organization shall remove the protected personal information from the Internet within three business days . . . ."); id. § 92I-5 (providing a private right of action for injunctive or declaratory relief from noncompliance with a removal request); (**Illinois**) 705 Ill. Comp. Stat. 90/2-5(a) (2024) ("All persons, businesses, and associations shall refrain from publicly posting or displaying on the Internet publicly available content that includes a judicial officer's personal information, provided that the judicial officer has made a written request to the person, business, or association that it refrain from disclosing the personal information."); id. at 2-5(c) (providing a private cause of action for declaratory and injunctive relief from noncompliance with a request to refrain from disclosing the subject personal information); (**Maryland**) Md. Code Ann., Cts. & Jud. Proc. § 3-2303(a)-(c) (2024) ("A protected individual," defined to include state and federal judges and magistrates as well as their immediate family members, "or the Office of Information Privacy on behalf of a protected individual, may request that a person who has published the protected individual's personal information remove the protected individual's personal information from publication . . . ."; "[t]he person to whom the request is made shall . . . [p]rovide for the removal of the personal information within 72 hours after receipt of the request"); id. at § 3-2303(e) (providing that a protected individual or the Office of Information Privacy may seek declaratory relief, injunctive relief, or damages to enforce this provision; further providing that "if a court finds that a person willfully refused to provide for the removal of personal information knowing that the individual on behalf of whom the request was made was a protected individual, the court may award punitive damages"); (**Missouri**) Mo. Rev. Stat. § 476.1304 (2024) ("No person, business, or association shall publicly post or display on the internet publicly available content that includes a judicial officer's personal information, provided that the judicial officer has made a written request to the person, business, or association that it refrain from disclosing the personal information."); id. at § 476.1308 (creating a private right of action for declaratory or injunctive relief from noncompliance with a request to refrain from disclosure); (**New Jersey**) N.J. Rev. Stat. § 2C:20-31.1 (2024) ("Upon notification . . . , and not later than 10 business days after receipt thereof, a person shall not knowingly, with purpose to expose another to harassment or risk of harm to life or property, or in reckless disregard of the probability of such exposure, post, repost, publish, or republish on the Internet, or otherwise make available, the home address or unpublished home telephone number of any covered person . . . ."); id. at § 56:8-166.1 (creating an assignable private cause of action for actual damages, but not less than liquidated damages of $1,000 per violation; providing for punitive damages upon proof of willful or reckless disregard of the law; additionally providing for other appropriate preliminary and equitable relief); (**New York**) N.Y. Judiciary Law § 859(2)(c)(i) (McKinney 2024) ("[T]he employer for an active or former judge or justice . . . shall, within five business days of receipt of such written request from an eligible individual, notify each person, business, association, and public or private agency identified in the written request that within seventy-two hours of receipt of such notification, that such person, business, association, and public or private agency must cease making public the personal information of the eligible individual identified in such request . . . ."); id. at § 859(4) (providing a cause of action for declaratory or injunctive relief from noncompliance with a request to cease making public subject information; further providing that upon a violation of a court order granting declaratory or injunctive relief, if the violator is a private entity, the eligible individual may recover damages in an amount up to a maximum of three times the actual damages, but not less than $4,000); (**Oklahoma**) Okla. Stat. tit. 20 § 3016(C) (2024) ("After receiving a written request[,] . . . the person, business, or association shall remove within seventy-two (72) hours the covered information from the Internet . . . and ensure that the covered information of the at-risk individual or immediate family is not made available on any publicly available website controlled by that person, business, or association . . . ."); id. at § 3017 (providing a

disclosing entity's failure to take the requested action within a statutorily designated period, but the remainder of these statutes limit liability still further by providing only injunctive or declaratory relief as an initial matter and permitting damages to be recovered only upon the disclosing entity's failure to comply with an injunction or declaratory judgment.[19]

By contrast, Section E of West Virginia's Daniel's Law creates a private right of action for a plaintiff to seek actual damages—indeed, liquidated damages "not less than $1000 for each violation"—and even punitive damages under certain circumstances, as well as appropriate preliminary or equitable relief, without ever providing a potential defendant with notice that posting that plaintiff's information violates the law. W. Va. Code § 5A-8-24(e). Quite the reverse, a disclosing entity would need to obtain written permission before properly disclosing any protected person's information. Id. ("Unless written permission is first obtained from the individual, a person, business, or association shall not disclose . . . ."). West Virginia's law thus places the burden on the would-be speaker to overcome the impediment to speech, rather than placing the burden on those who would like to advance a countervailing interest in safety. This is constitutionally problematic because the free flow of speech ought to be presumptively favored, in light of the enumeration of freedom of speech in the First Amendment as an interest that ordinarily trumps competing unenumerated governmental interests.

Section E's lack of a notice requirement also renders the provision overinclusive in that

---

cause of action for declaratory or injunctive relief from noncompliance with a removal request; further providing that if a private entity violates a court order granting declaratory or injunctive relief, the at-risk individual or their immediate family member may recover actual damages).

[19] Only the Maryland and New Jersey statutes appear plainly to permit recovery of damages based on an initial failure to comply with a removal request prior to the issuance of declaratory or injunctive relief. See supra note 18.

it burdens more speech than necessary to protect the safety of judicial and law enforcement officers because it risks chilling even speech unrelated to judicial and law enforcement officers. See Counterman v. Colorado, 600 U.S. 66, 75 (2023) (noting that "[p]rohibitions on speech have the potential to chill, or deter, speech outside their boundaries"). Without a notice requirement, it is difficult to imagine how anyone wishing to speak widely on the topic of home addresses and phone numbers could know exactly which home addresses and phone numbers belong to potential West Virginia's Daniel's Law plaintiffs. Defendants' websites, for example, display vast amounts of data pertaining to individuals throughout the country. Am. Compl., ECF No. 19, ¶¶ 15-16. Although receipt of a request to take down a given individual's information would alert even a high-volume speaker like defendants to the fact that that a potential West Virginia's Daniel's Law plaintiff's data is among the data points they display, it is difficult to imagine a mechanism by which they could preemptively sift through the data they display to identify every individual who might have served as a law enforcement officer in West Virginia at some point in their career. W. Va. Code § 5A-8-24(c)(4) (defining "law-enforcement officer" broadly). Thus, fear of liability under Section E of West Virginia's Daniel's Law—notably, $1,000 per violation in liquidated damages—may well lead some to refrain from speaking on the topic of home addresses and phone numbers at all, thereby forcing well-intentioned speakers to "self-censor" so as to "steer wide of the unlawful zone." Counterman, 600 U.S. at 75.

Thus, due to its lack of a notice requirement, Section E of West Virginia's Daniel's Law is far more restrictive than its comparators and is definitively not the least restrictive means of achieving its compelling interest. Section E of West Virginia's Daniel's Law therefore fails

strict scrutiny even as other more narrowly tailored federal and state statutes aiming at the same compelling interest pass constitutional muster. For example, after the Atlas district court found New Jersey's Daniel's Law to be constitutional in an opinion that did not emphasize narrow tailoring because it instead deployed a privacy balancing test, the Supreme Court of New Jersey confronted an as-applied challenge to New Jersey's Daniel's Law and concluded that the statute was constitutional as applied largely because it was narrowly tailored. The court explained, "[E]ven if an individual falls within one of the discrete categories of 'covered persons[]' [identified in the New Jersey statute,] the statute imposes no liability for publishing that individual's address or phone number unless and until an authorized person expressly invokes the protection of [New Jersey's] Daniel's Law by providing the notice required." Kratovil, 261 N.J. at 27, 336 A.3d at 217. Indeed, the court emphasized, "That strict notice requirement ensures that the statute is not a trap for the unwary; to the contrary, following receipt of the statutory notice, the recipient has an opportunity to identify the specific information subject to restrictions on disclosure and take steps to maintain the confidentiality of that information." Id. By contrast, because it lacks a notice requirement, Section E of West Virginia's Daniel's Law is a "trap for the unwary." Id.

The presence of a "strict notice requirement," id., in New Jersey's Daniel's Law was integral to the New Jersey Supreme Court's finding that the New Jersey statute was narrowly tailored and provided a basis upon which to distinguish Florida Star. "[New Jersey's] Daniel's Law substantially differs from the Florida statute struck down in Florida Star, which authorized civil damages against the newspaper with no notice or opportunity to prevent a disclosure or redisclosure of the victim's name." Id. Just as the presence of a notice

39

requirement was critical to the New Jersey Supreme Court's decision to find New Jersey's Daniel's Law narrowly tailored, the absence of any notice requirement in Section E of West Virginia's Daniel's Law is critical to the court's conclusion that West Virginia's Daniel's Law is not narrowly tailored.

This is not to say that a notice requirement is the only conceivable way of narrowly tailoring statutory protections for the home addresses and phone numbers of judicial and law enforcement officers and other public servants. The First Amendment sharply curtails the ability of legislators to impose content-based restrictions on speech, but to the extent it permits any such restrictions to survive strict scrutiny, the First Amendment requires narrow tailoring, not a particular means of narrow tailoring, which ultimately remains a legislative judgment. However, even beyond its lack of a notice requirement, Section E of West Virginia's Daniel's Law lacks another important, albeit related, speech-protective limit on liability.

Significantly, Section E also lacks a knowledge requirement.[20] The Supreme Court has specifically recognized the tendency of statutes restricting speech without a knowledge requirement to exert a chilling effect. In <u>Smith v. California</u>, the Supreme Court found that a criminal statute penalizing the sale of obscene literature violated the First Amendment because it imposed liability on booksellers without premising liability on knowledge of a book's

---

[20] To the extent that there is any doubt that Section E lacks a knowledge requirement, the court notes that the words "knowing" or "knowingly" do not appear in Section E. W. Va. Code § 5A-8-24(e). By contrast, as to government entities, West Virginia's Daniel's Law explicitly states that "a state or local government agency shall not <u>knowingly</u> disclose" protected information. W. Va. Code § 5A-8-24(d). Because the legislature plainly knew how to include a knowledge requirement where it wished to do so, the omission of such language as to private actors in Section E is presumably significant. <u>See</u> <u>Gibson v. Northfield Ins. Co.</u>, 219 W. Va. 40, 47, 631 S.E.2d 598, 605 (2005) ("Explicit direction for something in one provision, and its absence in a parallel provision, implies an intent to negate it in the second context.") (quotation omitted); <u>Christopher J. v. Ames</u>, 241 W. Va. 822, 832, 828 S.E.2d 884, 894 (2019) ("[I]n the interpretation of statutory provisions the familiar maxim <u>expressio unius est exclusio alterius</u>, the express mention of one thing implies the exclusion of another, applies.") (quotation omitted).

obscene contents. As the Court explained, "if the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose, [the seller] will tend to restrict the books he sells to those he has inspected." 361 U.S. 147, 153-54 (1959). The "elimination of the scienter requirement"—defined as "knowledge by appellant of the contents of the book"—was accordingly "an elimination which may tend to work a substantial restriction on the freedom of speech and of the press." Id. at 149-50.[21] Here too, Section E's lack of a knowledge requirement compounds the lack of a notice requirement such that those wishing to comply with West Virginia's Daniel's Law will face the burden of inspecting their speech for any content that might fall within the scope of West Virginia's Daniel's Law. As was the case with booksellers, this is a potentially insurmountable task for those who wish to speak broadly on the topic of home addresses and phone numbers, and many speakers may be chilled from speaking on the topic at all. Section E thereby burdens far more speech than is conceivably related to West Virginia's compelling interest.

Thus, because Section E of West Virginia's Daniel's Law lacks any mechanism, such

---

[21] One could distinguish this case from Smith in that Smith concerned a criminal statute. In the criminal context, a mens rea requirement provides a more important safeguard than is needed when mere civil liability is at stake. However, at the same time, Smith concerned obscenity, while the speech affected by West Virginia's Daniel's Law does not fall within a category of unprotected speech. These factors likely balance out to require at least as much constitutional protection here as in Smith. Florida Star, 491 U.S. at 539 (finding it constitutionally troubling that a civil statute imposing damages for the publication of the name of a rape victim lacked a "a scienter requirement of any kind . . . , engendering the perverse result that truthful publications challenged pursuant to this cause of action are less protected by the First Amendment than even the least protected [categories of unprotected speech, like obscenity]"). And regardless, Smith's logic concerning chilling effect is not confined to the criminal context. Defendants would go further in arguing that Smith provides a freestanding basis on which to find Section E of West Virginia's Daniel's Law unconstitutional. Mem. Supp. Mot. Dismiss, ECF No. 28 at 39 (arguing that the Supreme Court has held that speech—even unprotected speech like the obscenity at issue in Smith—may not be sanctioned unless the defendant at least had knowledge of the "[p]roblematic aspects of their speech"); see also Florida Star, 491 U.S. at 539 (finding that a negligence per se standard was not constitutionally adequate in a case concerning a civil statute that prohibited publication of the name of a rape victim without requiring a "case-by-case" analysis). However, because Section E of West Virginia's Daniel's Law fails strict scrutiny as a content-based regulation of speech due to its lack of a notice requirement, there is no need to rest exclusively on Smith.

as a notice requirement or a knowledge element, that could narrowly tailor the provision to West Virginia's compelling interest in protecting judicial and law enforcement officers, Section E of West Virginia's Daniel's Law fails strict scrutiny and is unconstitutional.

## CONCLUSION

The conclusion that Section E of West Virginia's Daniel's Law fails strict scrutiny as a content-based restriction of speech justifies granting the motion to dismiss. The court need not go on to address vagueness. See Brayshaw, 709 F. Supp. 2d at 1250 (declining to consider vagueness after finding that a statute violated the First Amendment as a content-based restriction of speech). Nor need the court seriously consider Jackson's final argument to salvage the constitutionality of Section E of West Virginia's Daniel's Law as an exercise of West Virginia's police power protected by the Tenth Amendment. Opp'n, ECF No. 30 at 39. The Tenth Amendment does not displace the First and Fourteenth Amendments. Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 588 U.S. 504, 521-22 (2019) (noting that the state's "police power" is limited to "regulations that do not . . . violate rights secured by the Constitution of the United States.").

This is not to say that the court is not sensitive to the comity concerns presented whenever a federal court is asked to consider the facial unconstitutionality of a state statute. The court is well aware that it has analyzed Section E of West Virginia's Daniel's Law in this opinion without aid of any interpretation of the provision by West Virginia's courts or any briefing from the state's perspective. Indeed, the issue of Section E of West Virginia's Daniel's Law's constitutionality arises in this case in the posture of private defendants' motion to dismiss civil suits brought by a private plaintiff, and West Virginia is not a party in this litigation

as the West Virginia Attorney General declined the parties' and the court's invitations to weigh in. Out of concern for the deference owed in interpreting a state statute to evaluate its constitutionality, this opinion has emphasized facially apparent defects in Section E, such as its lack of a notice requirement, and, where applicable, considered the principles of statutory interpretation that would be applied by West Virginia courts. See supra note 20. Ultimately, although West Virginia courts hold that "[w]herever an act of the Legislature can be so construed and applied as to avoid a conflict with the Constitution, . . . such construction will be adopted by the courts," Cottrill, 200 W. Va. at 698, 490 S.E.2d at 785, there is no construction to which Section E of West Virginia's Daniel's Law is "readily susceptible" that would render it constitutional, Stevens, 559 U.S. at 130.

No amount of due deference to the West Virginia Legislature and to its undoubtedly compelling interest in enhancing the safety of judicial and law enforcement officers can justify permitting this case to proceed against defendants, infringing their freedom to speak without content-based restrictions in violation of the First and Fourteenth Amendments. The standard for facial unconstitutionality has been met in this case because Section E of West Virginia's Daniel's Law's "unconstitutional applications are substantial compared to its constitutional ones." Moody, 603 U.S. at 718. Because Section E of West Virginia's Daniel's Law lacks a notice or knowledge requirement, it is unconstitutional on its face, and, accordingly, "no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon, 467 U.S. at 73. Thus, defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim is **GRANTED** with prejudice.[22]

---

[22] The court specifically notes that dismissal with prejudice is warranted because amendment would be futile

An appropriate order will be entered.

Entered: **08 – 18 – 2025**

Michael F. Urbanski
Senior United States District Judge

---

where Jackson's "theory of liability"—indeed, his cause of action—depends upon an unconstitutional statutory provision. <u>Cozzarelli</u>, 549 F.3d at 630.