# ZAZZALI, P.C.

A PROFESSIONAL CORPORATION
**ATTORNEYS AT LAW**

570 BROAD STREET, SUITE 1402
NEWARK, NJ 07102
Telephone: (973) 623-1822
Telecopier: (973) 623-2209

150 West State Street
Trenton, NJ 08608
Telephone: (609) 392-8172
Telecopier: (609) 392-8933

www.zazzali-law.com

**Please Reply to Newark**

ANDREW F. ZAZZALI (1899-1969)

ANDREW F. ZAZZALI, JR.
RICHARD A. FRIEDMAN
EDWARD H. O'HARE*
COLIN M. LYNCH**
RAYMOND M. BALDINO**
ALBERT J. LEONARDO**
SHEILA MURUGAN**
ZACHARY RAMSFELDER**
WESLEY B. FRIEDMAN****

COUNSEL
KATHLEEN NAPRSTEK CERISANO
JASON E. SOKOLOWSKI
DANIEL GEDDES‡‡

OF COUNSEL
JAMES R. ZAZZALI***
ROBERT A. FAGELLA**
PAUL A. MONTALBANO
BRADY M. CONNAUGHTON**
MATTHEW G. CONNAUGHTON**

*Also admitted Pennsylvania
**Also admitted New York
***Also admitted New York and DC
****Also admitted New York and Illinois
‡‡Workers Compensation Law Attorney


September 2, 2026

**<u>VIACM/ECF</u>**
Patricia S. Dodszuweit, Clerk of Court
Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, Pennsylvania 19106

**Re: Atlas Data Privacy Corp. et al. v. We Inform, LLC et al.,**
**<u>Third Circuit Court of Appeals Docket No. 25-1555 (Consolidated)</u>**

Dear Honorable Judges:

Please accept this letter, in lieu of a more formal brief, on behalf of Amici, New Jersey State Policemen's Benevolent Association ("State PBA"). We respectfully write to the Court as *Amici* to briefly comment on the supplemental submission by the Defendant, We Inform, LLC. That submission, argues, or attempts to argue, that Daniel's Law is facially unconstitutional, in part, as it is not tailored sufficiently narrow to further the government's otherwise legitimate interests.

The State PBA respectfully disagrees. As noted in a prior filing, the State PBA represents over 33,000 active State, County and Municipal law enforcement officers throughout the State of New Jersey, as well as approximately 23,000 retired law enforcement officers, comprised of approximately 350 Local PBA affiliates. They and their families fall within the class of "covered persons" Daniel's Law was and is designed to protect. The State PBA partnered with the

Plaintiff/Appellee, Atlas Data Privacy, Corp. ("Atlas)", to ensure that the privacy rights of its members established by Daniel's Law were effectively implemented. Effective implementation, respectfully, stems from the Law's civil enforcement architecture now under review. From the perspective of the State PBA, Daniel's Law is effectively tailored to protect the privacy interests of its members. That tailoring is demonstrated by Law's effectiveness in protecting the privacy interests of persons covered under the law, inclusive of, but not limited to State PBA members, through partnership with and assignment of rights to Atlas, and similar entities.

We, respectfully, direct this Court to the recent analysis by Matthew Adkisson and John Muffler, *Silence Is Not Compliance: Evidence from Two Judicial-Privacy Regimes* (September 1, 2026) (https://doi.org/10.5281/zenodo.22257002). This article/study demonstrates, empirically, that Daniel's Law's civil enforcement mechanisms are substantially more effective in ensuring that the privacy safeguards established by the Law are honored – more so than similar protections afforded under similar federal law that, in contrast to Daniel's Law, lack the tailored civil enforcement infrastructure embodied in Daniel's law, which is essential to fulfilling the Law's salutary purpose. A copy of this article is filed with this letter brief appended to the Certification of the undersigned as "Exhibit A."

We thank the Court for its attention to and consideration of this matter.

Respectfully submitted,

/s/ *Richard Friedman*
Richard Friedman, Esq.
Bar ID: 011211978

Cc: All counsel of record (via CM/ECF)

**DECLARATION OF COLIN M. LYNCH, ESQ.**

I, RICHARD FRIEDMAN, ESQ., being of full age, hereby depose and say:

1. I am attorney at law and licensed by the State of New Jersey and admitted to practice in the New Jersey Federal District Court and Third Circuit Court of Appeals, and legal counsel to *Amici*, the New Jersey State Policemen's Benevolent Association ("State PBA")

2. Attached hereto as "Exhibit A" is a true copy of the article by Matthew Adkisson and John Muffler entitled "*Silence Is Not Compliance: Evidence from Two Judicial-Privacy Regimes*" (September 1, 2026).

I hereby certify that the forgoing statements made by me are true to the best of my knowledge and belief. I am aware that if any of the forgoing statements made by me are willfully false, I am subject to punishment.

/s/ *Richard Friedman*
Richard Friedman, Esq.

Dated: September 2, 2026

# EXHIBIT A

# Silence is Not Compliance: Evidence from Two Judicial-Privacy Regimes

By Matthew Adkisson[1] and John Muffler[2]

Draft: September 1, 2026

[1] Matthew Adkisson is the founder and President of Atlas Data Privacy Corporation, a data privacy and security company, and a co-founder of the Alliance for Data Privacy and Security, a 501(c)3 non-profit organization dedicated to the expansion of privacy laws. Prior to starting Atlas, he worked as a software architect and engineer, co-founding several global cybersecurity companies.

[2] John Muffler is a former United States Marshals Service Chief Inspector who retired after 24 years of service. At the Marshals, he created and led the National Center for Judicial Security. He continues to work as a security consultant and threat assessment expert.

**Author's note and litigation disclosures.** Mr. Adkisson is the study's principal investigator; Atlas Data Privacy Corporation, of which he is founder and President, is the plaintiff in the Daniel's Law litigations from which the audited website sample derives and whose user records supplied the officer cohorts. Atlas and its counsel funded the audit in full, including investigator compensation and paid website access; no federal funds supported it. Mr. Muffler joined the study in August 2026 as collection was concluding, having seen no results at that point, to review, assess, and help present the findings; he previously consulted for Atlas in advocacy for Daniel's Law legislation in Florida. He is not involved in Daniel's Law litigation. He is not compensated for this study. The investigators who performed the searches were retained by and worked at the direction of Atlas's litigation counsel. Part III states the research roles, decision rights, and safeguards in full.

**Acknowledgments.** First and foremost the authors acknowledge and thank Judge Esther Salas for her tireless advocacy in support of Daniel's Law, the Anderl Act, and other judicial privacy and security legislation. We wish to acknowledge the United States Marshals Service and other federal and state law-enforcement agencies we have worked with and who work relentlessly to protect judges and other public servants against increasingly violent threats. We hope the evidence and insights from this audit will help make those agencies and their efforts even more effective. Lastly, we acknowledge and thank the tens of thousands of prosecutors and law-enforcement officers—and their family members—from every corner of New Jersey who decided to step up and be the "tip of the spear" to protect not only themselves but the next generation following in their footsteps. We hope in reading this you understand the difference you have made.

**Corresponding author.** Matthew Adkisson, Atlas Data Privacy Corporation, matt@atlas.net; also, the Alliance for Data Privacy and Security, matt@dataprivacy.org (preferred).

**Data and materials.** Public research materials including analysis code, a claim registry, aggregate tables, coarsened website metadata, and documentation will be deposited in a versioned repository with a durable DOI. The preprint will be updated when the deposit becomes public. The subject-level materials described in Part III.G are withheld.

# Abstract

Daniel Anderl, the son of United States District Judge Esther Salas, was killed at his family's home in 2020 by a gunman who had found the address online. Two judicial-privacy laws bear his name. New Jersey's Daniel's Law and the federal Anderl Act both require data brokers to remove a protected person's home address on request but differ in what follows when a request is ignored. Daniel's Law creates a private right of action, permits assignment of claims, and mandates at least $1,000 per violation without a separate fault element. The Anderl Act allows only specified government officials to sue and permits damages only if a defendant knowingly violates a resulting court order, with any award left to the court's discretion. By September 2026, 184 suits had been filed under the state law; a documented search found no publicly reported federal enforcement action. This Article asks whether the lack of litigation under the federal law reflects compliance with its requests.

Between March and August 2026, investigators searched 87 data-broker websites accessible to the general public to determine how often they disclosed the home addresses of 100 active federal judges from multiple judicial districts. Investigators identified a presumptive primary residence for each judge. Federal officials confirmed the initial thirty-seven addresses as accurate and later reported that thirty-four of those judges had been fully enrolled in the federal removal program before the audit began. Investigators searched the same websites for forty-eight New Jersey law-enforcement officers: twenty-four who had sent Daniel's Law requests through a request-delivery platform and twenty-four who met the same age and homeownership criteria but had sent none through it. To our knowledge, this is the first cohort-based test of how two judicial-privacy laws perform in practice.

Requesting officers appeared on an average of 12.5 data broker websites; comparison officers, on 62.7; both judicial cohorts fell between them. Judges appeared less often on websites listed by the federal judiciary's removal vendor than on the rest. The design is observational; the different enforcement architectures are the best available explanation. The Article describes the state regime as one of notice-based liability. Its goal is routine compliance: valid requests are ordinarily honored without litigation, with credible enforcement available when they are not. It proposes a federal repair built on that architecture. The larger lesson is not confined to judges: every statutory privacy right needs a credible path from violation, through enforcement, to consequence. Only then does the promise of a privacy law become protection one can count on.

# Introduction

On the evening of July 19, 2020, a gunman posing as a delivery driver rang the doorbell at the New Jersey home of United States District Judge Esther Salas. He was a lawyer who had appeared before the judge and had posted extensive racist and misogynistic writings online, including violent fantasies.[1] He had obtained her home address on the internet and traveled across the country intending to assassinate her.[2] The judge's twenty-year-old son, Daniel Anderl, answered the door and was shot and killed confronting the gunman. Mark Anderl, the judge's husband and Daniel's father, was shot three times and critically wounded before the gunman fled.[3] Out of that attack came two laws—one state and one federal—both named in Daniel's honor and both intended to protect judges and their families from such targeted violence.[4]

This Article asks whether those laws are working. That question was first put to us in March 2026 by Judge Salas herself.[5] By then, both laws had been in effect for years. Daniel's Law is a New Jersey state statute covering certain public servants—judges, prosecutors, law-enforcement officers, and child-protective investigators—and their family members.[6] It has produced a wave of litigation: 184 suits filed against data brokers since February 2024. Those suits have yielded judgments exceeding $200 million and orders transferring data-broker domain names, alongside a First Amendment challenge briefed and argued before the Third

---

[1] See U.S. Marshals Serv., Case Study: Attack on the Family of U.S. District Court Judge Esther Salas 3, 18 (Feb. 2021) [hereinafter USMS Case Study]; Holly Jeanine Boux, The Threat Is Coming from Inside the Bar: Using the Rules of Professional Discipline to Challenge Gender-Based Threats and Violence, 37 Geo. J. Legal Ethics 207, 209–10 (2024).

[2] Atlas Data Privacy Corp. v. We Inform, LLC, No. A-8-25, slip op. at 18–19 (N.J. Aug. 12, 2026); see also USMS Case Study, supra note 1, at 6–8.

[3] Esther Salas, Video Statement (Aug. 3, 2020), quoted in Federal Judge Says Her Son Died Protecting His Father from "Madman," CBS News (Aug. 3, 2020, 7:16 PM EDT), https://www.cbsnews.com/. news/judge-esther-salas-son-died-protecting-his-father-ambush/; Keith Zubrow, U.S. Judge Esther Salas Tells Her Story on 60 Minutes, CBS News: 60 Minutes Overtime (Feb. 21, 2021, 7:00 PM EST), https://www.cbsnews.com/news/judge-esther-salas-60-minutes-2021-02-21/.

[4] Daniel's Law, 2020 N.J. Laws ch. 125 (codified as amended in scattered sections of N.J. Stat. Ann. tits. 2C, 47, 56); Daniel Anderl Judicial Security and Privacy Act of 2022, Pub. L. No. 117-263, div. E, tit. LIX, subtit. D, §§ 5931–5939, 136 Stat. 2395, 3458–69 (2022) (set out as a note preceding 28 U.S.C. § 601) [hereinafter Anderl Act].

[5] Authors' notes of meeting with Judge Esther Salas (Mar. 2026) (on file with authors).

[6] N.J. Stat. Ann. § 56:8-166.1(d) (defining "covered person" to include co-resident immediate family members).

Circuit and a certified question of state law answered by the New Jersey Supreme Court.[7] Its federal counterpart, the Daniel Anderl Judicial Security and Privacy Act, has produced no enforcement action that we could find in court dockets, agency materials, or other public sources.[8] To Judge Salas and others, that silence had looked like success: judges could ask to have their personal information removed, and no one had ever needed to go to court. Why, she asked, had the state law generated so much litigation while the federal law quietly did its job?

The question supposes that the absence of litigation signals compliance. Drawing on a comparative audit of online home-address exposure among federal judges and New Jersey law-enforcement officers, this Article argues the opposite. Silence is not compliance. The federal Act's silent public enforcement record is not the sign of a job done but of a right no one visibly enforces. A law requiring data brokers to cease disclosing a home address works only as well as the enforcement that makes complying prudent and ignoring it costly. New Jersey placed a private right of action in the hands of the individuals its law covers—and they used it. The federal law provided no such right and relied instead on government enforcement, but a documented search found no publicly reported action invoking that authority.[9] One request-and-removal regime worked far better than the other.

The two statutes make that comparison possible—an opportunity rarely available in privacy-law research. Both arose from the same attack. They differ in scope: New Jersey's law reaches a broader class of public servants, and the federal law reaches more categories of personal information.[10] Yet they both obligate data brokers to remove a protected person's[11] home address on request. That common requirement allows us to evaluate both regimes using the same outcome measure: for each protected person, we counted how many audited data-broker websites still disclosed that person's primary home address.

---

[7] As of September 1, 2026, Atlas's ledger records 184 separately docketed Daniel's Law actions filed since February 2024 (on file with authors). One default judgment awarded $175,336,000 under the statutory liquidated-damages formula and $43,000,000 in punitive damages. *Atlas Data Privacy Corp. v. Cole Information Services, Inc.*, No. ESX-L-7209-24, slip op. at 8–9, 12 (N.J. Super. Ct. Law Div. Sept. 19, 2025). These are awards, not collections. See infra Part II.B and notes 99–103.

[8] A public-source search through September 1, 2026, found no civil action under § 5934(f) or other publicly reported enforcement under the Act. See infra Part II note 87 (repositories, terms, and limits); Anthony M. Ciolli, *Judicial Security in the Data Economy*, 27 N.C. J.L. & Tech. 385, 389 (2026) (same).

[9] N.J. Stat. Ann. § 56:8-166.1(b)–(c); Anderl Act § 5934(f)(1)–(3), 136 Stat. at 3466; see supra note 8.

[10] Compare N.J. Stat. Ann. § 56:8-166.1(d), with Anderl Act § 5933(1)–(2), 136 Stat. at 3459–60.

[11] "Protected person" is this Article's umbrella for Daniel's Law's "covered person" and the federal Act's "at-risk individual." See supra note 6; Anderl Act § 5933(1), 136 Stat. at 3459–60.

If enforcement improves data-broker compliance, stronger enforcement should correspond to lower post-request exposure. The federal Act leaves enforcement to government officials; Daniel's Law gives covered persons a private right of action, provides for liquidated damages that can increase as disclosures continue, and lets claims be assigned and pooled.[12] Once a request reaches a broker, only the state law backs it with an established record of private enforcement. New Jersey officers who sent Daniel's Law requests should therefore appear on substantially fewer audited websites than federal judges. That comparison is most probative on websites to which federal requests were presumptively transmitted; continued disclosure there would be consistent with a failure to enforce any resulting removal obligation.[13] That is a testable proposition, and we tested it.

We began where any attacker could: with each judge's public judicial profile and nothing else. A team of investigators then searched data-broker websites accessible to the general public[14] for the primary home address of each active district and magistrate judge in an initial pool. When investigators reached high confidence that they had found a judge's primary residence, they recorded the address as presumptive. The team located one for every judge. The authors later received oral confirmation from multiple federal officials that every address the team had identified was accurate. On average, a judge in that initial pool appeared on more than forty of the eighty-seven audited data-broker websites. The audit later expanded the judicial sample to one hundred judges drawn from multiple federal districts.[15] The team identified a presumptive home address for all one hundred.[16]

---

[12] N.J. Stat. Ann. § 56:8-166.1(b), (c)(1), (d); see infra note 66 and accompanying text; Cole Info. Servs., No. ESX-L-7209-24, slip op. at 7–8.

[13] The archived vendor list included 50 of the 87 audited websites. See DeleteMe, *Sites We Remove From*, https://joindeleteme.com/sites-we-remove-from/ (archived copy on file with authors). List membership is a transmission proxy, not proof of receipt. See infra Parts III.C.2, IV.B.

[14] "Accessible to the general public" means accessible without institutional access, protected status, or verified professional credentials. At the time of the audit, some audited websites required account registration or payment, and two required an enhanced vetting step, including a brief interview, before granting access. Those two websites' terms stated that access was limited to broad occupational groups (real-estate professionals on one; legal and investigative professionals on the other); the audit classifies access by what obtaining it required, not by eligibility statements, and even credited, the stated groups include millions of people in the United States. No audited website required institutional access or a protected status. Part III describes the access tiers.

[15] The additional districts were selected purposively; their identities and the selection criteria are withheld at the request of federal officials, for security reasons. Part III details cohort construction and the external-validity limits of purposive selection.

[16] Only the initial judicial pool's addresses were externally confirmed; the remainder were classified as presumptive under the protocol described in Part III. See infra Part III.B.2.

Those addresses were not supposed to be so widely available. According to federal officials, thirty-four of the judges—reported in this Article as cohort 1—were fully enrolled in the federal removal program as of 2025, before the audit began.[17] Yet every one was found. Most of the brokers whose websites disclosed the federal judges' addresses had been sued under Daniel's Law in February 2024—more than two years before the audit. Ample time to adjust how they handled removal requests under state and federal law.[18] For comparison, we randomly selected twenty-four New Jersey law-enforcement officers from among users of Atlas—a data-privacy company—who met age and homeownership criteria and had sent Daniel's Law requests to the brokers operating those same eighty-seven websites. The officers had assigned their claims to Atlas, which pursued them in court. Searches of the same websites, under the same outcome rules, found the average cohort-1 judge on more than forty and the average officer on thirteen.[19]

Perhaps that gap reflected underlying differences between judges and officers rather than the request-and-enforcement process. Because we could not reconstruct the officers' exposure before they sent requests, we built the closest available benchmark: twenty-four additional New Jersey law-enforcement officers randomly selected from among Atlas users who met the same age and homeownership criteria but had sent no removal requests through Atlas's platform. Investigators applied the same search protocol to both officer cohorts. The difference was stark: the average officer in the second cohort appeared on more than sixty audited websites, compared with thirteen for the average requesting officer.[20] Across the full federal sample, judges' average exposure fell between the two officer cohorts. The gap between judges and the second cohort was much larger on websites listed by the federal removal vendor—our best

[17] After collection, federal officials orally reported that 34 initial-pool judges were "fully enrolled"—their term for maximum protection—as of end of year 2025. Notes are on file. Individual statuses are restricted, identify no judge, and are used only to define the reporting cohorts. See infra Part III.B.1. The Judiciary's 2025 national count is not comparable because it uses a different date and denominator.

[18] All 87 websites were operated by defendants sued by April 30, 2025. Of 55 common-control groups, 48—comprising 80 websites—were sued in February 2024. See infra Parts III.C.1, III.F.2; public research materials.

[19] Atlas records and receipts show that each officer's requests were delivered to every audited broker. Exposure is the number of the 87 audited websites on which a subject's primary home address appeared; each separately accessible URL counted once. Cohort 1 (n = 34): mean 41.2, median 40.5; requesting officers (n = 24): mean 12.5, median 11.5. Searches began from different information. See infra Parts III.B.2, III.D, III.E; Part IV, Table 1.

[20] Comparison cohort (n = 24): mean 62.7, median 67.5. Requests sent outside Atlas's platform would not appear in its records; any second-cohort officer who sent one would be misclassified as having sent no recorded request, potentially understating the difference between cohorts. The observed ranges did not overlap: requesting officers appeared on 4–24 audited websites and second-cohort officers on 28–82. See infra Part III.B.1 (describing cohort selection).

available proxy for transmission of federal requests—than off the list, where it narrowed sharply but did not disappear.[21] That pattern runs in the direction the enforcement account implies; the off-list residual is why this Article treats the second cohort as a rough benchmark rather than a baseline.

Taken together, those comparisons point to what the judges lacked: private enforcement. This Article argues that a privacy right becomes real when three features operate together: a private right of action, which gives the protected person both authority to sue and a stake in every violation, rather than lodging enforcement in an agency that must ration finite resources among competing responsibilities;[22] statutory or liquidated damages, which fix a price the broker can predict and the plaintiff can recover without proving a dollar figure of harm;[23] and assignability, which lets claims that are impractical to pursue alone be aggregated, funded, and prosecuted together.[24] None of these mechanisms is new: American law has long used them in different combinations, including through qui tam actions, the Fair Debt Collection Practices Act, and the Telephone Consumer Protection Act.[25] Daniel's Law has all three features; the federal Act has none of them.[26]

A single claim is unlikely to attract counsel, and hundreds of data brokers are too many for one person to sue.[27] Without assignment, an officer would have to find each violation, sue each violator, finance litigation against hundreds of defendants, and attempt to collect any resulting judgments—a lone plaintiff against a global industry. Assignment lets enforcement match the

---

[21] Across the full federal-judge sample (n = 100), mean exposure on the vendor's published list (50 websites) was 15.3 versus 36.1 for the second cohort; off the list (37 websites), 21.2 versus 26.6. Part IV reports the website-level analysis.

[22] See Michael Sant'Ambrogio, Private Enforcement in Administrative Courts, 72 Vand. L. Rev. 425, 426, 437–38 (2019).

[23] See N.J. Stat. Ann. § 56:8-166.1(c)(1); see generally Daniel J. Solove & Danielle Keats Citron, Risk and Anxiety: A Theory of Data-Breach Harms, 96 Tex. L. Rev. 737 (2018).

[24] The audit evaluates the combined request-and-enforcement process; it cannot separately identify the marginal effect or establish the necessity of any single feature.

[25] See 31 U.S.C. §§ 3729–3730; Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 773–74 (2000); 15 U.S.C. § 1692k; 47 U.S.C. § 227(b)(3); see generally Sean Farhang, The Litigation State: Public Regulation and Private Lawsuits in the U.S. (2010).

[26] Compare Daniel's Law, N.J. Stat. Ann. § 56:8-166.1(b)–(d), with Anderl Act § 5934(f), 136 Stat. at 3466.

[27] California's Data Broker Registry listed 581 brokers as of June 2, 2026. See Cal. Priv. Prot. Agency, Privacy Momentum Builds: 300,000+ Californians Sign Up for DROP as Registered Data Brokers Hit a Record High (June 2, 2026), https://privacy.ca.gov/2026/06/privacy-momentum-builds-300000-californians-sign-up-for-drop-as-registered-data-brokers-hit-a-record-high/. On low-value claims, see Omri Ben-Shahar, The Paradox of Access Justice, and Its Application to Mandatory Arbitration, 83 U. Chi. L. Rev. 1755, 1807–08 (2016).

scale of the violations. The requesting officers assigned their claims without individually retaining counsel, advancing litigation costs, or appearing by name in any case caption. The claims went forward, and the requesting officers were the audit's least-exposed cohort. Assignment and pooling turned isolated claims into coordinated enforcement. In that way, the first assignors send their claims through the courthouse door so that those who follow need not.[28]

More broadly, existing scholarship links privacy rights to enforcement and documents data-broker harms that the law has been slow to recognize.[29] A newer empirical literature has begun measuring broker compliance, including among consumers and federal judges. This Article instead compares person-level home-address exposure across federal judges and two observational cohorts of New Jersey law-enforcement officers selected under common age and homeownership criteria. To our knowledge, it is the first cohort-based test of how two judicial-privacy laws perform in practice, with the addresses in its initial judicial sample independently confirmed by federal officials.[30] The Article also provides analysis code, aggregate data, and documentation that others can inspect, critique, and adapt.

---

[28] See Rebecca L. Sandefur, Access to What?, 148 Dædalus 49, 49–52 (2019); Omri Ben-Shahar, *The Paradox of Access Justice, and Its Application to Mandatory Arbitration*, 83 U. Chi. L. Rev. 1755, 1807–08 (2016). Part V extends these accounts from class litigation to claim assignment.

[29] On enforcement, see Ari Ezra Waldman, Privacy Law's False Promise, 97 Wash. U. L. Rev. 773, 803–07 (2020); Lauren Henry Scholz, Privacy Remedies, 94 Ind. L.J. 653, 688 (2019). On data-broker harms, see Thomas E. Kadri, Brokered Abuse, in Media and Society After Technological Disruption 111, 111–26 (Kyle Langvardt & Justin (Gus) Hurwitz eds., 2024); see also Danielle Keats Citron & Daniel J. Solove, Privacy Harms, 102 B.U. L. Rev. 793, 830–35 (2022).

[30] See Incogni Research, Judges at Risk: The Alarming Exposure of Personal Information Online (Mar. 25, 2025), https://blog.incogni.com/judges-personal-information-exposed/; Kejsi Take et al., What to Expect When You're Accessing: An Exploration of User Privacy Rights in People Search Websites, 2024 Proc. Priv. Enhancing Techs. (no. 4) 311, https://doi.org/10.56553/popets-2024-0118; Consumer Reports & Tall Poppy, Data Defense: Evaluating People-Search Site Removal Services (Aug. 8, 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/08/Data-Defense_-Evaluating-People-Search-Site-Removal-Services-.pdf; Jiahui He et al., Measuring the Accuracy and Effectiveness of PII Removal Services, 2025 Proc. Priv. Enhancing Techs. (no. 4) 166, https://doi.org/10.56553/popets-2025-0125; Elina van Kempen et al., Consumer Beware! Exploring Data Brokers' CCPA Compliance, arXiv:2506.21914 (Nov. 14, 2025), https://doi.org/10.48550/arXiv.2506.21914; Elina van Kempen et al., Let My Data Go: Data Brokers' Compliance with Opt-Out & Deletion Requests, arXiv:2607.04552 (July 5, 2026), https://doi.org/10.48550/arXiv.2607.04552; Gueorguieva et al., infra note 74. We identified no prior study combining two officer cohorts distinguished by Atlas-recorded requests, independent confirmation of the initial judicial sample's addresses, and a cross-regime comparison. For doctrinal treatment, see Ciolli, supra note 8.

The comparison reframes a policy debate centered on scope: these laws cover judges while leaving many others facing similar threats outside their reach.[31] That criticism leaves a premise untested—that the protected are protected. As to online home-address exposure, the hundred federal judges in our audit were not. In the data-broker market, the central constraint is not the breadth of the right but its enforcement architecture: a request succeeds or fails on what a broker risks by ignoring it, not merely on the statutory words that authorize it. The end state is one in which brokers honor the right on request without requiring each protected person to sue. We call that access to a just market.

The Article proceeds in five Parts. Part I compares the statutes as written: a shared request-and-removal obligation paired with different enforcement architectures. Part II traces their enforcement histories: Daniel's Law has produced a wave of private suits, while a documented search found no publicly reported government enforcement action under the federal Act. Part III describes the audit and its limits. Part IV reports the results. Part V considers what the exposure differences permit us to infer about enforcement architecture, develops the concept of access to a just market, and examines the implications for judges and the millions of Americans whose statutory privacy rights may likewise prove difficult to enforce.[32] The Conclusion returns to the stakes. The Appendix reports supplementary analyses; the public research materials provide the analysis code, aggregate data, and documentation.

[31] Daniel J. Solove, Data Is What Data Does: Regulating Based on Harm and Risk Instead of Sensitive Data, 118 Nw. U. L. Rev. 1081, 1120 (2024) ("[T]here are countless other people who are in just as much peril and who lack comparable protections."). See infra Conclusion.

[32] Roughly 160 million Americans—nearly half the country—live in the twenty-three states that had enacted comprehensive consumer-privacy statutes as of September 1, 2026, nineteen of them in force; the count excludes Florida's narrower Digital Bill of Rights. State lists compiled from the IAPP's state privacy legislation tracker and contemporaneous enactment reports; populations from U.S. Census Bureau, Vintage 2025 Population Estimates (July 1, 2025) (in-force states: 147,988,926 of 341,784,857; all twenty-three: 162,568,154). The Article does not claim that those statutes are unenforceable; it asks whether their request-based, publicly enforced design carries the same risk the federal Act's did.

# Part I. The Two Laws on Paper

**A. The Exposure the Laws Address**

Daniel Anderl's murder in July 2020 crystallized a danger that had been building for years. Congress found that threats and other inappropriate communications against federal judges and other judiciary personnel rose from 926 in 2015 to approximately 4,449 in 2019.[33] The danger persisted: in fiscal year 2025, the United States Marshals Service recorded 564 threats directed at 396 federal judges.[34] The peer-reviewed record reaches further back. The first systematic review of judicial homicides in the United States identifies fifty-four judges killed since the 1800s and links more than half to their judicial work—a proportion the authors treat as understated because the assailant's relationship to the judge was unknown in some cases.[35] Attacks against judges often stem from intense grievances rooted in legal decisions. Judges often live and work in the same communities as those appearing before them, creating opportunities for access and vulnerability.[36]

That record also points repeatedly to the home. Courthouses concentrate protection—magnetometers, marshals, controlled entries—but many modern attacks have reached judges and their families where they live: Judge Daronco, shot outside his New York home in 1988 by the father of a litigant; Judge Vance, killed in 1989 by a mail bomb opened at his kitchen table; Judge Lefkow's husband and mother, murdered in her Chicago home in 2005; Daniel Anderl, at the family's front door in 2020; Judge Roemer, killed in his Wisconsin home in 2022 by a man he had sentenced; Judge Wilkinson, shot in his Maryland driveway in 2023,

---

[33] Daniel Anderl Judicial Security and Privacy Act of 2022, Pub. L. No. 117-263, div. E, tit. LIX, subtit. D, § 5932(a)(3), 136 Stat. 2395, 3459 (2022); see supra notes 1–3 and accompanying text.

[34] U.S. Marshals Serv., U.S. Dep't of Just., Protective Investigations—Threat Statistics (data through Aug. 17, 2026), https://www.usmarshals.gov/what-we-do/judicial-security/protective-investigations-threat-statistics (fiscal year 2025: 807 protective investigations, 564 threats, and 396 unique judges threatened). The statutory-findings and table series use different definitions and are not commensurable, and the table counts threats non-uniquely; neither series connects any threat to online exposure. In a 2024 national survey of state-court judges, 90.2% reported concern about online PII exposure and 82.7% worried about their safety. Christine M. McDermott et al., Perceptions and Experiences with Judicial Security Threats: A Survey of U.S. State Court Judges, 60 Ct. Rev. 102, 104 tbl.2 (2024).

[35] William N. Robiner & Eugene Borgida, Judges at Risk: A Review of Homicides of U.S. Judges, 43 Behav. Sci. & L. 634, 634, 640 (2025); see id. at 636.

[36] Frederick S. Calhoun & Stephen W. Weston, Threat Assessment and Management Strategies: Identifying the Howlers and Hunters (2008); John F. Muffler, From Grievance to Attack: The Modus Operandi of Judicial Attackers, with Tips for Your Protection, Judges' J., Summer 2023, at 24; cf. Robiner & Borgida, supra note 35, at 634, 640.

hours after ruling against a litigant in a child-custody case.[37] Every attack in that canon shared a precondition: the assailant had found where the judge lived. A home can be hardened—alarms, cameras, a Marshals detail when a threat warrants one. But physical security is the last line of defense, and a costly one: some protections must be maintained indefinitely against attacks that may never come, by a Service that already describes its protective workload as unsustainable.[38] Guards at the door meet an attack already underway; making the address harder to find can stop one in the planning stages.

Home addresses have never been easier to find. A generation ago, a search had natural limits: the phone book was local, and the public records that could reveal an address sat scattered across courthouse files and county archives, possessed of what the Supreme Court in 1989 called their "practical obscurity"—the Court itself recognizing the "vast difference" between records that "might be found after a diligent search" and "a computerized summary located in a single clearinghouse of information."[39] Technology eroded those limits. Once public records went digital, they could be enriched, cross-indexed, stored indefinitely, and searched from anywhere.[40] A market formed to do exactly that. People-search brokers assemble files that may draw from property records, motor-vehicle records, and voter rolls; compile them into searchable profiles; and make home addresses available to anyone.[41] The attacks show what that means in practice. In 2013, a man whom Judge Timothy Corrigan had sentenced bought the

---

[37] See Robiner & Borgida, supra note 35, at 635–36, 639–40 tbls.2–3. See also Protecting the Judiciary at Home and in the Courthouse: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 6–8 (2005) (statement of Hon. Joan Humphrey Lefkow, J., U.S. Dist. Ct. for the N. Dist. of Ill.); Press Release, Md. Judiciary, Maryland Judiciary Issues Statement on the Death of Circuit Court for Washington County Judge Andrew Wilkinson (Oct. 20, 2023), https://mdcourts.gov/media/news/2023/pr20231020; Associated Press, Alabama to Execute Convicted Mail Bomber Nearly 30 Years After Crimes, CBS News (Mar. 22, 2018), https://www.cbsnews.com/news/alabama-to-execute-convicted-mail-bomber-nearly-30-years-after-crimes/; Robiner & Borgida, supra note 35, at 643.

[38] See Off. of the Inspector Gen., U.S. Dep't of Just., Audit Rep. No. 24-099, Audit of the United States Marshals Service's Home Intrusion Detection System Program 2 (2024); Oversight of the United States Marshals Service: Hearing Before the Subcomm. on Crime & Fed. Gov't Surveillance of the H. Comm. on the Judiciary, 118th Cong. 7 (2024) (statement of Ronald L. Davis, Dir., U.S. Marshals Serv.); Robiner & Borgida, supra note 35, at 635.

[39] U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 762, 764 (1989).

[40] See Daniel J. Solove, Access and Aggregation: Public Records, Privacy and the Constitution, 86 Minn. L. Rev. 1137, 1141–42 (2002); Chris Jay Hoofnagle, Big Brother's Little Helpers: How ChoicePoint and Other Commercial Data Brokers Collect and Package Your Data for Law Enforcement, 29 N.C. J. Int'l L. & Com. Reg. 595, 595 (2004); Andrew Guthrie Ferguson, Persistent Surveillance, 74 Ala. L. Rev. 1, 19–20 (2022).

[41] See supra note 14; Staff of S. Comm. on Commerce, Sci., & Transp., 113th Cong., A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes 12, 15 (Majority Staff Rep. Dec. 18, 2013); Fed. Trade Comm'n, Data Brokers: A Call for Transparency and Accountability 11–15 (2014). Sourcing varies by broker and is rarely disclosed record-by-record.

judge's family home address online for $1.95, waited outside his Florida home, and fired a rifle round that missed the judge's head by less than two inches.[42] The detective investigating Judge Wilkinson's murder reported that he and his colleagues "searched the judge's name on Google and it didn't take long to find his address with publicly available information."[43] And when the man who murdered a Minnesota legislator and her husband in 2025 was apprehended, one of his notebooks contained lists of people-search services, eleven of them named in the FBI's affidavit.[44] To this market, a home address is inventory: assembled in advance and made searchable on demand.[45]

### B. The Federal Answer: The Daniel Anderl Act

The legislative response came in two acts. New Jersey moved first: Daniel's Law was signed on November 20, 2020, four months after the attack.[46] Congress followed two years later, carrying the Daniel Anderl Judicial Security and Privacy Act into law on December 23, 2022, in the annual defense bill.[47] The federal Act's central prohibition requires no request at all: a data

---

[42] Timothy J. Corrigan, Opinion, Targeted Judge: Congress Should Provide Better Security, Orlando Sentinel (Dec. 4, 2020), https://www.orlandosentinel.com/opinion/guest-commentary/os-op-federal-judges-need-better-security-column-20201204-mtsfvyh65nbo3mhsbly7s5tlaa-story.html; Statement of Hon. Roslynn R. Mauskopf, Dir., Admin. Off. of the U.S. Cts., on S. 2340, at 1 (Dec. 2, 2021), https://www.uscourts.gov/file/36369/download.

[43] Madeleine O'Neill, 'This Is All Going to Be Over on the 19th': Police Records Reveal New Details About MD Judge's Killer, Md. Daily Rec. (Oct. 18, 2024), https://thedailyrecord.com/2024/10/18/this-is-all-going-to-be-over-on-the-19th-police-records-reveal-new-details-about-md-judges-killer/.

[44] Affidavit of Special Agent Terry Getsch in Support of Criminal Complaint ¶¶ 5, 33, United States v. Boelter, No. 25-mj-376 (D. Minn. June 15, 2025), ECF No. 1-1 (¶ 5: his preparation "included identifying several websites that allow users to search for the personal information of others, like home addresses and family member names"; ¶ 33: "One of those notebooks contained lists of internet-based people search engines including" eleven named services). The affidavit does not establish which services, if any, he used. Boelter pleaded guilty on June 11, 2026, and was sentenced on July 23, 2026. Press Release, U.S. Att'y's Off. for the Dist. of Minn., Vance Boelter Sentenced to Two Consecutive Life Terms Plus 40 Years Consecutive for the Stalking and Murder of Minnesota State Legislators (July 23, 2026), https://www.justice.gov/usao-mn/pr/vance-boelter-sentenced-two-consecutive-life-terms-plus-40-years-consecutive-stalking.

[45] Purpose attestations at checkout were self-certified and unverified; a minority of audited brokers imposed delayed or reviewed access. See infra Part III.C.2 (access classification); infra Part IV.D (95 of 100 federal judges appeared on at least one of the 27 audited websites requiring neither payment nor an account); see also supra note 14.

[46] Daniel's Law, 2020 N.J. Laws ch. 125 (approved Nov. 20, 2020) (codified as amended in scattered sections of N.J. Stat. Ann. tits. 2C, 47, 56).

[47] Daniel Anderl Judicial Security and Privacy Act of 2022, Pub. L. No. 117-263, div. E, tit. LIX, subtit. D, §§ 5931–5939, 136 Stat. 2395, 3458–69 (2022); see supra note 33. The Act is set out as a note preceding 28 U.S.C. § 601; there is no 28 U.S.C. § 5934.

broker may not "knowingly sell, license, trade for consideration, transfer, or purchase"[48] covered information—including home addresses[49]—of the federal judges and immediate family members it protects. The prohibition binds on knowledge, not on notice. A written request does additional work. It reaches beyond data brokers: any "person, business, or association" that receives one must stop publicly posting the covered information and remove it within seventy-two hours, identifying other instances on websites it controls and assisting the sender in locating them.[50] And the statute makes the request hard to mistake for an informal demand: it must expressly reference the prohibition itself, describe the redress and penalties behind it, and carry contact information for verifying its accuracy.[51] Nor must a judge send anything personally; the Act authorizes the Director of the Administrative Office of the United States Courts to transmit requests on a judge's behalf.[52] The commands reach the whole market and beyond. The measure of the design lies elsewhere.

Congress titled the provision governing violations that make covered information public "Redress and Penalties," but placed monetary relief beyond four steps.[53] Where covered information "is made public as a result of a violation," only specified judiciary officials may act: the Director of the Administrative Office of the United States Courts, the Director's designee, or—for judges of certain Article I courts—the relevant chief judge. The protected person cannot initiate the action. The action proceeds "through the Department of Justice." The relief initially available is only "injunctive or declaratory"—not damages for the violation that made the information public.[54] Damages enter only if a nongovernmental violator thereafter "knowingly violates" the resulting order; the court may then award the protected person "an amount equal to the actual damages sustained," together with court costs and attorney's fees.[55] Even then, the statute says "may," not "shall": a knowing violation of the federal order does not compel an award.

---

[48] Anderl Act § 5934(d)(1)(A), 136 Stat. at 3464.
[49] Id. § 5933(2), 136 Stat. at 3460.
[50] Id. § 5934(d)(1)(B), (d)(2)(A), 136 Stat. at 3464–65.
[51] Id. § 5934(b)(1), 136 Stat. at 3462 (the notice or request must be "in writing and contain information necessary to ensure compliance," including "information expressly referencing the prohibition on the posting or transfer of covered information" and "information regarding redress and penalties for violations provided in subsection (f)"). Notice so constituted supplies strong evidence of knowledge under the knowledge-based ban; it does not by itself resolve every knowledge question a later transaction might raise.
[52] Id. § 5934(b)(2)(A), 136 Stat. at 3462–63.
[53] Anderl Act § 5934(f), 136 Stat. at 3466 ("Redress and Penalties").
[54] Id. § 5934(f)(1). The chief judges of certain Article I courts hold the same authority. Id. § 5934(f)(2).
[55] Id. § 5934(f)(3)(B); see id. § 5934(f)(3)(A).

None of that architecture was inevitable. The bill as introduced in both chambers gave the action to "[a]n at-risk individual or immediate family member," suing in their own names, and priced a knowing and willful violation of the resulting order at up to treble damages, never less than ten thousand dollars.[56] By the time the bill emerged from committee the multiplier and the floor were gone, though the private action remained, carrying actual damages.[57] Enactment moved the action itself: control of the machinery passed exclusively to the specified officials, and the individual retained only the possibility of payment—a court that finds a knowing violation of a compliance order may still award actual damages to the person whose information was exposed.[58] One remedial feature never varied: damages waited until a court order was knowingly violated.[59] What individuals lost between introduction and enactment was not eligibility for compensation; it was the power to sue under the Act. Congress placed the enforcement key with officials. New Jersey placed it in private hands.

**C. The State Answer: Daniel's Law**

Daniel's Law starts with a request. Once an authorized person makes a written request for a covered person—the class includes active, formerly active, and retired judicial officers, prosecutors, law-enforcement officers, and child protective investigators in the Division of Child Protection and Permanency, together with immediate family members residing in the same household[60]—the recipient has ten business days from receipt to stop disclosing the person's home address and unpublished home telephone number.[61] The requester need not be the covered person personally: the statute defines "authorized person" to include the covered person, designated representatives for one who is deceased or incapacitated, a parent or guardian for a minor family member, and, for any federal judge, a designee of the United States Marshals Service or of a District Court clerk.[62] Timely compliance avoids liability under that provision: the ten days are a cure window, and disclosure before a request arrives violates no duty the provision imposes. Little of this arrived in one stroke. The core remedy—an aggrieved

[56] S. 2340, 117th Cong. § 5(e) (as introduced July 14, 2021); accord H.R. 4436, 117th Cong. § 5(e) (as introduced July 16, 2021) (identical).
[57] Compare S. 2340, 117th Cong. § 5(e) (as introduced July 14, 2021), with S. 2340, 117th Cong. § 4(e) (as reported by S. Comm. on the Judiciary, Dec. 16, 2021), and Anderl Act § 5934(f), 136 Stat. at 3466; see id. § 5934(f)(3)(B).
[58] Anderl Act § 5934(f)(3)(B); see supra note 55.
[59] Compare S. 2340, 117th Cong. § 5(e) (as introduced), with Anderl Act § 5934(f)(3), 136 Stat. at 3466.
[60] N.J. Stat. Ann. § 56:8-166.1(d) (as amended by 2023 N.J. Laws ch. 113, § 6); accord id. § 2C:20-31.1(a) (as amended by 2023 N.J. Laws ch. 113, § 5).
[61] N.J. Stat. Ann. § 56:8-166.1(a)(1); id. § 56:8-166.1(b)–(c).
[62] N.J. Stat. Ann. § 56:8-166.1(d); id. § 56:8-166.1(a)(2).

person's action carrying a thousand-dollar liquidated floor—was on the books before the attack, narrower in coverage and discretionary in its award.[63] Daniel's Law gave the scheme its name, added its removal-request mechanism, and broadened its coverage in 2020.[64] In 2023 the Legislature expanded the class again and added what makes the design distinctive: the ten-business-day notice-and-cure period, the mandatory award, and assignability.[65] The state built the machine, then came back and armed it.

A proved violation carries a mandatory monetary award. The court "shall award" actual damages, "but not less than liquidated damages computed at the rate of $1,000 for each violation," together with the prevailing plaintiff's reasonable attorney's fees and costs.[66] As the New Jersey Supreme Court confirmed in August 2026, actual-damages liability under the provision requires no mental-state showing.[67] State of mind is reserved for aggravation: punitive damages require "proof of willful or reckless disregard of the law."[68] The liquidated floor spares a covered person from pricing the harm of an exposed address, while the mandatory "shall" fixes entitlement once a violation is proved—the express answer to a scheme whose penalties, according to the committee statement, had all been discretionary before.[69]

The claim, once it exists, can move. The private right of action predated the 2023 amendment. In 2023, the Legislature added assignability: a covered person may assign a claim in writing to an assignee, who may sue in the covered person's stead.[70] For a single claimant, a claim worth only the statutory floor may not justify a standalone suit. Written assignment allows claims to be gathered in one holder, making assignee-led coordinated enforcement possible and allowing that holder to bear litigation costs that scattered claimants may not. The statute does not organize that enforcement, fund it, or promise that anyone will attempt it. It lets the claim travel, and stops there.

---

[63] 2015 N.J. Laws ch. 226, § 3 (approved Jan. 19, 2016) (codified as amended at N.J. Stat. Ann. § 56:8-166.1).

[64] Daniel's Law, 2020 N.J. Laws ch. 125 (approved Nov. 20, 2020); see supra note 46.

[65] 2023 N.J. Laws ch. 113, § 6 (approved July 20, 2023); id. § 5. See S. Health, Hum. Servs. & Senior Citizens Comm., Statement to S. 3125, 220th Leg. (N.J. Dec. 15, 2022); Paresh Dave, The Future of Online Privacy Hinges on Thousands of New Jersey Cops, WIRED (Nov. 25, 2024, 6:00 AM) (updated Nov. 27, 2024), https://www.wired.com/story/the-future-of-online-privacy-hinges-on-thousands-of-new-jersey-cops/.

[66] N.J. Stat. Ann. § 56:8-166.1(c).

[67] Atlas Data Privacy Corp. v. We Inform, LLC, No. A-8-25, slip op. at 7, 28 (N.J. Aug. 12, 2026); see N.J. Stat. Ann. § 56:8-166.1(c)(1). See infra Part II.B.

[68] N.J. Stat. Ann. § 56:8-166.1(c)(2); We Inform, No. A-8-25, slip op. at 28–29.

[69] S. Health, Hum. Servs. & Senior Citizens Comm. Statement, supra note 65.

[70] N.J. Stat. Ann. § 56:8-166.1(b), (d). The assignment amendment took effect on approval because 2023 N.J. Laws ch. 113, § 8 delays sections 1 through 5 and section 7, but not section 6. Id. §§ 6, 8 (approved July 20, 2023).

**D. The Enforcement Variable**

Set side by side, the statutes overlap without matching. The federal Act reaches more categories of covered information—phone numbers, financial accounts, children's schools, employment locations—while Daniel's Law protects broader classes of public servants, and neither covers everything the other covers.[71] Where they overlap, the two laws protect the same core interest against the same industry; where their substantive commands differ, the federal Act generally asks more—a standing ban no request need trigger, seventy-two hours instead of ten business days.[72] The difference that remains is not the right declared but the enforcement architecture behind it, and the architectures diverge at every joint. Who may sue: in New Jersey, the covered person or any assignee holding the claim; under the federal Act, specified government officials alone. What a violation yields at first: in New Jersey, a mandatory award with a thousand-dollar floor; under the federal Act, no money—only injunctive or declaratory relief. When money enters: in New Jersey, on proof of a violation; under the federal Act, only after a federal order is knowingly violated, and then at the court's discretion. Whether the claim can move: in New Jersey, by written assignment; under the federal Act, the action was never the individual's to give. In New Jersey, a proved violation creates a fee-bearing, assignable claim with a mandatory monetary floor. Under the federal Act, even a violation that makes covered information public creates only the possibility that a specified official will seek court relief directed at obligations the Act already imposed. Under the federal Act, monetary penalties intended to compel compliance also require more: a resulting order, its knowing violation, and a discretionary award. The two regimes diverge most where words end and consequences begin: what it costs to ignore a request.

Privacy scholarship has long located the field's weakness in exactly that space—between rights on the books and protection on the ground. A comprehensive review collected twenty-six studies examining the past decade's two flagship privacy regimes, Europe's General Data Protection Regulation (GDPR) and California's Consumer Privacy Act (CCPA), and reported that not one found a meaningful improvement in privacy outcomes.[73] Both regimes recognize request-based individual rights, and public regulators occupy a central enforcement role. Yet the

[71] Compare N.J. Stat. Ann. § 56:8-166.1(d), with Anderl Act § 5933(1), (2), (6), 136 Stat. at 3459–61. See also infra Part III.

[72] Compare Anderl Act § 5934(d)(1)(A), and id. § 5934(d)(2)(A), with N.J. Stat. Ann. § 56:8-166.1(a)(1).

[73] See Filippo Lancieri, Narrowing Data Protection's Enforcement Gap, 74 Me. L. Rev. 15, 16, 65–72 (2021); Regulation (EU) 2016/679, arts. 15–21, 79–82, 2016 O.J. (L 119) 1; Cal. Civ. Code §§ 1798.105, 1798.110, 1798.115, 1798.120, 1798.150.

accumulated field evidence documents practical noncompliance across both regimes: consent recorded after the user expressly refused it, opt-out flows hidden behind identity demands, removals followed by quiet re-listing.[74] Scholars call the pattern the enforcement gap—"a wide disparity between the stated protections on the books and the reality of how companies respond to them on the ground"—and a decade of empirical work has made it the expected condition of privacy law rather than the exception.[75]

One recurring diagnosis begins with public-enforcement capacity: agencies are often understaffed relative to the markets they oversee, dependent on appropriations, and exposed to changing political priorities.[76] A leading prescription follows: where public enforcement cannot supply consequences, authorize private plaintiffs armed with a damages award that "works as a kind of bounty."[77] An empirical study of how privacy compliance actually happens inside firms ends with a sentence that Congress and New Jersey's Legislature would, between them, put to the test: "any new privacy law must include a private right of action."[78] The two statutes this Part has described place that question in unusually sharp comparative relief: overlapping protected interests, a common regulated industry, and sharply different enforcement architectures, enacted independently and running in parallel. The comparison is naturally occurring, not experimental. Part II turns from the two laws on paper to what each has produced.

## Part II. The Two Laws at Work

### A. The Federal Program

[74] See Célestin Matte, Nataliia Bielova & Cristiana Santos, Do Cookie Banners Respect My Choice? Measuring Legal Compliance of Banners from IAB Europe's Transparency and Consent Framework, in 2020 IEEE Symp. on Sec. & Priv. 791 (2020); Kejsi Take et al., "It Feels Like Whack-a-mole": User Experiences of Data Removal from People Search Websites, 2022 Proc. Priv. Enhancing Techs. (no. 3) 159, https://doi.org/10.56553/popets-2022-0067; Anna-Maria Gueorguieva, Jennifer King, Apoorva Panidapu & Daniel E. Ho, Privacy Without Remedy: An Assessment of Data Broker Compliance with California Privacy Law, in Proceedings of the 2026 ACM Conference on Fairness, Accountability, and Transparency (FAccT '26) 7019 (2026), https://doi.org/10.1145/3805689.3812413.

[75] Lancieri, supra note 73, at 16; see also Waldman, supra note 29.

[76] See Jodi L. Short, The Politics of Regulatory Enforcement and Compliance: Theorizing and Operationalizing Political Influences, 15 Regul. & Governance 653, 654 (2021); Daniel J. Solove & Danielle Keats Citron, Standing and Privacy Harms: A Critique of TransUnion v. Ramirez, 101 B.U. L. Rev. Online 62, 70 (2021); Sant'Ambrogio, supra note 22, at 426.

[77] Solove & Citron, supra note 76, at 70.

[78] Waldman, supra note 29, at 831–32; see supra Part I.C.

The federal program predates the Anderl Act. Twenty-six days after Daniel Anderl was killed, the Judicial Conference acted by emergency procedure, resolving to seek legislation protecting judges' personally identifiable information and to build, with the Marshals Service, a resource to monitor its public availability.[79] The monitoring resolution grew into the program: the Administrative Office's PII reduction and redaction services, run by the Threat Management Branch of the Judiciary Security Division. The Branch monitors the internet for judges' covered information, engages a commercial removal service to delete judges' records from "known data broker websites," assesses each enrolled judge's online exposure, and feeds newly found sites back into the removal list.[80] The legislative resolution supplied the policy that, in the Administrative Office's own description, the Anderl Act "enacts."[81] Enrollment opened to every federal judge in the spring of 2023, and by the Judiciary's most recent annual report the services covered most of the sitting bench and extended to retired judges and family members.[82] The machinery is real. By the time our audit began, the federal government had been asking data brokers to cease disclosure of judges' home addresses for years.

---

[79] See Judicial Conference Approves Measures to Increase Security for Federal Judges, U.S. Cts. (Aug. 14, 2020), https://www.uscourts.gov/data-news/judiciary-news/2020/08/14/judicial-conference-approves-measures-increase-security-federal-judges; Judicial Conf. of the U.S., Report of the Proceedings of the Judicial Conference of the United States 12–13 (Sept. 15, 2020).

[80] Memorandum from Paul C. Gamble, Admin. Off. of the U.S. Cts., to All U.S. Judges, Implementation of the Daniel Anderl Judicial Security and Privacy Act and Update on the Home Intrusion Detection Systems Program 2 (Apr. 20, 2023), https://ncbj.org/wp-content/uploads/2024/08/Daniel-Anderl-Judicial-Security-and-Privacy-Act-removal-of-PII.pdf [hereinafter Gamble April 2023 Memorandum] (describing "DeleteMe, a third-party data broker monitoring and removal service to remove judges' PII from known data broker websites," and the use of exposure assessments to feed it additional websites; noting that, the week the Act's private-entity provisions took effect, the authorization forms—the intake for the Act's only enforcement mechanism—were still "being developed"). Memorandum from Paul C. Gamble, Admin. Off. of the U.S. Cts., to All U.S. Judges, Updates on Implementation of the Daniel Anderl Judicial Security and Privacy Act 1–2 (May 7, 2024) (posted with the April 20, 2023 memorandum at the same URL) [hereinafter Gamble May 2024 Memorandum] (reporting that the vendor had "redacted over 4.22 million pieces of PII" and that the PII Removal Portal was then live).

[81] Gamble April 2023 Memorandum, supra note 80, at 1.

[82] Admin. Off. of the U.S. Cts., Facilities and Security, in Annual Report 2025, https://www.uscourts.gov/data-news/reports/annual-reports/directors-annual-report/facilities-and-security-annual-report-2025 (last visited Sept. 1, 2026) ("Approximately 80 percent of sitting judges, as well as more than 100 retired judges and 1,200 qualified family members, are now enrolled."); see also Admin. Off. of the U.S. Cts., Facilities and Security, in Annual Report 2024, https://www.uscourts.gov/data-news/reports/annual-reports/directors-annual-report/annual-report-2024/facilities-and-security-annual-report-2024 (last visited Sept. 1, 2026) (the Vulnerability Management Program "provided services to 1,731 judges, 114 retired judges, and 235 family members").

Whether the program is viewed as a success depends on what is counted. Count activity, and it looks promising: judges enrolled, families covered, growth reported.[83] The enforcement literature has a name for that kind of record—"evidence of activity rather than evidence of effectiveness"—the kind of record that counts what a program does, not what difference it makes.[84] A request under the program can fail silently: a tally of requests sent remains the same whether the requests are honored or not. The Administrative Office's two most recent annual reports show what is counted: for 2024, 1,731 judges receiving services and more than 1,090 security incidents coordinated; for 2025, enrollment of "approximately 80 percent of sitting judges" along with "more than 100 retired judges and 1,200 qualified family members," and a security program experiencing "significant growth."[85] Neither report makes any mention of requests that failed, noncompliant brokers, or complaints from judges about ineffectiveness; neither counts address records actually removed; neither mentions the Act's enforcement provision at all. A publicly posted May 2024 memorandum reports that the vendor had redacted more than 4.22 million "pieces of PII"—a figure that does not identify unique address records, statutory requests, timely compliance, or whether the information remained unavailable.[86]

The enforcement provision completes the picture. The Act reserves civil enforcement to specified government actors; the documented public-source search identified no civil action

[83] See supra notes 80, 82; infra note 85.

[84] Keith Hawkins & John M. Thomas, The Enforcement Process in Regulatory Bureaucracies, in Enforcing Regulation 3, 19 (Keith Hawkins & John M. Thomas eds., 1984).

[85] Annual Report 2024, supra note 82 (services to 1,731 judges, 114 retired judges, and 235 family members; more than 1,090 potential or actual security incidents); Annual Report 2025, supra note 82 (enrollment, and growth in the Vulnerability Management Program).

[86] Cf. Jodi L. Short & Michael W. Toffel, Making Self-Regulation More Than Merely Symbolic: The Critical Role of the Legal Environment, 55 Admin. Sci. Q. 361, 361, 391 (2010). The 2024 and 2025 annual reports disclose no failed-request rate, reappearance rate, or public § 5934(f) action; the 2025 report does not name the Act. See Gamble May 2024 Memorandum, supra note 80. This does not establish an absence of internal monitoring: budget materials describe tracking pending requests and monitoring web activity. Admin. Off. of the U.S. Cts., The Judiciary Fiscal Year 2025 Congressional Budget Justification: Court Security 7.11 (2024).

under § 5934(f).[87] The public record therefore establishes the program's scale, but not its effect on the addresses it was designed to remove.

**B. Daniel's Law in Litigation**

The state regime ran through private hands. Thousands of New Jersey's covered persons—law-enforcement officers, prosecutors, judicial officers, family members—signed up with Atlas Data Privacy, a Jersey City company that had developed a software platform to deliver nondisclosure requests. Much of the enrollment came through outreach from the state's law-enforcement unions, the same organizations that had pushed to strengthen the law the year before.[88] Between November 14 and December 14, 2023, approximately 15,000 covered persons signed up and sent requests from Atlas-assigned email accounts. Atlas began delivery on December 15, 2023, when its email delivery service officially launched.[89] Over the following months, Atlas's systems delivered roughly forty million request emails to recipient addresses associated with approximately 1,000 data-broker websites.[90] A request starts the statute's ten-business-day clock only on receipt.[91] Atlas's role did not end with delivery. When data

---

[87] The authors ran domain-restricted web searches directed to CourtListener/RECAP and Justia, and searched GovInfo, the Federal Register, and the Administrative Office, Department of Justice, and Marshals Service websites through September 1, 2026 for civil actions under Anderl Act § 5934(f), 136 Stat. at 3466, using the statutory citation, the Act's titles, and the names of authorized officials and courts. None appeared; the only Federal Register reference is a Federal Election Commission rulemaking concerning contributor-record redaction requests. Modification and Redaction of Contributor Information, 89 Fed. Reg. 103,701 (proposed Dec. 19, 2024). The repositories' native interfaces, PACER, Lexis, and Westlaw were not searched. The search cannot exclude sealed proceedings, unfiled referrals, prefiling demands, or missed results. The public research materials contain the queries and dates.

[88] Dave, supra note 65. The author note discloses the affiliation. The two-pathway account rests on the author's statement of Aug. 29, 2026 (on file with authors).

[89] Enrollment continued after launch, with thousands more covered persons signing up and sending notices between December 15 and December 31, 2023.

[90] Dave, supra note 65 ("Altogether, Atlas would deliver 40 million emails to 1,000 websites on behalf of roughly 20,000 people over the next five months."). Enrollment figures are Atlas's records (on file with authors): a small number of covered persons enrolled before November 14, 2023, and approximately 2,200 more between December 15 and December 31, 2023; WIRED's "roughly 20,000" describes the five-month delivery window. The recipient list changed as websites entered or left the market: approximately 1,000 websites at launch and 1,100 over the program's life (Atlas records, on file with authors). "Delivered" means that Atlas's systems obtained a delivery receipt—recipient-system acceptance; Atlas's records (on file with authors) show a completed total exceeding forty million; the text retains WIRED's "roughly." In Cole, receipt was deemed admitted on default and found on the proof-hearing record, Cole Info. Servs., No. ESX-L-7209-24, slip op. at 2, 4; receipt has not been contested in the pending cases, which turn on the facial First Amendment question. The delivery record does not itself establish subsequent compliance.

[91] N.J. Stat. Ann. § 56:8-166.1(a)(1); see supra Part I.C.

brokers wrote to Atlas stating their refusal to comply with the law,[92] Atlas shared that information with its counsel. Investigators retained by and working at counsel's direction investigated whether requests had been honored and began documenting noncompliance. Covered persons then assigned their claims to Atlas.[93]

On February 6, 2024, Atlas began filing suit as assignee, alleging violations identified through those investigations. Filings followed additional deliveries and investigations through the spring. By September 2026, Atlas had filed 184 separately docketed actions in the Superior Court, naming 284 distinct defendants—257 corporate entities, 23 identified only by website address, and 4 natural persons; defendants removed a number of those actions to the District of New Jersey.[94] The judges of that district—each eligible for Daniel's Law protection—recused, and the federal actions proceeded before Judge Harvey Bartle III of the Eastern District of Pennsylvania, sitting by designation.[95]

That state litigation produced something the federal annual reports do not: a public record of alleged violations, contested defenses, and adjudicated consequences in particular cases. In that historical wave of lawsuits, evidence of sending, receipt, and noncompliance varies by case and, where established, rests on the litigation record—not the audit's own request-and-delivery record, described in Part III, which covers only the requesting cohort's requests to the audited websites. Settlements and post-suit compliance were public only to the extent the record

[92] Dave, *supra* note 65 (reporting data brokers' written responses to Atlas's requests, including a cease-and-desist demand asserting that Daniel's Law applied only to government agencies and not private companies, and demands to see requestors' identification).

[93] See supra Part I.C (N.J. Stat. Ann. § 56:8-166.1(b), (d)); Cole Info. Servs., No. ESX-L-7209-24 (judgment at 1–2, reciting that Atlas sues "as assignee of individuals who are Covered Persons"); Atlas Data Privacy Corp. v. We Inform, LLC, 758 F. Supp. 3d 322 (D.N.J. 2024) (slip op. at 9).

[94] Atlas litigation ledger (on file with authors; as of Sept. 1, 2026): 184 separately docketed actions; 284 distinct defendants (257 corporate entities; 23 identified only by website address, no entity known; 4 natural persons). See also Dave, supra note 65 (as of November 2024, "110 cases remain unresolved across five different counties" and thirty-six were being contested in federal court); Application for Multi-County Litigation Designation or Transfer to a Single Vicinage for Coordination at 1, 3 n.7, In re Daniel's Law Compliance Litigations (N.J. Nov. 3, 2025), https://www.njcourts.gov/sites/default/files/daniel-law-litigtions.pdf (Atlas's application to the Administrative Director of the Courts: as of November 3, 2025, 111 actions pending in the Law Division in seven counties, fifty-two removed actions then before Judge Bartle in the District of New Jersey, eight actions dismissed under settlements, and five voluntarily dismissed). No single public document states the total number of actions removed; by November 2024 the federal court had remanded thirty-nine for lack of diversity jurisdiction and decided the consolidated motion to dismiss in thirty-seven others. We Inform, 758 F. Supp. 3d 322 (slip op. at 8, 11); see infra note 97.

[95] Dave, supra note 65; see 28 U.S.C. § 292(b); We Inform, 758 F. Supp. 3d 322 (slip op. at 10).

disclosed them. Some defendants came to terms.[96] Some never appeared. Three early default judgments awarded thousands of dollars per covered person. The largest came later: in an unopposed default, the court found that a data broker had ignored written requests for at least eighteen months and awarded more than $218 million in statutory and punitive damages. Because the disclosures had continued until days before the proof hearing, the court also directed the transfer of the defendant's domain name.[97] Other defendants answered and fought, pressing constitutional and statutory defenses that remain in litigation.[98]

The fight is still under way. The removed cases were consolidated before Judge Bartle, who in November 2024 denied the defendants' consolidated motions to dismiss challenging Daniel's Law as facially unconstitutional under the First Amendment.[99] The defendants filed an interlocutory appeal that drew amici from every direction: forty-one states and the District of Columbia, a privacy organization, and law-enforcement associations supported the law; free-speech and press-freedom organizations and the data industry's trade associations opposed

[96] By November 2025, eight actions had been dismissed under settlements, and Atlas reported settlement discussions with nearly two dozen defendants in the actions then pending. Application for Multi-County Litigation Designation, supra note 94, at 3 n.7, 4 n.11.
[97] Atlas Data Privacy Corp. v. Cole Info. Servs., Inc., No. ESX-L-7209-24, slip op. at 2, 8–9, 12–13 (N.J. Super. Ct. Law Div. Sept. 19, 2025) (unopposed default judgment; defendant never appeared) (awarding $175,336,000 in statutory damages and $43,000,000 in punitive damages on a "deliberately conservative" formula—one violation per item of protected information per ten-business-day interval—after "at least" eighteen months of ignored requests; finding more than 8,000 concurrent unlawful disclosures "[m]ere days before" the proof hearing, id. at 3; and directing transfer of the domain name as "the primary means through which unlawful disclosures continued," id. at 5, a transfer that "applies only to the domain name itself," id. at 6). Three earlier default judgments awarded between $5,545 and $45,557 per covered person. Id. at 9. On the prior domain transfers, see id. at 5 & n.1 (collecting Atlas Data Privacy Corp. v. SCSD Holdings, LLC, No. MER-L-299-24 (N.J. Super. Ct. Law Div. Feb. 26, 2025); Atlas Data Privacy Corp. v. Previlon, LLC, No. MER-L-294-24 (N.J. Super. Ct. Law Div. June 25, 2025); and Atlas Data Privacy Corp. v. Lucky2Media, LLC, No. MER-L-286-24 (N.J. Super. Ct. Law Div. June 25, 2025)). The transfer did not end the conduct: the defendant registered coleinformation.io and resumed operations there, stopping only when Atlas's counsel threatened to seek an emergency order (statement of Atlas's litigation counsel, on file with authors).
[98] See infra notes 99–103 and accompanying text.
[99] Atlas Data Privacy Corp. v. We Inform, LLC, 758 F. Supp. 3d 322, 341–42 (D.N.J. 2024) (Bartle, J., sitting by designation under 28 U.S.C. § 292(b)) (denying consolidated motions to dismiss in thirty-seven removed actions); see infra note 100.

it.[100] After argument, the Third Circuit certified to the New Jersey Supreme Court the question of what mental state, if any, the statute requires.[101] On August 12, 2026, the state court answered without dissent: for actual-damages liability under subsection (c)(1), none. It left the constitutional question where it began—whether Daniel's Law so construed violates the First Amendment "is for the Third Circuit to determine."[102] That determination remains pending as of this writing.[103] The audit began in the middle of that fight—judgments entered, a consolidated appeal pending, the regime enforced and contested all at once.

**C. The Compliance Market**

A regulated industry is never composed of one kind of actor. The enforcement literature has treated that as a starting point since at least 1984, when Kagan and Scholz described the "amoral calculator"—the firm that "disobey[s] the law when the anticipated fine and probability of being caught are small in relation to the profits to be garnered through disobedience."[104] The

---

[100] Atlas Data Privacy Corp. v. We Inform, LLC, Nos. 25-1555 through 25-1578, 25-1580 through 25-1593, 25-1676, 25-1677 (3d Cir. argued July 8, 2025) (consolidated). Amici supporting appellees were the Electronic Privacy Information Center; the National Association of Assistant United States Attorneys, the National Association of Police Organizations, the Federal Bureau of Investigation Agents Association, and the New Jersey State Policemen's Benevolent Association; and forty-one states and the District of Columbia. Amici supporting appellants were the Foundation for Individual Rights and Expression, the Reporters Committee for Freedom of the Press, the Consumer Data Industry Association, the Software & Information Industry Association, and the Coalition for Sensible Public Records Access. See Petition and Order to Certify Questions of State Law, infra note 101, at 1–3, 18–19 (caption, argument date, and counsel for amici).

[101] The Third Circuit certified two questions—whether Daniel's Law "require[s] a mens rea for any of its elements" and, if so, what level for each. Petition and Order to Certify Questions of State Law at 11, Atlas Data Privacy Corp. v. We Inform, LLC, Nos. 25-1555 et al. (3d Cir. Sept. 2, 2025), ECF No. 103 (retaining jurisdiction; the state court "may reformulate these questions"). Under N.J. Ct. R. 2:12A-2, the New Jersey Supreme Court reformulated them into one: "What mental state, if any, is required to establish liability under Daniel's Law, N.J.S.A. 56:8-166.1?" Atlas Data Privacy Corp. v. We Inform, LLC, No. A-8-25, slip op. at 12 (N.J. Aug. 12, 2026).

[102] Atlas Data Privacy Corp. v. We Inform, LLC, No. A-8-25, slip op. at 7, 28, 40–41 (N.J. Aug. 12, 2026) (Pierre-Louis, J.) (no mental-state requirement for actual-damages liability under § 56:8-166.1(c)(1); declining to import common-law tort standards; "[w]hether Daniel's Law is constitutional . . . is for the Third Circuit to determine"). Subsection (c)(1)'s mandatory award is described supra Part I.C; the punitive award under (c)(2) retains its express "willful or reckless disregard" element, which the Court cited as evidence that the omission in (c)(1) was deliberate. Id. at 28–29.

[103] Posture as of September 1, 2026: the consolidated appeals remain pending. By order of August 12, 2026, the Third Circuit permitted supplemental briefs of no more than five pages, which were filed on August 26, 2026 (ECF Nos. 112–114; cited infra note 168); no decision had issued.

[104] Robert A. Kagan & John T. Scholz, The "Criminology of the Corporation" and Regulatory Enforcement Strategies, in Enforcing Regulation 67, 67–68 (Keith Hawkins & John M. Thomas eds., 1984). The text adapts their insight to data brokers and classifies conduct, not business models; it does not reproduce their typology.

calculator is only one kind of firm a regulator faces, and the practical lesson follows: an enforcement strategy tuned to one kind misses the others. Data brokers meet privacy-law demands in three recognizable patterns: compliance, calculation, and defiance. Some brokers honor requests on receipt; the asking is enough.[105] Some brokers run what this Article calls the amoral calculus—Holmes's bad man in the people-search business, pricing compliance against noncompliance and taking the cheaper path.[106] And some brokers do not answer at all—they conduct themselves as if beyond the reach of American law, greeting requests, suits, and judgments with the same silence. This Article calls that third pattern defiance and, within the framework, the brokers that practice it the defiant. Like compliant and calculating, defiant describes a pattern of conduct—not an immutable category of firm or a finding about any firm's state of mind. No single remedy moves all three. Communication moves the first; consequences move the second; the defiant are moved only by a court's coercive power.

An enforcement design serves the market it faces, or fails some part of it. New Jersey's design answers each pattern in its own language. The notice-and-cure structure serves the first: a broker prepared to comply learns what to remove and has ten business days to do it; if it does, it owes nothing.[107] The mandatory award serves the second: for each proven violation, subsection (c)(1) requires actual damages subject to a liquidated floor of $1,000, without an additional mental-state element—a design this Article calls notice-based liability. That rule changes the arithmetic the calculating broker runs.[108] And the remedies of last resort serve the third: equitable relief that, on default, has culminated in court-ordered transfers of defendants' domain names—a consequence that does not depend on the broker's participation.[109] The architecture is not novel; it is the enforcement pyramid the regulatory literature has

---

[105] See generally Tom R. Tyler, Why People Obey the Law (1990); cf. Kagan & Scholz, supra note 104, at 68.

[106] Oliver Wendell Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 459 (1897); Kagan & Scholz, supra note 104, at 67; see also Sharon Oded, Inducing Corporate Proactive Compliance: Liability Controls & Corporate Monitors 58 (Mar. 30, 2012) (unpublished Ph.D. dissertation, Erasmus University Rotterdam), https://repub.eur.nl/pub/32036. The Article's term names a reasoning pattern, not a marketwide classification.

[107] N.J. Stat. Ann. § 56:8-166.1(a); see supra Part I.C; Albert J. Reiss, Jr., Selecting Strategies of Social Control over Organizational Life, in Enforcing Regulation, supra note 84, at 23, 24.

[108] N.J. Stat. Ann. § 56:8-166.1(c)(1); see supra note 102; supra Part I.C. The label "notice-based liability" describes the trigger, not fault or the recipient's state of mind. Once invocation, receipt, a ten-business-day opportunity to cure, and post-window disclosure are proved, reasonable care is no defense. Those predicates distinguish the design from liability for an initial disclosure without notice or cure. See Kratovil v. City of New Brunswick, 261 N.J. 1, 27, 336 A.3d 201, 217 (2025); We Inform, No. A-8-25, slip op. at 28–31; N.J. Stat. Ann. § 2C:20-31.1(b); cf. Jackson v. Whitepages, Inc., 798 F. Supp. 3d 583, 609–11 (N.D. W. Va. 2025). Part V carries the design into the federal repair.

[109] See supra note 97; infra Part V.

recommended for three decades—persuasion at the base, deterrence in the middle, incapacitation at the apex—with one difference. In Ayres and Braithwaite's canonical pyramid, escalation is the regulator's choice; under Daniel's Law, it is the purpose of assignment. The claim and the incentive to enforce it travel together.[110] Daniel's Law privatizes the pyramid's escalation.

These patterns of conduct do not operate independently, and neither do the remedies. The middle watches what happens to the worst. Chester Bowles, who had administered price controls during World War II, described a small group inclined to evade, another willing to obey regardless, and a much larger middle that wanted to obey but not to be made a "sucker" by others' evasion.[111] Bowles offered no firm-level percentages, but his account of businesses operating under price controls made the same qualitative point: most did all they could to make them work; many "fought them by all means, fair and foul"; and where firms dragged their feet, he concluded, the cause was "hard dollars-and-cents calculations."[112]

What keeps the many compliant is not fear alone. Enforcement against the defiant reassures the rest—confirmation that they "will not be harmed economically by their compliance."[113] Among data brokers competing to sell the same records, the point is literal: a broker that honors requests may confer a competitive advantage on a rival that does not.[114] A modern review finds the same condition at work: responsive regulation is more effective where "the regulated sector knows that the regulator will follow through on its escalation strategy," while a regulator known to be "soft" is likely to undermine compliance across the industry, not merely among the

[110] Ian Ayres & John Braithwaite, Responsive Regulation: Transcending the Deregulation Debate 35–41, 54–100 (1992).
[111] See Chester Bowles, Promises to Keep: My Years in Public Life, 1941–1969, at 41–42 (1971); Kagan & Scholz, supra note 104, at 90 n.24; Eugene Bardach & Robert A. Kagan, Going by the Book: The Problem of Regulatory Unreasonableness 65–66 (1982); Cary Coglianese, Building Better Compliance, 100 Tex. L. Rev. Online 192, 192 & n.2 (2022).
[112] Bowles, supra note 111, at 87, 114; Coglianese, supra note 111, at 192 n.2.
[113] Neal Shover, John Lynxwiler, Stephen Groce & Donald Clelland, Regional Variation in Regulatory Law Enforcement: The Surface Mining Control and Reclamation Act of 1977, in Enforcing Regulation, supra note 84, at 121, 137.
[114] See Kagan & Scholz, supra note 104, at 76; cf. Short & Toffel, supra note 86, at 361.

firms that escape it.[115] The pyramid works from the top down: the compliant many stay in the base only as long as the defiant few are caught and punished. A design that cannot punish its worst is not merely incomplete. It risks teaching the middle to ignore the law.

**D. Observable Implications**

Applied to the two judicial-privacy regimes, the framework yields a causal hypothesis: different enforcement architectures should produce different compliance behavior. Its observable implication here is a difference in residual exposure. The audit tests that implication. But the framework was articulated after the authors had seen at least some results, as Part III discloses; it is an explanatory account, not an outcome-blind prediction. The federal design asks—officially, uniformly, at scale—and a broker for whom asking is enough will comply. The Act reserves civil escalation to specified government actors, and Section A's documented public-source search identified no action invoking that authority. For the defiant, an official request is one more unanswered notice. For the calculating, a remedy's deterrent force turns not only on its formal availability but also on the perceived probability that it will be used: an actor that sees no visible consequence for persistent nonresponse may infer, over time, that ignoring the law is inexpensive. The state design speaks all three languages—notice for the willing, a mandatory award for the calculating, and coercive relief for the defiant—with an assignee positioned to carry claims through escalation.[116] Neither legislature designed this comparison: it emerged from two independently enacted regimes, not from a common research design.[117] The framework therefore expects the federal program to move part of the market and Daniel's Law to move more of it, with the defiant limiting both.

The audit compares two officer cohorts, distinguished by whether Atlas recorded removal requests, and 100 federal judges drawn from multiple federal districts. Atlas recorded no removal requests for the comparison officers, but its records cannot exclude requests sent through other channels. After collection closed, federal officials reported enrollment status for

[115] Jeroen van der Heijden, Responsive Regulation in Practice: A Review of the International Academic Literature 16 (State of the Art in Regulatory Governance Research Paper 2020.06, July 2020), https://www.wgtn.ac.nz/__data/assets/pdf_file/0005/1873103/2020-State-of-the-Art-in-Regulatory-Governance-06-Responsive-regulation-in-practice.pdf (citing Short & Toffel, supra note 86, and Judith van Erp, Naming Without Shaming: The Publication of Sanctions in the Dutch Financial Market, 5 Regul. & Governance 287 (2011)); Jeroen van der Heijden, Why Meta-Research Matters to Regulation and Governance Scholarship: An Illustrative Evidence Synthesis of Responsive Regulation Research, 15 Regul. & Governance S123 (2021).
[116] See supra Parts II.A–C.
[117] See supra Part I.C; infra Part III.

the initial judicial pool. The Article uses the thirty-four judges reported fully enrolled as cohort 1 and the remaining sixty-six judges as cohort 2. Because cohort 2 combines judges whose enrollment was unreported with judges not reported fully enrolled—and differs from cohort 1 in district composition and address validation—the audit makes no enrolled–unenrolled comparison and estimates no enrollment effect. Instead, the federal vendor's published list supplies a website-level proxy: list status marks where federal requests were more likely to have been transmitted, not where transmission, receipt, or compliance is established.[118]

The comparisons the audit can observe are these. The comparison officers supply a rough benchmark for exposure without Atlas-recorded requests. The vendor-list split compares exposure on listed websites, where federal transmission was more likely, with exposure on unlisted websites. And website-level comparisons ask whether investigators observed different cohorts' addresses on the same audited websites. The rival accounts remain on the table. If requests alone are sufficient, then, to the extent list status tracks transmission, the exposure gap between requesting officers and federal judges should narrow on listed websites, whatever law stands behind the requests. If exposure principally tracks the supply of source data—the motor-vehicle, voter, credit-header, and property records generated in the ordinary course of adult life—cohort differences should track observable differences in that supply rather than request regime. Converging evidence can support the architecture account without independently establishing causation. Part III describes how the design developed, what it can identify, and the limits of the vendor-list proxy. Part IV reports the patterns that emerged.[119]

## Part III. The Audit: Methods

### A. Design, Provenance, and Ethics

#### *1. Design and Chronology*

[118] Part III defines the cohorts and their counts (24 requesting officers; 24 comparison officers; 100 federal judges, reported in two cohorts of 34 and 66) and the scope and limits of each side's request evidence: Atlas recorded no removal requests for the comparison officers but cannot exclude requests sent through other channels; on the federal side, federal officials, after collection closed, orally reported the enrollment on which cohort 1 is defined (Part III.B.1). The individual classifications are held only in the restricted research record; no individual judge's status is identified. On the cohort label's composition, see infra note 119.

[119] See Molly Cinnamon, You Have the Right to Be Deleted: First Amendment Challenges to Data Broker Deletion Laws 34 (Sept. 2024) (unpublished manuscript, available on SSRN); supra note 41; infra Part III; infra Part V.A.

We audited two officer cohorts and 100 federal judges on the same 87 data-broker websites: 24 requesting officers, for whom Atlas recorded Daniel's Law requests sent from Atlas-assigned email accounts; 24 comparison officers, for whom Atlas recorded none; and the judges, reported in two cohorts defined in Section B.1. The audit measures endpoint exposure, not internal request handling, legal sufficiency, or counterfactual exposure.

The audit began with an initial judicial pool in mid-March 2026. After initial results, it expanded to additional federal districts and the requesting-officer cohort. The working hypothesis—that stronger private enforcement would correspond to lower endpoint exposure under Daniel's Law than under the federal regime—took final form during that expansion. The comparison cohort was added in early August, after most collection was complete and the team had seen other cohorts' results. This was an iterative observational audit, not a confirmatory test of a prespecified hypothesis. The two judicial reporting cohorts used in Part IV were defined after collection closed, from federal officials' enrollment report (Section B.1); the report informed no search or coding decision.

Search investigators were not told the specific hypothesis or officer-cohort assignments, although subject type was apparent from the different search inputs; lead investigators knew the assignments.

2. *Roles and Conflicts*

The design team comprised the first author, Atlas's founder and president and the study's principal investigator; counsel representing Atlas in Daniel's Law litigation; and investigators retained by and working at counsel's direction. The principal investigator selected the cohort criteria; lead investigators selected the litigation-derived website frame and made the exclusions in Section C.1; Atlas supplied officers' reference addresses; and investigators identified judges' presumptive addresses under Section B.2. Atlas and its counsel funded the audit, including investigator compensation and paid access; no federal funds supported it.

The second author joined in early August as collection was concluding, having seen no results, to assess and help present the findings. He previously consulted for Atlas on Daniel's Law legislation in Florida. He is not compensated for this study.

3. *Ethics and Confidentiality*

The searches used only websites accessible to the general public (supra note 14). Atlas's records defined the officer cohorts and supplied their reference addresses; multiple federal officials confirmed the initial judicial pool's addresses. Those nonpublic inputs identified subjects and validated observations but were not search sources. No subject was contacted during an exposure search.

Collection was complete before external institutional review was sought. In late August 2026, the Heartland Institutional Review Board classified the submitted study as exempt.[120] No study-specific consent was obtained or deemed necessary. Identifiable captures remain encrypted in access-restricted storage. Public materials omit subject-level identifiers and use study identifiers for websites and common-control groups.

## B. Cohorts and Address Reference Standard

### 1. *Cohort Construction*

The judicial sample comprises 100 active district and magistrate judges from multiple federal districts. Within each included district, membership was formulaic: every active district and magistrate judge on the federal judiciary's public roster, excluding those on senior status or serving by assignment, entered the sample, leaving no investigator discretion over inclusion. The additional districts were selected before searches under a fixed criterion unrelated to observed exposure; at federal officials' request, their identities and the criterion are withheld for security reasons. Selection remained purposive, and withholding the criterion prevents independent assessment of that component of external validity; the Article therefore makes no claim of national representativeness. The audit reports the judges in two cohorts defined after collection closed (Section A.1): cohort 1, the thirty-four judges whose full enrollment in the federal removal program federal officials reported, judge by judge, as of end of year 2025; and cohort 2, the remaining sixty-six judges, drawn from multiple federal districts. The cohorts are reporting strata, not an enrollment contrast: cohort 2 combines judges whose enrollment was unreported with judges not reported fully enrolled, the two differ in address validation (Section B.2) and district composition, and the audit estimates no enrollment effect.

---

[120] Letter from S. J. Maberry, Dir., Heartland Institutional Rev. Bd., to the principal investigator, *Approval for HIRB Project No. 082726-1421* (Aug. 28, 2026) (on file with authors). The letter classified the submitted study as exempt and marked 45 C.F.R. § 46.104(d)(4) and (d)(5). Because subsection (d)(5) requires federal conduct, support, or specified approval—none of which applied—the Article relies only on the Board's (d)(4) classification.

The officer cohorts came from Atlas's users under identical filters except request history.[121] Both pools contained New Jersey covered persons born from January 1, 1942 through December 31, 1983, who owned single-family homes; those criteria tracked the initial judicial pool's age range and dwelling composition. The requesting pool required requests to every audited broker (approximately 5,500 users qualified); the comparison pool required no request in Atlas's logs from the user's Atlas-assigned account (approximately 750 qualified). A lead investigator randomly selected 24 from each pool using anonymized identifiers, but the seed and draw history were not preserved. The cohorts were not matched on gender and are imbalanced on the principal investigator's public-material classification (Appendix Section A-4). Atlas's logs cannot exclude comparison-officer requests through other channels; that cohort is a rough benchmark, not a control group.

2. *The Address Reference Standard*

For judges, investigators began with a name and duty station and used audited websites to identify a candidate residence; a presumptive designation required a lead investigator's concurrence. Federal officials confirmed every address in the initial judicial pool as a current primary home address.[122] The remaining judges' addresses remain presumptive: the instrument measuring exposure also helped construct the reference standard. A wrong address could suppress measured exposure by directing searches to the wrong residence or inflate it through correlated republication. Officers' sign-up addresses were supplied directly and checked only to confirm that the property had not since been sold.

The discovery protocol was accurate for every judge in the initial pool—the officials confirmed each address it had produced—supporting but not establishing comparable accuracy in the rest of the sample. Deleting the address-producing cell for every judge would shift the principal interaction by no more than 2.7 percentage points without changing its direction; every judge was Found on at least five websites. That bound does not reach correlated republication errors. The cohort-1 restricted interaction in Part IV restricts the judicial side to externally confirmed addresses.

---

[121] The requesting cohort included law-enforcement and prosecutorial roles covered by Daniel's Law. The Article calls them "requesting officers" and omits more granular occupations to reduce reidentification risk.

[122] Multiple federal officials orally confirmed addresses to the first author and counsel; no written record was exchanged. See supra Introduction note 16.

Presumptive designations were rolling and judgment-based, without recorded as-of dates or a written rule. A disclosure required the subject's name and reference address together, including format variants resolving to the same property. A correct street and municipality with the street number redacted was Found; in a multi-unit building, a missing or wrong unit was Not Found; a post hoc dwelling-type comparison among the judges is reported in Appendix Section A-4. Because officers were restricted to single-family homes, the unit rule had greater opportunity to reduce measured judicial exposure; its effect by cohort and stratum was not compiled. The rules were applied uniformly across cohorts and phases.

## C. Website Frame and Classifications

### 1. *Frame and Exclusions*

The websites form a litigation-derived frame, not a universe of data brokers. From approximately 1,100 brokers to which Atlas users had sent requests, the frame included brokers Atlas had sued for Daniel's Law noncompliance by April 30, 2025, and whose websites investigators could search at the outset.

The frame began with 101 candidates and ended with 87 after excluding seven defunct websites, three with incomplete observations, and four for eligibility or scope. Of the seven defunct websites, four were taken down by their owners and three transferred by court order after default in Daniel's Law proceedings. A categorical rule excluded any domain that ceased operation during the audit; disappearance may itself reflect enforcement. Two New Jersey-specific property-search services were excluded for cross-district comparability after principal results were computed, but the grounds were documented before their quantitative effect was computed. No exclusion depended on a scored outcome. No complete excluded-website matrices survive for an add-back analysis.

### 2. *Vendor-List and Access Classifications*

An archived copy of the federal removal vendor's published list classified 50 websites as on-list and 37 as off-list.[123] List status indicates where federal requests were relatively more or less likely to have been transmitted; it does not establish any judge-specific request, and federal removals may extend beyond the list.

[123] The vendor and archived list are identified supra note 13.

We classified access as "Free, No Login," "Free, Login," or paid, with paid access divided into immediate or delayed results. If conditions varied by subject, the website received the most restrictive tier required for any Found disclosure.

### D. Request and Delivery Evidence

Each requesting officer sent a request from their Atlas email account to the designated address for every included website: 24 × 87 = 2,088 officer-website pairs. Where websites shared a request address, one request could correspond to more than one website. Every observation followed the statutory compliance period by more than a year.

For each request, Atlas retained an end-of-DATA SMTP 250 acceptance from the recipient's designated mail exchanger, message-level matching, and no later nondelivery notice; the Article treats that record as statutory receipt under the law.[124]

The audit observes no federal-program transmission for any individual judge. Its federal evidence is the vendor list and federal officials' post-collection oral report of the enrollment on which cohort 1 is defined: all thirty-four of its judges were fully enrolled as of end of year 2025.[125] List status therefore measures relative likelihood of transmission, not observed transmission or receipt.

### E. Search, Coding, and Timing

Searches began with name and duty station for judges and name and reference address for officers; inputs then varied by website design. Reverse-address and email-enrichment sites used information obtained elsewhere—including judges' presumptive addresses—so their returns confirm an association and create correlated-republication dependence. Information entered into a query field was not itself a disclosure. No contemporaneous instrument recorded per-site query sequences, name variants, stopping rules, or investigator training and calibration. Every

---

[124] John C. Klensin, *Simple Mail Transfer Protocol*, RFC 5321, §§ 3.3, 4.2.5, 6.1 (Oct. 2008), https://www.rfc-editor.org/rfc/rfc5321 (a 250 response establishes server acceptance and responsibility to deliver or relay the complete message). N.J. Stat. Ann. § 12A:12-15(b), (e), (f). In *Cole*, receipt was deemed admitted on default and found on the proof-hearing record. *Atlas Data Privacy Corp. v. Cole Information Services, Inc.*, No. ESX-L-7209-24, slip op. at 2, 4 (N.J. Super. Ct. Law Div. Sept. 19, 2025).

[125] The report was oral and judge by judge; no written record was exchanged. Authors' notes are on file. Individual statuses remain restricted, are used only to define the reporting cohorts, and are not disclosed. See supra Introduction note 17.

Found disclosure was documented at capture with timestamped third-party screen-capture tools; their identities are withheld for operational-security reasons.

At least two investigators reviewed every Found disclosure and escalated disagreements; automated matching could review captures but not determine outcomes.

Officer Not Found cells had affirmative captures of negative or inaccurate results under a rule applied identically to both officer cohorts; judicial negatives rested on the completed workflow without separate captures. This asymmetry has no assigned direction. No random re-audit or disagreement log permits an inter-rater statistic.

Because the comparison cohort was audited in August after the other cohorts, continuously changing records confound cohort with calendar time; no earlier cohort was re-audited, and the direction of any resulting bias is unknown.

## F. Estimation, Dependence, and Limitations

### 1. *Outcomes and Estimands*

The unit is the subject-website pair, coded Found (one) when a completed search returned a record satisfying Section B.2 and Not Found (zero) otherwise. A subject's exposure count is the number of included websites coded Found; the stratum rate is that count divided by 50 on-list or 37 off-list websites. Cohort statistics are unweighted subject means, and website statistics are unweighted subject counts.

The principal estimand is a difference in differences: the comparison-officer-minus-judges gap on listed websites minus the same gap on unlisted websites. Let $\bar{R}(g, s)$ denote cohort *g*'s mean rate in stratum *s*, with *J* denoting judges and *C* comparison officers:

$$[\bar{R}(C, \text{listed}) - \bar{R}(J, \text{listed})] - [\bar{R}(C, \text{unlisted}) - \bar{R}(J, \text{unlisted})].$$

The requesting-versus-comparison and judges-versus-requesting interactions are reported separately. All estimands describe selected cohorts on a fixed website set.

### 2. *Estimation and Dependence*

Part IV reports direct summaries computed from the matrices without a modeling layer. Its 95% percentile bootstrap intervals use 10,000 resamples of subjects within cohorts while treating the

87 websites as fixed. For interaction estimands, a second interval also resamples websites within vendor-list strata. The intervals are pointwise and unadjusted for multiple comparisons; they measure stability under resampling, not population generalizability. Exploratory age, gender, residence-length, and dwelling-type analyses appear in Appendix Section A-4.

As a dependence check, relationships pleaded in the same Daniel's Law action place the 87 websites into 55 common-control groups, the largest containing 13. This proxy may join websites sharing only ownership and miss infrastructure shared across otherwise unrelated companies. A clustered interval resamples subjects within cohorts and common-control groups as intact units; Table 2 reports it with the subject-only and two-way intervals. Delete-one-group and equal-group-weight sensitivities appear in the Appendix.

3. *Design Limitations*

The audit is observational, not causal: the selected cohorts had no pre-request baseline and differed in selection, address validation, negative documentation, and timing. Its findings support descriptive contrasts and an explanatory account, not a causal estimate.

**G. Public Materials and Data Availability**

Public materials will include the analysis code, README, claim registry, aggregate tables, and coarsened website metadata. Subject-level hit matrices, granular demographics and residence-transfer dates, captures, and the website crosswalk will not be released because they could reveal individual judges or officers and the exposure of their home addresses. The public materials therefore will not permit independent recomputation of Part IV's statistics; the code and registry will permit readers to inspect the calculations and compare the released aggregates with the Article's figures. The materials will be deposited in a versioned repository with a durable DOI and license.

## Part IV. The Audit Results

**A. Exposure Across Cohorts**

The results formed a gradient. The 24 requesting officers had the lowest observed exposure: their primary home addresses appeared on an average of 12.5 of the 87 audited data-broker

websites.[126] The 24 comparison officers—selected under the same age and homeownership criteria but for whom Atlas recorded no removal requests—had the highest observed exposure, averaging 62.7 websites. Both federal-judge reporting cohorts fell between them on average: cohort-2 judges (n = 66) appeared on 34.1 websites and cohort-1 judges (n = 34) on 41.2. Figure 1 plots every subject's exposure and marks the reporting groups' means and medians; Table 1 reports the corresponding summary statistics. The medians confirmed the same ordering: requesting officers lowest, the comparison officers highest, and both federal-judge cohorts between them.




**Figure 1. Observed Home-Address Exposure Across the Audit's Reporting Groups.** Each dot represents one audited person; its vertical position reports the number of the 87 audited data-broker websites on which that person's primary home address appeared. Horizontal bars mark cohort medians; open diamonds mark cohort means. From left are the 24 requesting officers, who used Atlas-assigned email accounts to send removal requests

[126] Exposure is defined supra note 19: the number of the 87 audited data-broker websites on which a subject's primary home address appeared. Each separately accessible website was counted separately, regardless of common operation or a shared back-end database.

under New Jersey's Daniel's Law; the federal judges, in their two reporting cohorts (cohort 2, n = 66; cohort 1, n = 34; Part III.B.1); and the 24 comparison officers, selected under the same age and homeownership criteria but for whom Atlas recorded no removal requests. That classification cannot exclude requests those officers may have sent through other channels. The officer cohorts' observed ranges did not overlap: 4–24 websites for requesting officers and 28–82 for comparison officers. Cohorts are ordered by mean observed exposure. Within-cohort horizontal placement of dots is deterministic and has no substantive meaning. The figure is descriptive; its left-to-right ordering reflects observed exposure, not a causal estimate.

**Table 1. Observed Home-Address Exposure by Cohort (of the 87 Audited Data-Broker Websites)**

| Cohort | n | Mean | Median | SD | Min–Max | IQR |
|---|---|---|---|---|---|---|
| Requesting officers | 24 | 12.5 | 11.5 | 4.9 | 4–24 | 10.0–14.0 |
| Federal judges — cohort 2 | 66 | 34.1 | 34.0 | 13.3 | 5–65 | 26.3–42.8 |
| Federal judges — cohort 1 | 34 | 41.2 | 40.5 | 11.7 | 10–61 | 35.3–50.0 |
| *All federal judges* | *100* | *36.6* | *37.0* | *13.2* | *5–65* | *29.0–45.3* |
| Comparison officers | 24 | 62.7 | 67.5 | 15.1 | 28–82 | 49.5–75.3 |

*Note.* Entries are counts of the 87 audited data-broker websites on which each subject's primary home address was observed. Cohorts are ordered by mean observed exposure; the pooled federal row is a subtotal of the two judicial reporting cohorts. The comparison officers were selected under the same age and homeownership criteria as the requesting officers but are those for whom Atlas recorded no removal requests; that classification cannot exclude requests sent through other channels. Statistics were calculated from unrounded values and rounded independently for presentation.

But the gradient should not obscure a more basic result: every judge was exposed. For all 100 judges, a primary home address appeared on at least 5 audited websites. Federal officials externally confirmed the initial judicial pool's addresses; the remainder were classified as presumptive under the protocol described in Part III.[127] Half the federal sample appeared on 37 or more websites. No subject in any cohort had zero observed exposure: the lowest observed values were 4 among requesting officers and 28 among comparison officers. Exposure varied in degree; it was never absent.

Cohort 1 provides the audit's only cohort-specific evidence concerning reported enrollment: every one of its thirty-four judges had been reported fully enrolled in the federal removal

[127] See supra note 16; supra Part III.B.2.

program as of end of year 2025, before collection began, and every one was found.[128] Their addresses appeared on an average of 41.2 of the 87 audited websites. The audit makes no enrolled–unenrolled comparison and estimates no enrollment effect; cohort 2 is not an unenrolled group (Part III.B.1).

Most of the observed difference between the judicial cohorts' means is associated with dwelling stock. Dwelling type varies only among the judges — every officer owned a single-family home by selection (Part III.B.1) — and every cohort-1 reference address was a house, while cohort 2 divides evenly: thirty-three house addresses and thirty-three apartment, condominium, or other multi-unit addresses. Cohort-2 judges with house addresses averaged 39.8 websites; the data did not distinguish that mean from cohort 1's 41.2 (difference 1.5; Welch 95% interval [−4.3, 7.2]). Cohort-2 judges with multi-unit addresses averaged 28.5, a within-cohort gap of 11.2 websites ([5.3, 17.2]).[129] The comparison is post hoc and one-sided by construction — cohort 1 has no multi-unit addresses — and the dwelling gap conflates data brokers' thinner unit-level records with the capture protocol's unit rule, which coded a building-level listing that did not disclose the subject's unit as not found (Part III.B.2). Because cohort 2 pools districts whose dwelling stock differs, dwelling also cannot be separated from other district-level differences. In the one stratum where the cohorts can be compared, the audit found no reliable difference between them.

---

[128] See supra note 17.

[129] The comparison is reported in full in Appendix Section A-4, with the classification rule (condominium and cooperative units counted as multi-unit) and the interval procedures. "Did not distinguish" means the interval spans zero, not that no difference exists; the interval remains compatible with differences of meaningful size in either direction.




**Figure 2. Observed Home-Address Exposure by Dwelling Type of the Reference Address.** Each dot represents one audited person; its vertical position reports the number of the 87 audited data-broker websites on which that person's primary home address appeared. Horizontal bars mark group medians; open diamonds mark group means. The judicial reporting cohorts are divided by the dwelling type of the reference address: from left are the 24 requesting officers; cohort-2 judges whose reference address was an apartment, condominium, or other multi-unit residence (n = 33); cohort-2 judges whose reference address was a house (n = 33); cohort-1 judges, all of whose reference addresses were houses (n = 34); and the 24 comparison officers. Every officer owned a single-family home by selection (Part III.B.1), so dwelling type varies only among the judges; the officer groups reprint Figure 1's distributions for scale. The dwelling comparison is post hoc; the dwelling gap conflates data brokers' thinner unit-level records with the capture protocol's unit rule (Part III.B.2), and cohort 2 pools districts whose dwelling stock differs, so dwelling cannot be separated from other district-level differences. Groups are ordered by mean observed exposure. Within-group horizontal placement of dots is deterministic and has no substantive meaning. The figure is descriptive and does not identify a causal effect.

The officer-cohort difference extended beyond their averages: their observed ranges did not overlap. Requesting officers appeared on 4 to 24 audited websites; comparison officers, on 28 to 82. The most-exposed requesting officer thus appeared on fewer websites than the least-exposed comparison officer—and on fewer than the federal-judge median of 37 websites. Across the 48 officers selected under the same age and homeownership criteria, the observed

ranges separated completely according to whether Atlas had recorded removal requests for them.

**B. Exposure by Federal Vendor-List Status**

The cohort ordering held when the 87 audited websites were divided by whether they appeared on the federal vendor's published list.[130] The gaps between the cohorts did not. The list included 50 of the audited websites—where federal requests were most likely to have been transmitted—leaving 37 off the list. Because the strata differ in size, comparisons across them use exposure rates: the percentage of a stratum's websites on which a subject's primary home address appeared. On the listed websites, judges' mean exposure rate was 30.7%, compared with 72.2% for comparison officers—a gap of 41.5 percentage points. Off the list, the corresponding rates were 57.3% and 72.0%, a gap of 14.6 points. The difference between those gaps was 26.9 percentage points (95% bootstrap interval, 20.0 to 33.7, resampling subjects within cohorts and treating the 87 audited websites as fixed).[131] Figure 3 plots all three groups' rates by list status; Table 2 reports the estimates, including the wider interval produced by resampling both subjects and websites. Because neither cohort membership nor list status was randomly assigned, the 26.9-point difference is an observed association within the audited website set, not an estimate of the federal program's causal effect. Sensitivity analyses clustering websites under common corporate ownership or control preserved the interaction's direction, although weighting those groups equally rather than weighting websites equally reduced its magnitude. In an exploratory analysis restricted to cohort 1, whose reference addresses were all externally confirmed, the interaction was positive (29.9 percentage points; subject-bootstrap 95% interval [22.7, 36.9], conditional on the fixed website set). The analysis is post hoc and was adopted in response to the reference-standard limitation described in Part III.B.2.

Within cohort 1, mean exposure was 34.8% on listed websites and 64.5% off the list: on average, these enrolled judges' addresses appeared on more than one in three websites the vendor itself lists.

[130] The vendor's published list, its archived version, and the mapping to the audited websites are described supra note 13.

[131] Statistics were calculated from unrounded estimates and rounded independently for presentation; values falling exactly halfway at the reported decimal place were rounded upward. Arithmetic performed on displayed components may therefore differ by 0.1 percentage point from a reported difference. Bootstrap procedures and the full interval set, including intervals from resampling both subjects and websites, appear infra in Table 2 and supra in Part III.F.2.




**Figure 3. Mean Home-Address Exposure Rates Within and Outside the Federal Vendor's Published List.** Points show each cohort's mean exposure rate: the percentage of websites in a stratum on which a cohort member's primary home address appeared, averaged across cohort members. The strata comprise the 50 audited websites appearing on the federal vendor's published list and the 37 audited websites outside it. Vertical bars are 95% bootstrap intervals from resampling of subjects within cohorts, treating the 87 audited websites as fixed; uncertainty attributable to website composition and common-control grouping is reported in Table 2. The federal-judge series pools the judicial reporting cohorts (n = 100). The requesting officers (n = 24) used Atlas-assigned email accounts to send removal requests under New Jersey's Daniel's Law. The comparison cohort (n = 24) consists of officers selected under the same age and homeownership criteria but for whom Atlas recorded no removal requests; that classification cannot exclude requests they may have sent through other channels. The gap between judges and comparison officers was 41.5 percentage points on the list and 14.6 points off it, a difference of 26.9 points (95% bootstrap interval, 20.0 to 33.7). Displayed values are rounded independently from unrounded estimates. Horizontal offsets separate the intervals and have no substantive meaning. The figure is descriptive: neither cohort membership nor list status was randomly assigned, and the differences shown are observed associations, not estimates of the federal program's causal effect.

**Table 2. Exposure Rates by Federal Vendor-List Status: Estimates and Uncertainty**

**Panel A. Mean exposure rates by stratum (%)**

| Group | On-list (50 websites) | 95% bootstrap interval | Off-list (37 websites) | 95% bootstrap interval |
|---|---|---|---|---|
| Federal judges (n = 100) | 30.7 | [27.7, 33.6] | 57.3 | [53.8, 60.8] |
| Requesting officers (n = 24) | 10.5 | [7.8, 13.6] | 19.7 | [17.2, 22.3] |
| Comparison officers (n = 24) | 72.2 | [64.8, 79.0] | 72.0 | [63.7, 79.5] |

**Panel B. Differences and interactions (percentage points)**

| Estimand | Estimate | Subject-bootstrap 95% interval | Subject-and-website 95% interval |
|---|---|---|---|
| On-list gap (comparison officers – judges) | 41.5 | [33.6, 49.0] | — |
| Off-list gap (comparison officers – judges) | 14.6 | [5.8, 23.0] | — |
| Judges-vs-comparison interaction (on – off) | 26.9 | [20.0, 33.7] | [13.5, 40.6] |
| Cohort-1 restricted interaction (post hoc; confirmed reference addresses) | 29.9 | [22.7, 36.9] | [15.4, 44.6] |
| Judges' within-group contrast (off – on) | 26.6 | [24.2, 29.1] | — |
| Requesting officers' within-group contrast (off – on) | 9.2 | [5.9, 12.5] | — |
| Difference of within-group contrasts (judges – requesting officers) | 17.4 | [13.4, 21.6] | [4.7, 29.8] |
| Requesting-vs-comparison interaction (sensitivity) | 9.4 | [2.2, 16.3] | [−4.7, 23.5] |

*Notes.* **(a)** Statistics were calculated from unrounded estimates and rounded independently for presentation; arithmetic performed on displayed components may therefore differ by 0.1 percentage point from the reported interaction. **(b)** Subject-bootstrap intervals resample subjects within cohorts (B = 10,000), treating the 87 audited websites as fixed; subject-and-website intervals additionally resample websites within strata. **(c)** Some audited websites are under common corporate ownership or control (websites named in the same Daniel's Law action; 55 groups among the 87, the largest comprising 13). Resampling those groups as intact units, the interaction's interval was [7.8, 44.4]; the lower bound remained above zero. Deleting the largest group reduced the interaction to 18.9; weighting groups equally rather than websites equally reduced it to 16.8—a descriptive sensitivity, not a corrected or preferred estimate; the Article's estimand weights websites equally. The interaction's direction was preserved in every leave-one-group-out deletion (range 18.9–29.6; full results in the Appendix). **(d)** Neither cohort membership nor list status was randomly assigned; all entries are observed associations within the audited website set. **(e)** The requesting-vs-comparison interaction is a sensitivity analysis, not a placebo or falsification test. **(f)** The cohort-1 restricted interaction restricts the judicial side of the principal interaction to cohort 1, whose reference addresses were all externally confirmed (Part III.B.2); because cohort 1 was defined by the post-collection enrollment report and excludes other confirmed addresses for disclosure-protection reasons, it tests whether the interaction persists in that confirmed subset and neither isolates reference-standard error nor estimates an enrollment effect; it is a post-hoc sensitivity to the address reference standard, not a pre-specified estimand. Its intervals follow the procedures in note (b); resampling subjects within cohorts and commonly controlled website groups as intact units gave [7.6, 50.1].

The off-list gap was smaller, but it did not disappear. On the 37 websites outside the vendor's published list, judges' mean exposure rate was 14.6 percentage points below the rate for comparison officers (95% bootstrap interval, 5.8 to 23.0). That gap was less than half as large as the on-list gap. Even where federal requests were less likely to have been transmitted, judges appeared on a smaller share of websites than officers for whom Atlas recorded no removal requests. The audit does not identify the source of that residual. The pattern is consistent with federal removal activity extending beyond the published list, independent privacy efforts by judges, and unmeasured differences between judges and officers; Part V weighs those possibilities. The residual is also why this Article treats the comparison officers as a rough benchmark rather than a baseline: off the list, the groups were substantially closer than on it, but they were not the same.

The requesting officers provide a check on whether the same list-status pattern appears outside the federal request channel. They sent their requests from Atlas-assigned email accounts, not through the federal vendor; the vendor's published list therefore did not define their request channel. Their mean exposure rate was 10.5% on listed websites and 19.7% off the list, a difference of 9.2 percentage points. For judges, the corresponding difference was 26.6 points. The judges' list-status difference was therefore 17.4 points larger than the requesting officers' (95% bootstrap interval, 13.4 to 21.6, resampling subjects within cohorts). This is a sensitivity

analysis, not a falsification test: the list-status association was larger among judges, but the design does not establish that the federal program caused the difference.

### C. Website-Level Results

The website-level results sharpen the cohort pattern. Of the 87 audited websites, 40 disclosed the primary home address of no requesting officer. Across those websites, mean exposure rates were 65.5% for comparison officers and 39.4% for federal judges—equivalent to 15.7 of the 24 comparison officers and 39.4 of the 100 judges per website. Thirty-eight of the 40 disclosed at least one comparison officer, and every one disclosed at least two federal judges. The absence of requesting officers therefore did not generally reflect an absence of home-address data.

Twenty-two of those 40 websites appeared on the federal vendor's published list—the stratum where federal requests were most likely to have been transmitted. Atlas's records show that all 24 requesting officers sent removal requests from their Atlas-assigned email accounts to the request address associated with each of those 22 websites.[132] SMTP records show that each message was accepted by the recipient mail system.[133] Yet no requesting officer's address appeared on any of them. Those websites disclosed the home addresses of, on average, 66.9% of comparison officers (16.0 of 24) and 27.0% of federal judges (27.0 of 100); twenty-one of the 22 disclosed the addresses of at least ten comparison officers, and every one disclosed at least two federal judges.

The cohort pattern was pronounced but not uniform across websites. Every audited website disclosed at least 2 of the 100 federal judges, with per-website counts ranging from 2 to 97. For requesting officers, the median per-website count was 2 of 24 (mean 3.5), and 40 websites disclosed none. At the upper end of the distribution, the six highest-count websites disclosed between 18 and 22 requesting officers; five of the six were outside the vendor's published list. In

[132] Some audited websites are under common corporate ownership or control; the audit grouped websites named in the same Daniel's Law action (parent, subsidiary, sibling, or affiliate relationships). The audit nevertheless treats each separately accessible website as one website; a request sent to a commonly controlled group may therefore correspond to more than one audited website. Some grouped websites may also share back-end infrastructure, which the audit does not observe. Request coverage was verified using the request address associated with each website. The implications of common control for statistical dependence are addressed supra in Part III.F.2 and Part IV, Table 2.

[133] Daniel's Law requires removal not later than ten business days after receipt of the written notice. N.J. Stat. Ann. § 56:8-166.1(a)(1). Consistent with New Jersey law, the audit classifies a request as received when SMTP records show that the recipient mail system accepted it. That classification does not establish that a person read the request. See supra Part III.D.

a separate comparison, three websites reversed the usual cohort ordering by disclosing more requesting officers than comparison officers; the largest such margin was 19 requesting officers against 14 comparison officers. The complete distribution, including these exceptions, is retained in the internal research record.

### D. Public Accessibility and Principal Findings

Paid access was unnecessary to locate nearly every judge. Of the 87 audited websites, 27 required neither payment nor an account.[134] On those websites, investigators found a primary home address for 95 of the 100 federal judges; the median per-judge count was 5 of 27.

Exploratory analyses reported in the Appendix examined age, gender, and residence length within cohorts. They did not show a reliable linear association between exposure and age or residence length in any cohort, or a reliable gender gap within any judicial cohort. A post-hoc officer-gender interaction appeared, but the small cells, single-rater classification, and observational design make it a lead for replication rather than a finding on which this Article relies.[135]

Across the person- and website-level analyses, one ordering recurred: observed exposure was lowest among requesting officers, highest among comparison officers, and intermediate in every federal-judge cohort. The separation was greatest on websites within the federal vendor's published list, but it was not uniform: the off-list residual, high requesting-officer counts on several websites, and reversals of the cohort ordering on three websites mark its limits. Judicial exposure also extended to websites requiring neither payment nor an account. The audit documents these patterns; it does not, by itself, establish why they arose. Part V considers what these results permit us to infer about enforcement architecture—and what they do not.

## Part V. The Architecture of Credible Enforcement

### A. What Explains the Exposure Pattern

[134] A website was classified "Free, No Login" if investigators could view a subject's full primary home address without logging in, creating an account, or providing payment information. The classification describes the access conditions observed during the audit. See supra Part III.C.2.
[135] See infra Appendix Section A-4 (estimands, intervals, missingness, the gender-classification method, and the residence-length measurement protocol).

The alternative explanations deserve their strongest case before any verdict. Perhaps judges are easier to find because their names, courts, and commissions are public. But the comparison officers—who were not selected for public prominence—appeared on more audited websites on average than any judicial cohort, and prominence alone does not explain why judges appeared less often on vendor-listed websites than on unlisted ones.[136] Perhaps occupation or differences in source-data supply explain the gap between the officer cohorts. Yet the requesting and comparison cohorts came from the same covered occupational pool, were subject to the same age and homeownership screens, and differed sharply in residual exposure: 12.5 websites on average for requesting officers and 62.7 for comparison officers.[137] That contrast supports an account centered on requests and enforcement, although requests sent through other channels and unmeasured differences between the cohorts cannot be excluded.

The ordering held across both judicial cohorts: each fell between the requesting and comparison officers. Within-cohort post hoc summaries found no reliable linear association between exposure and either age or residence length, and no reliable gender gap among judges; an exploratory gender interaction did appear among the officer cohorts. Because cohort 2 pools multiple districts, however, pooled summaries may mask district-level relationships. These results are descriptive and do not exclude alternative explanations.[138] Dwelling type does more of the work: most of the difference between the judicial reporting cohorts is associated with dwelling stock (Part IV.A), although the dwelling gap cannot be separated from the unit rule's

---

[136] Exposure gradient: supra Part IV, Table 1; stratum contrast within judges: supra Part IV, Table 2.

[137] Cohort construction and screens: supra Part III.B.1 (the cohorts differ by one recorded selection criterion—removal requests sent from Atlas-assigned email accounts—which does not establish that request history was their only real-world difference); means: supra Part IV, Table 1 (12.5 and 62.7 of 87).

[138] See infra Appendix Section A-4 (exploratory covariates). Gender here means gender as classified by the principal investigator from public material, not self-identification (infra Appendix Section A-4). Age: no reliable linear association in any reporting group (Pearson r between −0.12 and 0.16, Fisher-z intervals spanning zero, all $p \geq 0.47$). Gender: no reliable gap in either judicial cohort (cohort 1 +0.8, cohort 2 +2.7 websites, women minus men; Welch $p \geq 0.41$); the officer-cohort exploratory interaction (women's requesting-versus-comparison gap 16.3 websites larger than men's; bootstrap [6.4, 26.3]; permutation $p = 0.020$, $B = 20{,}000$; cells of five and seven women; expressly exploratory). Residence length (whole months since the last recorded sale or transfer of the primary residence; protocol in Appendix Section A-4): no reliable association in any reporting group—Spearman ρ between −0.17 and 0.15 and Pearson r between −0.18 and 0.12, every interval spanning zero (all Pearson $p \geq 0.39$); cohort 2 $n = 52$ of 66.

stricter coding or from other district-level differences.[139] The unit rule also creates more opportunities to lower measured exposure among judges than among officers, and its effect on the principal interaction was not quantified.

Cohort 1's high exposure cannot be attributed to lack of reported enrollment alone. Federal officials reported that every judge in the cohort was fully enrolled before collection, yet the cohort averaged 41.2 websites. Still, the audit neither inspected the underlying enrollment records nor observed transmission to any particular website.[140] Vendor-list status therefore remains a proxy for where federal transmission was more likely, not proof that a request was sent to or received by a particular website.[141] Taken together, the evidence weakens the alternative explanations without eliminating them. The study lacks person-level baselines, cannot exclude requests through other channels, and cannot rule out every cohort, calendar, source-data, or website-selection difference. Finally, the website sample came entirely from brokers Atlas had already sued. The results therefore describe an enforcement-exposed segment of the market and do not support generalization to unaudited brokers.[142]

Those limits reflect an observational design: the cohorts were selected, not assigned. But the comparisons converge. The exposure gap appeared in both judicial cohorts and varied across vendor-list strata in the direction the enforcement account predicts. The officer benchmark pointed the same way: requesting officers had lower mean exposure than both judicial cohorts, while comparison officers had higher mean exposure. The pattern also persisted in the operator-group and delete-one analyses reported in Part IV.[143] Each alternative explanation can account for part of the pattern; none fits the pattern as a whole as well as the difference in enforcement architecture.

---

[139] Dwelling type: supra Part IV.A; infra Appendix Section A-4. Cohort-2 house-address judges averaged 39.8 websites against cohort 1's 41.2 (difference 1.5; Welch 95% interval [−4.3, 7.2] — spanning zero but compatible with differences of meaningful size); cohort-2 multi-unit judges averaged 28.5, a within-cohort gap of 11.2 ([5.3, 17.2]). Cohort 1 contains no multi-unit addresses, so the comparison is confined to the house stratum. The unit rule's incidence by cohort and stratum was not compiled from the capture records, so its effect on the principal interaction is not quantified; see supra Part III.B.2.

[140] The report and its limits—after collection closed, oral, judge by judge as of end of year 2025—supra Part III.D; cohort 1's statistics: supra Parts IV.A, IV.B; enrollment share: Annual Report 2025, supra note 82 (approximately eighty percent of sitting judges enrolled)—a different measure, denominator, and date, which the Article does not compare with the audit's figure.

[141] See supra Part III.D.

[142] See supra Parts III.C.1, III.F.2, III.F.3.

[143] See supra Part IV.A (cohort results); Part IV.B (the difference-in-differences interaction, 26.9 points); Table 2 note (c); infra Appendix Table A-1 (sensitivity and influence analyses).

This Article therefore advances that architectural difference as the best available explanation. Under the state regime, failure to comply with the request creates an assignable claim, and proof of that violation triggers a mandatory monetary floor. Under the federal regime, a violation that makes covered information public can be enforced only through a discretionary official channel. The hypothesis is causal, but the test is observational. The audit supplies converging support for the account; it does not isolate the architecture's effect or the contribution of any one feature within it.[144]

**B. Credible Escalation and the Just Market**

Why, then, did the audit find higher residual exposure under the federal regime—and why did the bounded search identify no public enforcement action under it? The answer begins with arithmetic, not fault. A centralized enforcer has finite capacity. Under the federal Act, each matter must first secure the attention of a specified judiciary official, who alone can initiate enforcement through the Department of Justice. A court must then grant injunctive or declaratory relief, and the regulated party must knowingly violate the resulting order before damages become possible. Even then, an award is discretionary.[145] Every matter must therefore clear an official threshold before the statute can impose a monetary consequence. Silbey documented the institutional consequence four decades ago. An enforcement office with every formal tool at its disposal litigated fewer than one percent of its complaints. It addressed grievances one by one while the practices generating them continued. Protection therefore depended partly on the cooperation of the regulated parties.[146] Nothing in that account requires official neglect. The vulnerability is structural: the person exposed can invoke the right, but only an official can put the law in motion.

The architectures place different constraints on scale. With fixed public capacity, a growing potential caseload can reduce the perceived likelihood that any one matter will be pursued. Assignment changes the constraint: each valid claim assigned to a repeat enforcer expands the set of claims it may pursue, while aggregation may support enforcement that an isolated claim would not. For the calculating data broker, the operative difference is not whether a remedy

---

[144] Identification limits: supra Part III.F.3; the framework's post-results development is disclosed supra Part III.A.1.
[145] See supra Part I.B; Daniel Anderl Judicial Security and Privacy Act § 5934(f)(1)–(3), 136 Stat. 3458, 3466 (2022).
[146] Susan S. Silbey, *The Consequences of Responsive Regulation*, in *Enforcing Regulation* 147, 158, 162–63, 166 n.4 (Keith Hawkins & John M. Thomas eds., 1984); see also Short, supra Part I note 76, at 654; Sant'Ambrogio, supra Introduction note 22, at 426; Rory Van Loo, *The Missing Regulatory State: Monitoring Businesses in an Age of Surveillance*, 72 Vand. L. Rev. 1563 (2019).

exists on paper—both statutes provide one—but whether a violation is likely to carry consequences. Once a state violation is established, subsection (c)(1) adds no separate fault inquiry before the mandatory award. All else equal, that raises the expected cost of noncompliance and makes the consequence more predictable. Private enforcement can add a feedback effect: greater predictability may make claims more likely to be pursued, and their pursuit can make enforcement more credible in turn.[147] This is a model of the calculating response, not a finding about any firm's motives; the audit measured outcomes, not states of mind. The observed exposure pattern is consistent with that model and, after considering the rival explanations, supports it.[148]

Visible escalation can shape the calculating tier by showing that violations can carry consequences. Daniel's Law litigation generated that signal through 184 separately docketed actions, whose records collectively documented allegations, defenses, disclosed settlements, defaults, judgments, and coercive relief. Those records made escalation observable; the audit does not establish which firms saw them or how any reacted. The federal program produced a different kind of public record. It reports appropriations, staffing, implementation status, an enrollment share, and a vendor's tally of items scrubbed. But the documented search identified no public source reporting requests sent, compliance within the statutory window, or recurrence; the audit likewise could not observe requests sent for individual judges.[149] This is Hawkins and Thomas's distinction between evidence of activity and evidence of effectiveness.[150] It matters twice: public consequences can inform market expectations, and public outcome measures permit accountability. On the public record examined here, the federal program

[147] See A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harv. L. Rev. 869, 887–90 (1998); A. Mitchell Polinsky & Steven Shavell, *The Economic Theory of Public Enforcement of Law*, 38 J. Econ. Literature 45, §§ 3.2, 8 (2000); Richard Craswell & John E. Calfee, *Deterrence and Uncertain Legal Standards*, 2 J.L. Econ. & Org. 279 (1986); Farhang, supra Introduction note 25, at 22–28; William M. Landes & Richard A. Posner, *The Private Enforcement of Law*, 4 J. Legal Stud. 1 (1975); cf. Tom Baker, Alon Harel & Tamar Kugler, *The Virtues of Uncertainty in Law: An Experimental Approach*, 89 Iowa L. Rev. 443 (2004). None isolates a mental-state element; see infra note 170.

[148] See Kagan & Scholz, supra Part II note 104, at 67–68; Gary S. Becker, *Crime and Punishment: An Economic Approach*, 76 J. Pol. Econ. 169 (1968); van der Heijden, *Responsive Regulation in Practice*, supra Part II note 115, at 16; Short & Toffel, supra Part II note 86, at 361, 391.

[149] The action count: Atlas litigation ledger (on file with authors; as of September 1, 2026) (184 separately docketed actions; 284 distinct defendants); see supra Part II note 94. Program metrics: supra Part II notes 80, 82, 85 (enrollment and service counts; the May 2024 memorandum's tally of PII items redacted—not unique address records or sustained removals); the absence of public effectiveness measures is bounded to the documented public search, supra Part II note 87; judge-specific transmission: supra Part III.D.

[150] Hawkins & Thomas, supra Part II note 84, at 19.

supplied neither visible enforcement nor an aggregate measure of whether statutory removals occurred on time and lasted.

During the audit window, courts ordered three domains in the audit's candidate frame transferred after defendants defaulted; the domains were therefore excluded from the analytic set.[151] The transfers show courts using the regime's most coercive remedy. A transfer can stop domain-specific disclosure, but it does not show that the operator ceased doing business elsewhere.[152] The record does not establish whether any judgment was collected, whether recoveries in other matters sustained these cases, or whether any case was profitable.

Galanter would have recognized the brokers' side of the docket. Repeat players—organizations engaged in many similar cases over time—can play for rules, absorb losses strategically, and exploit advantages unavailable to one-shotters who must win now or never. An individual right-holder with a comparatively small claim against a distant data company is the kind of one-shotter Galanter described.[153] Assignment answers that asymmetry in kind. Among Galanter's possible reforms was the "assignee-manager of fragmentary rights," with ASCAP as a working example; such units, he wrote, "would in effect be" repeat players.[154] An assignee holding many claims can operate as a repeat player on the claimants' side—pooling resources, learning defendants' playbook, and seeking to shape rules and market behavior rather than a single payment.

Aggregation through assignment has a Supreme Court pedigree. In *Sprint Communications Co. v. APCC Services, Inc.*, assignees aggregated the small claims of payphone operators and promised the proceeds to their assignors. The Court held that they had Article III standing, on the strength of an assignment tradition it traced through centuries of practice.[155] The dissent argued that assignees obligated to remit the proceeds lacked a personal stake; the majority relied on history and the legal title conveyed by assignment.[156] *Sprint* is a standing case: it does not decide whether claims under any particular statute are assignable, bless any assignment's terms, or

---

[151] See supra Part III.C.1.
[152] See supra note 97 (the Cole transfer followed default and reached the domain only). The Article draws no enterprise-death or incapacitation implication from any transfer.
[153] Marc Galanter, Why the "Haves" Come Out Ahead: Speculations on the Limits of Legal Change, 9 Law & Soc'y Rev. 95, 97–103 (1974).
[154] Id. at 141–43 (the assignee-manager identified as one item in his catalogue of structural responses).
[155] 554 U.S. 269, 271–72, 274–88 (2008).
[156] Id. at 298–303 (Roberts, C.J., dissenting).

touch the merits of claims like these. Its contribution here is narrower: aggregation through assignment is not a procedural invention of the data-privacy wars.[157]

These mechanisms point beyond individual access to justice toward an end state this Article calls access to a just market: firms ordinarily honor valid requests without litigation, while a persistent enforcement presence makes noncompliance likely to be detected and pursued. The concept resembles but is not identical to Ben-Shahar's vicarious access. Class litigation can distribute recovery and, more important here, generate a deterrence externality for people who never sue.[158] Here, the related externality operates at the request stage: prior enforcement may change how firms handle subsequent valid requests. That is this Article's application of Nyborg and Telle's warning model, in which warnings conserve scarce enforcement resources by directing prosecution toward actors that persist.[159]

The audit observes an exposure pattern consistent with that endpoint, but not the causal history that produced it. Requesting officers had the lowest mean exposure among the audit's reporting groups, and none appeared as a named plaintiff in litigation.[160] At the website level, forty sites displayed no requesting officer's address, even though all forty displayed at least two judges and thirty-eight displayed at least one comparison officer.[161] The audit cannot determine whether each requesting-officer absence reflected removal or data the site never held. But the aggregate result—requesters absent where others remained exposed—is the market condition a functioning enforcement regime is meant to produce. That condition directly benefits later requesters, whose goal is simply to have valid requests honored. By aggregating and carrying early claims through the courthouse door, an assignee can help turn access to justice for the individual assignors into access to a just market for all who come after.

### C. Objections, Constitutional Stakes, and Federal Repair

157 N.J. Stat. Ann. § 56:8-166.1(b), (d); see supra Part I.C. Sprint does not supply an a-fortiori comparison: the majority relied partly on legal title, and the interest conveyed under the Daniel's Law assignments is outside the record examined here.

158 Ben-Shahar, *supra* note 28, at 1762, 1807–08.

159 Karine Nyborg & Kjetil Telle, The Role of Warnings in Regulation: Keeping Control with Less Punishment, 88 J. Pub. Econ. 2801 (2004). "Access to a just market" is this Article's terminology, not Nyborg and Telle's.

160 Supra Part IV, Table 1; supra Part III.D (the officers sent their own requests from Atlas-assigned email accounts); supra Part II.B (Atlas pursued the assigned claims in court).

161 See supra Part IV.C (the forty websites on which no requesting officer's address appeared; thirty-eight with at least one comparison officer; all forty with at least two judges).

Private enforcement carries risks of its own. Profit-seeking enforcers may prioritize monetary recovery over prospective compliance, select claims for expected value rather than public importance, and use aggregated statutory exposure to increase settlement pressure.[162] Assignment can also separate control of the litigation from the person whose privacy right was violated.[163] Daniel's Law answers some, not all, through structure. A covered person must elect assignment in writing, and only the claim moves; prospective statutory protection remains with the covered person. Liability follows only after notice and a ten-business-day period for compliance; punitive damages require a separate showing of willful or reckless conduct; and courts retain control over judgments and coercive relief.[164] The profit motive is not offered as a virtue. The design claim is narrower: an economic incentive lets a repeat enforcer pursue claims that isolated right-holders often cannot.[165]

Daniel Solove frames the scope objection directly: laws that protect judges leave countless others facing similar dangers without equivalent protection.[166] The objection is sound, and the audit sharpens rather than blunts it. Substantial residual exposure remained even among the judges the federal Act was designed to protect.[167] Judicial privacy is nevertheless a useful testing ground: the covered populations are defined, related statutes operate against the same market, and residual exposure can be measured. The resulting lesson about enforcement architecture may travel beyond judicial-privacy statutes even where statutory details differ. Lawmakers need not choose between expanding coverage and strengthening enforcement. Broader coverage should carry that lesson forward, not reproduce the same enforcement gap on a larger scale.

The New Jersey Supreme Court has now held that the actual-or-liquidated award under subsection (c)(1) requires no separate mental-state showing; liability turns on receipt of a valid request, expiration of the ten-business-day compliance period, and continued disclosure. Whether the First Amendment requires a different rule remains before the Third Circuit. Defendants argue that the statute is a content-based restriction that fails any level of scrutiny and that damages imposed without a mental-state element chill protected speech; Atlas and the New Jersey Attorney General respond that the First Amendment imposes no categorical

---

[162] Margaret H. Lemos & Max Minzner, For-Profit Public Enforcement, 127 Harv. L. Rev. 853, 857, 860–61 (2014).
[163] See Daniel J. Solove & Woodrow Hartzog, Kafka in the Age of AI and the Futility of Privacy as Control, 104 B.U. L. Rev. 1021, 1034 (2024); Woodrow Hartzog & Daniel J. Solove, Privacy as Contract?, 112 Iowa L. Rev. (forthcoming 2026) (Jan. 7, 2026 manuscript at 18, 24–25), https://ssrn.com/abstract=6081773.
[164] N.J. Stat. Ann. § 56:8-166.1(a)(1)–(2), (c)(2), (c)(4), (d); see supra Part I.C.
[165] Galanter, *supra* note 153, at 141–42.
[166] Solove, supra note 31, at 1119–20.
[167] See supra Part IV.A.

mental-state requirement and that Daniel's Law's individualized notice, compliance period, limited information categories, and many constitutional applications defeat the facial challenge.[168] This Article does not attempt to resolve that dispute. It makes two narrower contributions. First, the audit makes the practical stakes of enforcement strength concrete: requesters under a regime with publicly visible escalation had lower residual exposure than judges under a regime for which the bounded search identified no public enforcement action. Second, the design account identifies what the absence of a separate fault element does to the statute's enforcement architecture—and why that difference may matter for compliance.

The record and the legislative history set out in Part I support a specific federal repair. Congress should restore what was initially proposed: the private right to seek relief under the Act, which the introduced bill contained and the enacted statute reserves to officials.[169] The audit does not identify how much of the observed difference is attributable to a private right of action, a mandatory monetary floor, notice-based liability, assignability, visible litigation, or another feature of the state regime. The recommendation treats those features as a mutually reinforcing architecture, not as separately estimated effects. Congress should also add what no version of the federal bill ever contained: a fixed, mandatory statutory award for a proved violation and express assignability of the claim.

Liability for a violation should be notice-based, with no separate mental-state element—the rule the New Jersey statute carries today as construed by the state supreme court. Notice and the compliance period narrow the rule's reach: liability arises only after a firm receives a compliant request identifying what must be removed and the time to remove it expires. A separate fault element would add another issue on which liability could turn after the statutory violation was

---

[168] The Article reports the litigating positions; it adopts none of them and imports neither side's severability, narrowing-construction, or remedial fallbacks. Construction: Atlas Data Privacy Corp. v. We Inform, LLC, No. A-8-25, slip op. at 28, 41 (N.J. Aug. 12, 2026) (no mental-state requirement for the subsection (c)(1) award; the willful-or-reckless element of subsection (c)(2) treated separately). Posture as of September 1, 2026: Atlas Data Privacy Corp. v. We Inform, LLC, Nos. 25-1555 et al. (3d Cir. argued July 8, 2025) (pending). Positions: Letter Brief of Defendants-Appellants at 1–4, We Inform, Nos. 25-1555 et al. (3d Cir. Aug. 26, 2026), ECF No. 113; Plaintiffs-Appellees' Supplemental Brief at 1–5, We Inform, Nos. 25-1555 et al. (3d Cir. Aug. 26, 2026), ECF No. 114; Letter Brief of Intervenor-Appellee Attorney General of New Jersey at 1–4, We Inform, Nos. 25-1555 et al. (3d Cir. Aug. 26, 2026), ECF No. 112—all filed under Order, We Inform, Nos. 25-1555 et al. (3d Cir. Aug. 12, 2026) (permitting supplemental briefs of no more than five pages after the state court's answer).

[169] See supra Part I.B; supra notes 57, 59: S. 2340, 117th Cong. § 5(e) (as introduced July 14, 2021) (a private right, with treble damages and a $10,000 floor available only for a knowing and willful violation of an order); S. 2340, 117th Cong. § 4(e) (as reported Dec. 16, 2021) (actual damages); Anderl Act § 5934(f), 136 Stat. at 3466. No version carried a fixed, mandatory award for a proved statutory violation: the introduced bill's floor was discretionary and attached to violation of an order. Damages and assignability are additions, not restorations; the legislative record draws the line.

proved, reducing the certainty of the consequence. State of mind should remain, as in New Jersey, a basis for aggravation.[170]

The covered person's affirmative election should remain the design's hinge—a judge may have sound reasons not to participate, and an election-based statute respects that choice.[171] These reforms should supplement, not displace, the Act's existing prohibition on data brokers knowingly transacting in covered information.[172] Public enforcement should remain a complement rather than a gatekeeper; the existing request apparatus should remain funded; and the program should report outcomes—removals, timely compliance, and recurrence of disclosure—in privacy-protective aggregate form.[173] The architecture the evidence supports combines notice and an opportunity to comply, a fixed, mandatory monetary consequence for a proved request-stage violation without a separate fault inquiry, and coercive relief for persistent noncompliance—supplemented by public enforcement, conditioned on private election, and measured through aggregate outcome reporting.

**D. Beyond Judges**

The lesson reaches beyond judicial-privacy laws; the gap between statutory promise and practical protection is not unique to judges. Large populations now hold statutory privacy rights that recent empirical work shows are difficult to exercise and unevenly honored: an audit of 250 registered California data brokers found forty-three percent maintaining request processes that made full exercise of statutory rights effectively impossible, and nearly two-thirds imposing at least one substantial source of friction.[174] The answer is not to transplant this statute's particulars—a damages figure and assignment clause designed for one statutory setting

---

[170] This is design theory, not an audit finding. Collection occurred while the mental-state question was contested: Atlas Data Privacy Corp. v. We Inform, LLC, 758 F. Supp. 3d 322, 341–42 (D.N.J. 2024); Atlas Data Privacy Corp. v. We Inform, LLC, No. A-8-25, slip op. at 28, 41 (N.J. Aug. 12, 2026). The audit cannot identify firms' perceived construction or isolate the mental-state rule's effect. For Kratovil, We Inform, and Jackson v. Whitepages, see supra note 106. A narrow event-based defense could address the reasonable-care-but-late case without a general fault inquiry. See We Inform, No. A-8-25, slip op. at 30–31 (describing that case). The Court also treated the mental-state provisions in subsection (c)(2) and N.J. Stat. Ann. § 2C:20-31.1(b) as deliberate. Id. at 28–29. On the Third Circuit's posture, see supra note 167.

[171] See supra Part I.C; supra text accompanying notes 157–160. Nothing here supports asserting rights for a judge who has not elected to do so.

[172] Anderl Act § 5934(d)(1)(A), 136 Stat. at 3464; see supra Part I.B. 173. The proposal contemplates aggregate, privacy-protective reporting, not judge-level disclosure. See Waldman, supra note 29, at 831.

[173] The proposal contemplates aggregate, privacy-protective reporting, not judge-level disclosure. See Waldman, supra note 29, at 831.

[174] Gueorguieva et al., supra note 74, at 7019; see also supra note 32.

will not fit every right.[175] The broader lesson is architectural: every privacy right needs a credible, measurable route from violation, through enforcement, to consequence. For a request-based right, credibility requires a path to consequences when a valid request goes unhonored; measurability requires public reporting of outcomes. Two statutes placed related removal duties on the same data broker market. One made the route from request to consequence privately traversable and publicly visible; the other reserved escalation to officials and, in the public record examined here, supplied no outcome measure. The lesson is not that every privacy law needs to be Daniel's Law. It is that a statutory promise becomes practical protection only when noncompliance carries credible consequences.

[175] See Press Release, Off. of the Att'y Gen., Cal. Dep't of Just., Attorney General Bonta Announces Settlement with Sephora as Part of Ongoing Enforcement of California Consumer Privacy Act (Aug. 24, 2022); In re Am. Honda Motor Co., Decision and Order (Cal. Priv. Prot. Agency Mar. 12, 2025). The claim is difficulty and unevenness, not absence of enforcement.

# Conclusion

Judge Salas set this audit on its course when she asked us why Daniel's Law had generated so much litigation while the Anderl Act quietly did its job.[176] Nearly two hundred suits had been filed in New Jersey; our bounded search identified not one public federal enforcement action. The lack of federal litigation had looked like success—and had we found success, it would have been worth studying to learn what in the federal law or its implementation had produced compliance. But the audit found otherwise. New Jersey's law, by providing a private right of action, liquidated damages, and assignability of claims, made consequences visible in the market; the federal law kept its results from view. In the audit, federal judges remained more exposed than the officers who had sent requests under the state law.

The federal program did make a difference: judges appeared on a smaller share of the websites on the federal vendor's published list than of the audited websites off it, a pattern consistent with federal removal activity. But every judge was found—including all thirty-four judges federal officials later reported to have been fully enrolled before the audit. Requesting officers appeared, on average, on roughly one website in seven; comparison officers, for whom Atlas recorded no removal requests, on nearly three in four; and each judicial cohort fell between them.

The requesting officers show what a functioning privacy right is supposed to make possible: lower residual exposure without requiring every protected person to litigate in their own name. They sent requests and assigned their claims; none of the requesting officers appeared as a named plaintiff in litigation. But assignment is the transition, not the destination: it permits early claims to be pursued at scale so that later requests are simply honored. Under the federal Act, a judge can invoke the right, but they cannot carry the claim forward themselves; the next step belongs to officials. A just market is not one in which every request travels with a lawsuit. It is one in which early lawsuits make compliance ordinary and future litigation uncommon. New Jersey's covered persons are pursuing that path.

If Congress desires to strengthen the federal law, it need not start from scratch. The Anderl Act already says that covered information must come down. The unfinished question is what happens when it does not. Congress should restore the private right of action in the introduced

[176] See supra notes 5–8 and accompanying text. The question was put to the authors in March 2026. See supra note 5.

bill, provide a fixed mandatory award for a proved violation, permit assignment of claims, and make liability turn on notice, time to comply, and continued disclosure. It should keep and fund the removal program, while requiring aggregate reporting on removals, timely compliance, and recurrence. The public program and the private right are not rivals. One facilitates removal; the other makes refusal consequential. These reforms fit judicial privacy, but their design principle is broader: every privacy right needs a credible path from violation to consequence.

The concrete thing Daniel's Law protects is distance—the space between a public servant and the person who means them harm. The modern-era data broker market erodes that distance, one sale, transfer, or disclosure at a time. Privacy laws recognize the resulting danger and grant individual rights. But rights do not enforce themselves, and the law is more practiced at valuing harms after they arrive than valuing the foreseeable failures that precede their arrival. Between disclosures dismissed as too insignificant to matter and tragedies too significant to repair lies the interval in which the law must act. Beyond that interval, it can only wait to assign a price for grievous loss. In 2020, New Jersey saw the cost of waiting—and chose a different path. Daniel's Law changes the point at which the law takes a loss seriously. It attaches consequences to noncompliance while protection is still possible. It refuses to let the difficulty of pricing distance make its erosion inevitable. As the evidence supplied by our audit indicates, it appears to be working.

# Appendix

**Appendix Table A-1 — Leave-One-Group-Out Deletions of the Principal Interaction**

Each row deletes one commonly controlled group (websites named in the same Daniel's Law action) and recomputes the principal judges-vs-comparison interaction on the remaining websites (point estimate; website-weighted rates; strata as published). Full-set interaction: **26.9** percentage points. All 55 deletions leave the interaction positive; range [18.9, 29.6].

| Group (hashed ID) | Websites in group | On-list | Off-list | Interaction after deletion (pp) | Change from 26.9 (pp) |
|---|---|---|---|---|---|
| 24ad4e59 | 13 | 12 | 1 | 18.9 | −7.9 |
| aee5153d | 3 | 0 | 3 | 24.8 | −2.0 |
| f6375d2c | 1 | 0 | 1 | 25.2 | −1.7 |
| f0cafc9f | 1 | 0 | 1 | 25.4 | −1.5 |
| 4897bb6f | 1 | 0 | 1 | 25.9 | −1.0 |
| 0692094f | 1 | 0 | 1 | 26.0 | −0.9 |
| 44a4080c | 1 | 0 | 1 | 26.0 | −0.9 |
| 003ac8ea | 2 | 2 | 0 | 26.0 | −0.8 |
| f6a3d893 | 2 | 0 | 2 | 26.1 | −0.8 |

| Group (hashed ID) | Websites in group | On-list | Off-list | Interaction after deletion (pp) | Change from 26.9 (pp) |
|---|---|---|---|---|---|
| 87df9891 | 1 | 1 | 0 | 26.1 | −0.7 |
| 939fa132 | 1 | 0 | 1 | 26.2 | −0.6 |
| bf5fbaca | 2 | 2 | 0 | 26.2 | −0.6 |
| e16d9465 | 1 | 1 | 0 | 26.3 | −0.6 |
| f3a3b44d | 1 | 0 | 1 | 26.3 | −0.5 |
| ed1e8802 | 3 | 3 | 0 | 26.4 | −0.5 |
| e0ab671e | 1 | 1 | 0 | 26.4 | −0.5 |
| d964c416 | 1 | 0 | 1 | 26.6 | −0.2 |
| bccfa18d | 1 | 0 | 1 | 26.6 | −0.2 |
| a211879a | 1 | 0 | 1 | 26.6 | −0.2 |
| 74505ea2 | 1 | 0 | 1 | 26.7 | −0.2 |
| 0932f768 | 1 | 0 | 1 | 26.7 | −0.2 |
| 8dbe9441 | 1 | 0 | 1 | 26.8 | −0.0 |
| 71659e4f | 1 | 1 | 0 | 26.8 | −0.0 |

| Group (hashed ID) | Websites in group | On-list | Off-list | Interaction after deletion (pp) | Change from 26.9 (pp) |
|---|---|---|---|---|---|
| 7dfbec2a | 1 | 1 | 0 | 26.8 | −0.0 |
| ab2be3a0 | 1 | 0 | 1 | 26.9 | +0.1 |
| 13c15c73 | 1 | 1 | 0 | 26.9 | +0.1 |
| 58c8310f | 1 | 1 | 0 | 27.0 | +0.1 |
| ad4069c7 | 2 | 0 | 2 | 27.0 | +0.1 |
| 01acafdf | 1 | 0 | 1 | 27.0 | +0.2 |
| 952cc68c | 1 | 1 | 0 | 27.1 | +0.2 |
| a6312288 | 1 | 0 | 1 | 27.1 | +0.2 |
| b1a634da | 1 | 0 | 1 | 27.1 | +0.3 |
| 2b9ab088 | 1 | 0 | 1 | 27.2 | +0.3 |
| 1d62e4d2 | 1 | 1 | 0 | 27.2 | +0.3 |
| 184db268 | 1 | 1 | 0 | 27.2 | +0.4 |
| 2b3aee64 | 1 | 1 | 0 | 27.2 | +0.4 |
| 96dedfaa | 1 | 0 | 1 | 27.2 | +0.4 |

| Group (hashed ID) | Websites in group | On-list | Off-list | Interaction after deletion (pp) | Change from 26.9 (pp) |
|---|---|---|---|---|---|
| 771296f3 | 1 | 0 | 1 | 27.2 | +0.4 |
| de0a1ac9 | 1 | 0 | 1 | 27.3 | +0.4 |
| c665d202 | 1 | 0 | 1 | 27.3 | +0.4 |
| 6274e989 | 1 | 1 | 0 | 27.3 | +0.5 |
| 43aaf05d | 1 | 0 | 1 | 27.4 | +0.5 |
| 936e05a6 | 1 | 1 | 0 | 27.4 | +0.5 |
| e51a3846 | 1 | 1 | 0 | 27.5 | +0.6 |
| c8636a8e | 1 | 1 | 0 | 27.5 | +0.7 |
| 656b12b1 | 1 | 0 | 1 | 27.6 | +0.7 |
| de5c575b | 1 | 0 | 1 | 27.6 | +0.7 |
| b7a5ba72 | 1 | 0 | 1 | 27.8 | +0.9 |
| dffae0ed | 5 | 5 | 0 | 27.9 | +1.1 |
| 2acc89a7 | 1 | 1 | 0 | 27.9 | +1.1 |
| b257f4ef | 3 | 3 | 0 | 27.9 | +1.1 |

| Group (hashed ID) | Websites in group | On-list | Off-list | Interaction after deletion (pp) | Change from 26.9 (pp) |
|---|---|---|---|---|---|
| 080a7690 | 1 | 1 | 0 | 28.4 | +1.6 |
| bfe297e7 | 1 | 0 | 1 | 28.6 | +1.8 |
| 3b1c8a88 | 1 | 0 | 1 | 28.9 | +2.1 |
| 53867f28 | 7 | 6 | 1 | 29.6 | +2.7 |

*Notes.* Rows sorted by post-deletion estimate. The largest single-group influence remains the 13-website group (24ad4e59): deletion lowers the interaction to 18.9, still positive. Weighting the 55 groups equally rather than websites equally gives 16.8 percentage points—a descriptive sensitivity, not a corrected or preferred estimate, because the Article's estimand weights websites equally. Computational verification: delete_one_operator_full_87f.csv, an aggregate output printed by the authors from the restricted inputs described in Part III.G.*

### Appendix Section A-2 — Cohort-1 Restricted Interaction (Post Hoc; Confirmed Reference Addresses)

**Motivation.** For most of the judicial sample, the address reference standard was constructed in part from the audited websites themselves, so reference-standard error is not independent of the outcome measure (Part III.B.2). Every cohort-1 reference address was externally confirmed: federal officials confirmed each as the judge's actual primary home address. Because cohort 1 was defined by the post-collection enrollment report and excludes other confirmed addresses for disclosure-protection reasons, this analysis tests whether the interaction persists in that confirmed subset; it does not isolate reference-standard error or estimate an enrollment effect.

**Estimand.** The principal interaction with its judicial side restricted to cohort 1 ($n = 34$): $[\bar{R}(CG2, on) - \bar{R}(J1, on)] - [\bar{R}(CG2, off) - \bar{R}(J1, off)]$, website-weighted. Point estimate: **29.9** percentage points.

**Intervals** ($B = 10{,}000$, percentile):

| Procedure | Seed | 95% bootstrap interval |
|---|---|---|
| Subject bootstrap (subjects within cohorts; 87 websites fixed) | 71 | [22.7, 36.9] |
| Two-way (subjects + websites-within-strata) | 73 | [15.4, 44.6] |
| Common-control clustered two-way (subjects + intact groups, joint draw, site-weighted) | 79 | [7.6, 50.1] |

All lower bounds are above zero.

**Labels and framing.** Post hoc; exploratory sensitivity; the confirmed-address restriction was adopted August 27, 2026, and the cohort-1 form at the September 1 geographic abstraction, both after the principal results were known. The result shows that the principal direction persists in the externally confirmed, fully enrolled cohort. It is not proof that incorporation bias did not affect the pooled result, and it does not bound the incorporation error; the mechanical component of incorporation is separately bounded in Part III.B.2 (at most one guaranteed cell per judge; interaction shift ≤ 2.7 points).

**Computational verification.** Computed by the released numbers-manifest script, run by the authors against the restricted inputs described in Part III.G, which include the enrollment classifications defining cohort 1 (point estimate via independent exact-fraction arithmetic; intervals against the pipeline authority); readers cannot reproduce the computation from the public files.

**Appendix Figure A-3 — Empirical Distribution of Exposure by Cohort**




**Figure A-3. Empirical cumulative distributions of residential-address exposure, by cohort.** Each step curve shows the share of a cohort for whom a disclosure was coded Found on no more than the specified number of the 87 audited data-broker websites; markers identify cohort medians. The requesting-officer distribution lies at the low-exposure end and the comparison-officer distribution at the high-exposure end, while the two judicial distributions fall between them and overlap substantially. The requesting- and comparison-officer ranges do not overlap: the requesting-officer maximum was 24 websites and the comparison-officer minimum was 28. Every subject had a disclosure coded Found on at least four websites. Group sizes were 24 requesting officers, 66 cohort-2 judges, 34 cohort-1 judges, and 24 comparison officers. The figure is descriptive and does not identify a causal effect.

## Appendix Section A-4 — Exploratory Covariates: Age, Gender, Residence Length, and Dwelling Type

**Purpose, status, and chronology.** Part V.A states that the available exploratory analyses did not show a reliable linear association between exposure and age or residence length in any cohort, that gender did not show a reliable gap in the judicial cohorts, that an exploratory gender interaction appeared among the officer cohorts, and that most of the difference between the judicial reporting cohorts' means is associated with dwelling type. This section publishes those analyses. Every analysis here is exploratory, post hoc, and cross-sectional; none was

pre-specified, none carries the Article's principal estimand, and none is offered as evidence of equivalence—"did not show a reliable linear association" means the data did not distinguish a linear association from zero, not that no association exists. Chronology: the officer-cohort analyses and part of the judicial analyses were run during the audit's analysis phase after the principal results were known; the remaining judicial analyses were added on September 1, 2026, also after the principal results were known; the residence-length analyses were first run on August 30, 2026, and rerun on the final matrices on September 1. The judicial results are reported by the post-collection reporting cohorts (Part III.B.1) and were computed on that partition on September 1. Cohort 2 pools judges from multiple districts, and a pooled correlation can mask or induce district-level relationships, so the judicial summaries below are post-hoc reporting-group descriptions and are not used to exclude rival explanations. The intervals are pointwise and unadjusted for multiplicity (Part III.F.2).

**Estimands and data.** Exposure is the count of the 87 audited websites on which a subject's primary home address appeared. For age, the estimand is the Pearson correlation between age and exposure within a cohort—a test of linear association only—with a Fisher-z 95% interval. Gender in this section is a classification, not self-identification: subjects were classified as women or men by the investigators from publicly available material (the method is stated below), and "women" and "men" throughout denote subjects so classified. For gender, the estimand is the difference in mean exposure, subjects classified as women minus subjects classified as men, within a cohort, with a Welch 95% interval. For the officer cohorts, the further estimand is the difference of those differences between the comparison and requesting cohorts. For residence length, the estimand is the within-cohort Spearman rank correlation between months in residence and exposure, with a bootstrap percentile interval (2,000 draws of subject pairs within the cohort; seed 20260830) read as a stability measure; the Pearson correlation with its Fisher-z interval is reported alongside for comparability with the age analyses, and no pooled estimate is reported because pooling would conflate within-cohort associations with between-cohort differences. Months in residence is the number of whole months between the most recent recorded sale or transfer of the subject's primary residence and August 30, 2026, the metadata reference date. Investigators preserved each address as submitted, normalized its street suffix, directional, unit designation, punctuation, and postal code for matching, and resolved the corresponding legal parcel or unit through the official address, parcel, deed, and assessment records of the subject's jurisdiction; publicly available property-record and real-estate listing services were used for corroboration, with the official record controlling in any conflict. The reported date is the best-supported deed, closing, or

official sale or transfer date—not a later recordation, listing, mortgage, lien, satisfaction, or financing date. Condominium units were distinguished from their parent buildings, cooperative and other non-condominium apartments were handled according to their ownership structure, and a deed for nominal consideration was retained as a genuine transfer even where an earlier paid sale was also identified, so for some subjects the measure understates continuous occupancy. The record sources consulted in each jurisdiction are preserved in the confidential research record and are not named here, because the jurisdictions they name would disclose subjects' states of residence beyond what the cohort definitions state; the transfer dates themselves are restricted-class data under Part III.G. Age and gender were recorded for every subject in every cohort (no missing values). Residence length was recorded for every subject in three of the four reporting groups; for 14 cohort-2 judges a transfer date could not be reliably determined, and those judges are excluded from the cohort-2 residence-length analysis and reported as missing below. Atlas does not collect gender from its users. In every cohort, gender was classified by the principal investigator from publicly available material about each subject, on express indicators in that material—pronouns or biographical identification—rather than on names or photographs; no subject was asked, and no second rater reviewed the classifications, so the variable is gender as publicly identified in those materials and read by one rater, not self-report, with the misclassification risk that a single reading of public material implies.

**Age—no reliable linear association in any reporting group.** Requesting officers (n = 24): r = 0.16, 95% interval [−0.26, 0.53], p = 0.47. Comparison officers (n = 24): r = −0.11 [−0.49, 0.31], p = 0.62. Cohort-2 judges (n = 66): r = −0.01 [−0.25, 0.24], p = 0.97. Cohort-1 judges (n = 34): r = −0.12 [−0.44, 0.23], p = 0.50. The intervals are wide—the cohorts are small—and remain compatible with linear associations of meaningful size; nonlinear associations were not tested.

**Gender—judicial cohorts: no reliable gap.** Women minus men, mean exposure: cohort 2 (30 women, 36 men): difference +2.7 [−3.6, 8.9], p = 0.41; cohort 1 (18 / 16): difference +0.8 [−7.2, 8.8], p = 0.85.

**Gender—officer cohorts: an exploratory interaction, reported as a lead.** Among comparison officers, women (n = 7) averaged 72.0 websites and men (n = 17) 58.9: difference +13.1 [2.5, 23.7], Welch p = 0.018, Mann-Whitney p = 0.075. Among requesting officers, women (n = 5) averaged 10.0 and men (n = 19) 13.2: difference −3.2 [−7.0, 0.6], Welch p =

0.093. The requesting-versus-comparison gap was therefore 16.3 websites larger for women than for men (difference of differences); a bootstrap that resampled subjects within each cohort with their gender labels (B = 10,000; seed 89) gave [6.4, 26.3], and a permutation test that shuffled gender labels within each cohort (B = 20,000; seed 7) gave p = 0.020. Expressed descriptively, requesting officers' mean exposure was 86% lower than comparison officers' among women and 78% lower among men. These are cross-cohort relative differences, not estimated reductions caused by requesting or enforcement. This is not an independent finding of the Article. The female cells hold five and seven people; gender was not a selection criterion; the two cohorts were audited in different windows (Part III.E); and the design cannot separate gender from any covariate that travels with it, including source-data differences in how brokers hold women's and men's records. The Article reports it so that the pattern is on the record for replication, and draws no conclusion from it.

**Residence length—no reliable rank-based or linear association in any cohort.** Spearman correlation between months in residence and exposure, with the bootstrap interval, and the Pearson correlation with its Fisher-z interval: requesting officers (n = 24; median 12.2 years): ρ = −0.17 [−0.54, 0.26]; r = −0.18 [−0.55, 0.24], p = 0.39. Comparison officers (n = 24; median 14.3 years): ρ = −0.07 [−0.50, 0.35]; r = −0.07 [−0.46, 0.34], p = 0.74. Cohort-2 judges (n = 52 of 66; median 10.3 years): ρ = 0.15 [−0.11, 0.40]; r = 0.08 [−0.20, 0.34], p = 0.59. Cohort-1 judges (n = 34; median 17.8 years): ρ = 0.04 [−0.33, 0.38]; r = 0.12 [−0.23, 0.44], p = 0.52. Every interval spans zero. The cohort-2 estimate describes the fifty-two judges with a recorded date, not the full cohort. As with age, the cohorts are small, and the intervals remain compatible with associations of meaningful size; the measure can understate occupancy where a nominal-consideration transfer intervened, and the analysis cannot speak to exposure in the first months after a move.

**Dwelling type — most of the cohort difference is associated with dwelling stock.** Dwelling type varies only among the judges: every officer owned a single-family home (a selection criterion, Part III.B.1), and every cohort-1 reference address was a house. Within cohort 2, thirty-three reference addresses were houses and thirty-three were apartments, condominiums, or other multi-unit residences. Mean exposure was 39.8 websites for cohort-2 judges with house addresses (median 39.0), 28.5 for cohort-2 judges with multi-unit addresses (median 29.0), and 41.2 for cohort 1 (median 40.5). The house-minus-multi-unit difference within cohort 2 was 11.2 websites (Welch 95% interval [5.3, 17.2]); cohort 1's mean exceeded the cohort-2 house-address mean by 1.5 ([−4.3, 7.2]). The comparison is post hoc, observational,

and unadjusted; dwelling type was not a selection criterion for the judges, and cohort 2 pools multiple districts whose dwelling composition differs, so the partition is a description of the reporting group, not a within-district comparison. The gap conflates two mechanisms these data cannot separate: data brokers may hold and display less unit-level address information for multi-unit residents, and the capture protocol's unit rule coded a building-level listing that did not disclose the subject's unit as not found (Part III.B.2). On either mechanism, the difference concerns measured exposure at the audited websites, not the underlying availability of the building address.

**Computational verification.** Every value above is printed by the released numbers-manifest script (§ 5), run by the authors against the restricted inputs described in Part III.G—the analysis matrices, the cohort metadata, and the residence-length metadata file (whose length-of-time field the script verifies, on every numeric row, as the whole months between the recorded transfer date and August 30, 2026), and the derived claims verify TRUE in its claim registry (§ 6) (age: no reliable linear association in any reporting group; no reliable judicial gender gap; the officer-cohort interaction 16.3 with permutation p = 0.020; its bootstrap interval [6.4, 26.3] and the absence of missing age or gender values; residence length: no reliable association in any reporting group, the officer-cohort reproduction of the August 30 intervals, and the missingness count). The restricted inputs include the enrollment classifications defining the reporting cohorts. Readers cannot reproduce these analyses from the public files. The unit rule's incidence was not compiled from the capture records, so its effect is disclosed as a direction without a magnitude (Part III.B.2).